IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>Klausner Lumber Two LLC,<br><br>　　　　　　Debtor.[1] | Chapter 11<br><br>Case No. 20-11518-KBO |

**DECLARATION OF ROBERT PRUSAK IN SUPPORT
OF DEBTOR'S BANKRUPTCY FILING**

I, Robert Prusak, being duly sworn, declare under penalty of perjury as follows:

1. I am the appointed Chief Restructuring Officer ("CRO") of Klausner Lumber Two LLC ("KL2" or the "Debtor") in this Chapter 11 case (the "Bankruptcy Case"). I am a managing director with Asgaard Capital, LLC ("Asgaard"). It is my understanding that the Debtor will soon file a motion for entry of an order authorizing the Debtor to retain and employ Asgaard, including my appointment as CRO, to assist the Debtor in the management of its affairs, its sale, and any subsequent wind-down actions, whether pursuant to a plan or otherwise.

2. I am over the age of 18 and am authorized to submit this Declaration. If called as witness, I could and would competently testify to the facts set forth in this Declaration.

3. As part of my employment and services for KL2, I am generally familiar with some of the Debtor's prior history, and am familiar with its recent history, and the status of its assets, financial affairs, and operations. That said, due to my and Asgaard's recent retention and the rather unique circumstances preceding this case as described below, some of this Declaration is based only on documents I have reviewed, documents reviewed by KL2's counsel and other

---

[1] The last four digits of the Debtor's EIN is 4897. The Debtor's mailing address is 260 Piper Lane, Enfield, NC 27823.

1

professionals (also all newly appointed), plant visits by me and other Asgaard personnel, and discussions with former employees, creditors, and other interested parties, knowledge I have gained as part of Asgaard's work for a sister entity named Klausner Lumber One LLC ("KL1"), which has also filed its own Chapter 11 petition in this Court,[2] and various conversations among Asgaard and the principals of KL2 and certain of its other affiliates (and such parties' German counsel).

## Introduction

4. On June 10, 2020 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

5. The purposes of this Bankruptcy Case are as follows:

(a) to protect, via the automatic stay, a new, modern-style large lumber mill in Enfield, North Carolina, that was recently (and abruptly) shuttered in an uncontrolled manner before it could become operational;

(b) to arrange for the retention of a new group of independent professionals and an independent director to preserve the Debtor's assets, and restructure the Debtor by building consensus through trust, a lack of connection to any prior parties or their actions, open communications, and fair dealing with all parties;

(c) to bring renewed employment to a part of rural North Carolina; and

(d) to systematically address the debt owed to creditors in the manner prescribed by the Bankruptcy Code.

---

[2] *See In re Klausner Lumber One LLC*, Case No. 20-11033 (KBO), Bankr. D. Del., filed on April 30, 2020.

**Background of the Debtor**

6.     This is an unusual case; it has a similar history to that set forth for KL1 in its initial pleadings, but the Debtor here has its own separate issues, as well.  The Debtor was formed several years ago, along with KL1 to build two state-of-the-art sawmills: KL1 in north-central Florida, an area known for its abundant timber and agricultural resources, and the Debtor, KL2 in eastern North Carolina, which had similar natural advantages for a large, modern timber mill.  As noted above, KL1 filed its own Chapter 11 bankruptcy proceeding on April 30, 2020, in this Court, Case No. 20-11033, and KL1's case remains pending with a sale process ongoing.

7.     KL1 and KL2 were to be the new, United States operations of Austria's Klausner family of companies.  Prior to the Great Recession, such companies were collectively the sixth largest sawmill operation in the world.  I am told that several years ago, the Klausner companies decided to expand into the United States via the formation and construction of KL1 and KL2, as well as miscellaneous affiliates to support such US operations.

8.     KL1 and KL2 were to be the first new sawmills built in the United States for some time.  Using European technology that would result in efficiencies of operations and production, and far greater utilization / less wastage of raw materials, the operations would, if successful, have a competitive advantage over traditional East Coast lumber mills.  In addition, KL1 and KL2 are located in rural, timber-rich areas, surfeit with local raw materials, and a populace that would greatly benefit from new, large employers in the region.

9.     In light of this, over $166 million was invested in KL2 to build it from the ground up and to attempt to make it operational.  Such funds were raised through shareholder and related-party loans and capital, and an indirect investment – which may be as much as $75 million, although I am still confirming such figures – by "EB-5" investors in KL2's secured lender, an

entity named Carolina Sawmills L.P. ("Carolina Sawmills"). Carolina Sawmills is an affiliate of KL2.[3] In addition, I understand that local municipal agencies, primarily the county government of Halifax County (the "County"), which is the county where the Debtor's operations were built, provided over $7.7 million dollars in direct and indirect grants, support, and infrastructure (purchase and contribution of land, building out roads, water, sewers, etc.). Such governmental support helped KL2's attempts to build a state-of-the-art sawmill and was provided with the hopes and expectations that KL2 would generate a substantial number of jobs in an area that historically did not have large local employers. The expectation was that, in time, KL2 would have an annual capacity to produce 250 million board feet of lumber and employ approximately 350 local workers.

10. Construction of the KL2 sawmill began in Enfield, North Carolina, in 2014. I am informed that several setbacks and delays occurred during construction over the next several years, and it never became fully operational, all of which caused a drain on liquidity.

11. I am told that senior management, all European individuals experienced in sawmill operations and financial aspects of KL2, spent 2019 and then started 2020 considering, in conjunction with similar efforts for KL1, various liquidity and capital raising options, all of which were challenging. In addition, by 2020 (or perhaps earlier), KL2's foreign related parties appeared to be having financial issues of their own. That recently culminated in bankruptcy proceedings being filed by two related parties of KL2 on April 15, 2020, Klausner Nordamerika Beteiligungs GmbH and Klausner Trading International GmbH,[4] in Austria's Innsbruck Regional Court. It has

---

[3] The General Partner of Carolina Sawmills is Carolina Entrepreneur LLC. The Managing Member of Carolina Entrepreneur LLC is Klausner Consulting USA, Inc. Leopold Stephen is the President of Klausner Consulting USA, Inc. Mr. Stephen is also the President of KL2. I understand that a substantial amount was invested in KL1, through a similar structure of insider and affiliate loans and capital, and EB-5 investors in KL1's lender, which is Florida Sawmills, L.P.

[4] Klausner Trading International GmbH is listed on KL2's list of **twenty-nine** largest unsecured creditors (4 more than the required amount), showed as being owed $924,718.75 on an unsecured basis. The list also indicates that KL2 owes $1,225,171.35 to Klausner Holz Thuringen GmBH and $108,720.00 to Klausner Holz Sachen GmBH.

been reported in the media that Dr. Stefan Geiler was appointed as administrator for both of these Austrian companies, but neither I, Asgaard, nor any of KL2's professionals have been contacted by or had any dealings with Dr. Geiler. (Importantly, KL2 was still able to obtain all proper corporate authority for this Chapter 11 bankruptcy proceeding.)

12. As noted above, the KL2 sawmill is located in Enfield, Halifax County, North Carolina. Pursuant to an Economic Development Agreement ("EDA") executed by the County and KL2 on or about November 1, 2012, the County conveyed approximately 430 acres of land that the County acquired for the sawmill site to KL2 by a deed filed on January 6, 2014. However, the County reserved or retained a future interest in the Original Property known as a "right of entry or power of termination," which could be exercised by the County if KL2 failed to complete construction and commence operation of its sawmill facility within twenty-four months from the date of recording of the deed.

13. After the construction process started, on March 26, 2015, a Deed of Trust (effective as of November 14, 2014) was filed to secure a KL2 debt obligation to Carolina Sawmills in the principal amount of $75 million; this is the "EB-5" financing referred to above.

14. Since entering into the EDA, the County has asserted that it spent $7,757,621.91 on the project site, including the funding for the acquisition of the real property, improvements in public roads, water, storm water and wastewater systems, and construction of a rail spur. Over the years, as KL2 was unable to fulfill its obligations under the EDA by becoming operational and hiring the requisite number of employees, I am told that KL2 and the County entered into a various forbearance negotiations and discussions, the result of which was to give KL2 more time to fulfill

---

There are other European entities on the list. Asgaard and KL2's counsel will attempt to determine if any of those entities are affiliated with the Klausner group of companies.

its obligations. KL2 never was able to fulfill its obligations, and in late 2019, the County made formal demand for repayment of the "Economic Incentive Amount" in the EDA, which was approximately $7,750,0000 as noted above. That demand letter also notified KL2 of the County's intent to exercise its right of reverter on KL2's land.

15.    By early 2020, KL2's and its related parties' fiscal distress had left KL2 on very unsound financial footing.

16.    In March of 2020, the impact of COVID-19 on KL2 and the national pandemic that followed fully manifested itself. This rapid escalation of COVID-19's spread, and concerns about COVID-19's consequences, appeared to eliminate any plans for a controlled liquidation or bankruptcy, either for KL2 or KL1. I am told that the KL2 management team and certain skilled employees were concerned about COVID-19 and that they would become stranded in the United States due to travel restrictions. In addition, they would have no ability to complete construction of KL2 remotely. The liquidity problems at KL2 were acute, and neither KL1 nor KL2's foreign related parties – long the source of financial support for KL2 – were unable to provide any further funds, whatsoever.

17.    All of these financial and medical hurdles came to a head in March of 2020. The sawmill was shut down on March 16, 2020 (this also took place with respect to KL1, as set forth in the papers filed in that bankruptcy case). On that date, KL2 dismissed all employees and left the facility unattended, while it was still in the "commissioning" phase. Thus, the KL2 sawmill never became operational.

18.    At the same time, facing return restrictions announced by various European governments, KL2's entire management team and various employees returned to Europe, in order

to avoid the potentially dangerous health situation in the US, with the attendant potential long-term travel restrictions.

19. Having no ability to operate, no financing, and no liquidity, KL2's operations were shuttered immediately. There was no controlled shut down process. Employees were informed (or learned) that they should no longer come to work; it has been alleged they did not receive their final paychecks.[5] Insurance lapsed shortly thereafter. There were no private security personnel for this expensive, valuable plant. KL2's corporate counsel, having no decisionmaker left at the local helm, stated that it had received no responses to multiple entreaties to management, and was owed substantial amounts and provided written notice that it would disengage from all matters.

20. On April 13, 2020, the County filed an action in North Carolina state court, seeking, among other things, a declaratory judgment to terminate its agreement with KL2 and to recover the funds it had expended for land acquisition and necessary improvements. It also exercised its right of entry and power of termination by recording same in Book 2615, Page 750 of the Halifax Public Registry, effectively making KL2 no longer the owner of the land where its sawmill resides. A few weeks later, the County also undertook to insure the property, cover the utilities, and provide security at the property.

---

[5] On March 31, 2020, various KL1 and KL2 employees (the "WARN plaintiffs") filed a class action lawsuit in the United States District Court for the Middle District of Florida (the "Florida District Court") against KL1, KL2 and other defendants, alleging violations of the Worker Adjustment Notification and Retraining Notification Act and related statutes. On May 29, 2020, after having been informed that KL1 had filed a bankruptcy petition, the Florida District Court issued an order staying the action against all defendants, including KL2, through August 31, 2020. I do not believe any of the defendants had filed an answer in that action prior to the stay being issued. On May 18, 2020, the same WARN plaintiffs commenced an adversary proceeding in the KL1 bankruptcy case asserting the same claims against the same parties named in the Florida WARN action, including against KL2. It is my understanding that the two WARN actions are duplicative of each other. In any event, the summons in the in the WARN adversary proceeding was only recently issued and I understand counsel to the WARN plaintiffs and counsel for KL1 and KL2 have already spoken about coordinating matters in the two proceedings.

21. The County's position appeared to make any restructuring or sale of KL2 impossible. While the County's actions may be challenged as a voidable preference, such litigation would take substantial time, during which no sale process could effectively be run. Nor would there be any available funding for such litigation, as KL2 could not obtain post-petition financing when it has no right to access its plant.

**Asgaard, Cypress, and the other KL2 Professionals Become Involved**

22. Shortly after KL2's shutdown, Asgaard and the law firm of Westerman Ball Ederer Miller Zucker & Sharfstein, LLP – both complete strangers to this situation at the beginning of March, 2020 – were put in contact with KL1's and KL2's senior managers in Europe. Asgaard realized the opportunity for creditors here, and the terrible risk to creditor recoveries if this dire path continued.

23. As with KL1, Asgaard assembled a proposed team including new counsel for KL2, and a new investment banker to KL2, for KL2 to consider. Independence and adherence to proper corporate governance are paramount. In order for any bankruptcy process to succeed, creditors and parties in interest must feel they are dealing with "honest brokers," empowered by Bankruptcy Court orders, on notice to all, and following traditional corporate law (including the new independent director) to reorganize this very substantial asset, for the benefit of all constituents, including creditors.

24. Importantly, I and KL2's other new professionals recognized not only the need for independence of KL2 from its non-debtor affiliates, but also independence of KL2 from KL1 to the extent they have conflicting issues. For that reason, an independent director of KL2 has been identified, who is different from (and wholly unaffiliated with) the independent director of KL1. In addition, to deal with any inter-estate issues, the independent directors of KL1 and KL2 are

empowered to have their respective Debtor hire conflicts counsel and other professionals as needed. I understand that the independent directors will hire such counsel, and I assume that there will be a KL2 creditors' committee which is different than the duly-appointed creditors' committee of KL1. While I do not think the issues among KL1 and KL2 are out of the ordinary (for instance, every corporate family typically features intercompany claims), I wish to disclose that I, the CRO to KL1 (Michael Freeman, also with Asgaard), and counsel to KL1 and KL2 have identified the following so far:

(a) As of December 31, 2019 (the last financials available), KL2 is shown as owing KL1 some $10.4 million, on an unsecured basis. I understand this amount may be higher as apparently KL1 was using its funds to cover the payroll of KL2 leading up to their collective shutdown. The independent directors of KL1 and KL2 will have to address this, assisted by the creditors' committees of the two entities, and by the conflict's counsel retained through the independent directors once they hire such.

(b) Certain of the leased rolling stock has been shared among KL1 and KL2. As with the above, issues of ownership, claims, and the like will have to be worked out among the estates, by independent parties.

25. The identification of these inter-estate issues, among other efforts toward getting KL2 in a position to be sold for the benefit of its creditors, demonstrates the amount of pre-petition work done by Asgaard and KL2's new professionals. Over the course of April and May, before being formally retained, Asgaard and the proposed KL2 professionals invested hundreds of uncompensated hours and related expenses learning about the assets, KL2's operations, its history, the various litigation, its creditors, secured status of numerous parties, and the like. I and other Asgaard professionals visited KL2, met with former employees, familiarized ourselves with the

operations, and identified further challenges and potential solutions. Specifically, Asgaard was formally engaged as of May 15 (and I became the CRO on that day as well). Since that time, Asgaard has been paid $50,000 in fees, an expense reimbursement of approximately $17,000, as well as $47,625 in commissions related to certain equipment sales which Asgaard arranged, allowing KL2 to file bankruptcy with a modest amount of unencumbered funds. Asgaard did not and will not, bill for any other time or expense which it incurred before being formally retained, or since being retained through the Petition Date. This has resulted in a write off of all time and expenses accrued after May 15, 2020 of $123,233.10, so there will be no payments made to Asgaard for any pre-petition work (including amounts incurred prior to its retention on May 15, 2020) and Asgaard will not be seeking anything further from the Debtor for any of its pre-petition work. Among Asgaard and the other new KL2 professionals, it is my understanding that approximately $500,000 has been incurred and written off to get KL2 to this point.

### Recent Key Events Leading to this Filing as a Chapter 11

26. Over the last several weeks, KL2 and its new professionals have negotiated a settlement with the County (which KL2 intends to finalize and seek Court approval of very soon). Under this settlement, the County will be repaid the amounts it is owed under the EDA upon the closing of a sale of KL2, and in return will convey, in fee, all rights to the land to a buyer. In addition, as will be set forth in the settlement agreement, the County will subordinate its interests in the former KL2 land to a post-petition lender, allowing KL2 to obtain post-petition financing. Although, at first, we thought that these issues might be part of an adversary proceeding before this Court, which would take substantial time and funds (none of which KL2 has, or can obtain in any material amount other than through post-petition financing through consensual subordination of the County's interests). Instead, this comprehensive settlement (which the Debtor intends to

finalize and seek Court approval of very soon) allows a path forward to a sale or reorganization in this case. In addition, pending approval and funding of the Debtor's post-petition financing, the County will continue to cover certain utilities,[6] insurance, and security expenses for the subject property and plant, post-petition (which will be reimbursed under the settlement).

27. The arrangements with the County are beneficial, since in between the time from when the Debtor shuttered the property and the County began to provide security, the plant was broken into twice and a number of hand tools appear to have been stolen. The agreement with the County to continue to provide security, as well as power and insurance until the anticipated settlement motion is approved by this Court and funding from a DIP lender is obtained, approved and funded, further benefits the Debtor's estate while the parties work towards an amicable resolution of their disputes.

28. KL2 enters this post-petition phase with approximately $217,000.00 in unencumbered cash on hand,[7] the results of the sale described immediately below. These funds will be used to finance required operational expenses for the early days of the case. DIP financing will need to be put in place to fund the rest of the Bankruptcy Case, but such financing will be contingent on reaching a final deal with the County in which it will subordinate its interests (as noted above, this is expected to be finalized in the coming days). A number of parties have expressed an interest in providing DIP financing. In addition, in order to generate funds pre-petition to file this case, Asgaard contacted over thirty potential purchasers of certain unencumbered equipment owned by KL2, and obtained competitive bids. As a result, KL2 sold

---

[6] Because the County will continue to pay for utilities for a period of time, the Debtor is not initially filing a motion to obtain relief under Section 366 of the Bankruptcy Code.

[7] It is my understanding that the cash on hand is not subject to the lien of any creditor, as it is the proceeds of unencumbered collateral, there was no active UCC on "all assets" of the Debtor, and it was deposited into a new KL2 account as to which there is no deposit account control agreement.

some individual pieces of equipment prior to the Petition Date. I note that one piece of equipment was sold, pre-petition, to Capital Recovery Group, LLC. The DIP Lenders to KL1 are Big Shoulders Capital VI, LLC and CRG Acquisition, LLC. Capital Recovery Group, LLC is affiliated with CRG Acquisition, LLC, and I have dealt with the same principal for Capital Recovery Group as KL1 dealt with in its post-petition financing from CRG. The equipment sale proceeds were used to pay some pre-petition fees and expenses, including the amounts set forth above for Asgaard (the balance being written off), a $10,000 retainer for Donlin Recano (KL2's proposed claims agent), a $10,000 retainer to new Delaware counsel to Carolina Sawmills, as pre-petition lender, $29,500 paid to Hilco for an appraisal of the property, plant and equipment to support the KL2 post-petition financing process, and $1,717 to the Morris Nichols law firm for the Chapter 11 filing fee of KL2. The balance will be used as the initial funding of the estate until DIP financing can be obtained.

29. Based on my discussions with counsel, given the status of the Chapter 11 case as of the Petition Date, the Debtor does not have the need for the typical "first day" motions. The Debtor was shuttered pre-petition and was not operational, the cash on hand is not subject to any liens, the utilities are being paid for by the County, and the Debtor will not be seeking DIP financing approval until the terms of such financing are negotiated and agreed to. The Debtor estimates that it has sufficient funds to cover expenses for approximately 60 days. In fact, the only "first day" motion that the Debtor has at this time is the application to retain Donlin Recano, which will be filed shortly after the case is commenced. Of course, if this changes, the Debtor will proceed accordingly, and I will supplement this Declaration as necessary.

**Conclusion**

30. As indicated above, this is an unusual case. Very large investments and extensions of credit were made over the years – by unsecured creditors, related parties, an affiliated lender (and EB-5 investors in such lender), government agencies, and many others – to get to a functioning, modern business, which I believe has substantial value in the marketplace. Further investments of unpaid time, toil, expense, and stress were made by Asgaard and the dedicated new professionals of KL2. As a result, despite this period of rudderless operations, no backstop for creditors through insurance, no pre-existing unaffiliated secured lender (such as a traditional bank) that could step in to protect its collateral, or any safety net whatsoever, I believe we have the keys to a process that will preserve value through this Chapter 11 case, continue the process to make the plant operational in an area of the country that needs it, and provide a return to creditors and other constituencies consistent with the intent and specific provisions of the Bankruptcy Code.

*[Remainder of this page intentionally blank.]*

Dated: June 12, 2020

                                               _____
                                               Robert Prusak
                                               KL2 Chief Restructuring Officer
                                               Asgaard Capital

02203830.DOCX