## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re | Chapter 11 |
| KLAUSNER LUMBER TWO LLC, | Case No. 20-11518 (KBO) |
| Debtor.[1] | **Proposed Hearing Date:** **August 31, 2020, at 10:00 a.m. (ET)** |
|  | **Proposed Objection Deadline:** **August 27, 2020, at 4:00 p.m. (ET)** |

**MOTION OF THE DEBTOR FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTOR TO OBTAIN POST-PETITION FINANCING, GRANTING SENIOR POST-PETITION SECURITY INTERESTS AND ACCORDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS PURSUANT TO SECTIONS 364(c) AND 364(d) OF THE BANKRUPTCY CODE, (II) AUTHORIZING THE USE OF CASH COLLATERAL, (III) MODIFYING THE AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF**

Klausner Lumber Two LLC (the "Debtor"), through its proposed counsel, hereby moves pursuant to sections 105, 361, 362, 363, 364(c)(1) and 364(c)(2) of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), Rules 2002, 4001(c), and 9014 of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules") and rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "DIP Order") (i) authorizing the Debtor to obtain post-petition financing, granting superprioirty administrative expense status pursuant to sections 364(c) and 364(d) of the Bankruptcy Code, (ii) authorizing the use of cash collateral, (iii) modifying the automatic stay, and (iv) granting related relief. In support of this Motion, the Debtor relies on the *Declaration of Robert*

---

[1] The last four digits of the Debtor's EIN is 4897.  The Debtor's mailing address is P.O. Box C, Redding Ridge CT, 06876.

*Prusak in Support of the Motion of the Debtor for Entry of an Order (I) Authorizing the Debtor to Obtain Post-Petition Financing, Granting Senior Post-Petition Security Interest and According Superpriority Administrative Expense Status Pursuant to Sections 364(c) and 364(d) of the Bankruptcy Code, (II) Authorizing the Use of Cash Collateral, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* (the "Prusak Declaration") attached hereto as **Exhibit B**, and the *Declaration of J.T. Atkins in Support of the Motion of the Debtor for Entry of an Order (I) Authorizing the Debtor to Obtain Post-Petition Financing, Granting Senior Post-Petition Security Interest and According Superpriority Administrative Expense Status Pursuant to Sections 364(c) and 364(d) of the Bankruptcy Code, (II) Authorizing the Use of Cash Collateral, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* (the "Atkins Declaration") attached hereto as **Exhibit C**, and states as follows:

## JURISDICTION AND VENUE

1.    This Court has jurisdiction over this motion pursuant to 28 U.S.C. sections 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. section 157(b)(2). Venue is proper in this district pursuant to 28 U.S.C. sections 1408 and 1409.

2.    The statutory predicates for relief sought herein are sections 105(a), 361, 362, 363, and 364 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001(c), and 9014, and Local Rule 4001-2. The Debtor confirms its consent, pursuant to Rule 7008 of the Bankruptcy Rules and Rule 9013-1(f) of the Local Rules, to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

**RELIEF REQUESTED**

3.    Through this Motion, the Debtor requests that the Court enter the DIP Order, seeking the following relief:

    a.   authorizing the Debtor to obtain post-petition financing, consisting of a senior secured superpriority term loan (the "<u>DIP Credit Facility</u>") in an aggregate maximum amount of $3,500,000.00 plus any accrued capitalized interest and fees (the "<u>Total DIP Principal Amount</u>"), from Legalist, Inc., on behalf of those funds and/or accounts managed and/or advised by Legalist (as lender, agent, and collateral agent, the "<u>DIP Lender</u>"), as evidenced by that certain Senior Secured Term Loan Note, executed by the Debtor as borrower in favor of DIP Lender, a copy of which is attached to the DIP Order as **Exhibit A** (the "<u>DIP Note</u>");[2]

    b.   authorizing the Debtor to use the proceeds of the DIP Credit Facility, as permitted in the DIP Note and in the DIP Order (collectively, the "<u>DIP Loan Documents</u>"), and as specifically detailed in the budget attached to the DIP Order as **Exhibit B** (as may be modified, the "<u>Approved Budget</u>");

    c.   authorizing the Debtor to grant to the DIP Lender (a) superpriority administrative claim status pursuant to sections 364(c)(1) and 507(b) of the Bankruptcy Code, and (b) valid, enforceable, non-avoidable, automatically and fully perfected DIP Credit Liens (as defined in the DIP Order) in all DIP

---

[2] Capitalized terms used herein but not otherwise defined have the meanings ascribed to them in the DIP Order or DIP Note, as applicable.

Collateral (as defined hereafter), including, without limitation, any Cash Collateral (as that term is defined in section 363(a) of the Bankruptcy Code), to secure DIP Lender Expenses (as defined in the DIP Order), together with all principal of, and interest and fees on the DIP Credit Facility and any other amount owed by Debtor under the DIP Loan Documents (collectively, the "<u>DIP Obligations</u>"),which DIP Credit Liens shall be subject to the relative rankings and priorities set forth in the DIP Order;

d. authorizing the Debtor's use of the proceeds of the DIP Credit Facility, including Cash Collateral, whenever or wherever acquired in accordance with the terms set forth herein (expressly including the Approved Budget);

e. waiving the Debtor's ability to surcharge pursuant to section 506(c) of the Bankruptcy Code against any DIP Collateral;

f. vacating and/or modifying the automatic stay, pursuant to section 362 of the Bankruptcy Code, to the extent necessary to (a) consummate the transactions contemplated by the DIP Loan Documents and (b) permit the DIP Lender to exercise any right or remedy provided therein;

g. approving all Cash-Management Requirements (as defined in the DIP Order) and the Debtor's entry into the cash-management arrangements and DIP Blocked Account (as defined in the DIP Order) control agreements contemplated thereby;

h. waiving the fourteen (14) day stay provisions of Bankruptcy Rules 4001(a)(3) and 6004(h);

    i.   authorizing the Debtor to execute and enter into, and to perform all acts necessary or desirable to consummate the transactions contemplated by, the DIP Note and the other DIP Loan Documents; and

    j.   granting the Debtor such other and further relief as is just and proper.

## BACKGROUND

4.   On June 10, 2020 (the "Petition Date"), the Debtor commenced a voluntary case under chapter 11 of the Bankruptcy Code (this "Case") in the Bankruptcy Court for the District of Delaware (this "Court"). No Trustee or examiner has been appointed in this Case. The Debtor is operating its business as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

5.   On June 25, 2020, the United States Trustee for the District of Delaware (the "US Trustee") appointed the official committee of unsecured creditors (the "Committee").

6.   The Debtor is the owner of a state-of-the-art timber sawmill located in Halifax County, North Carolina.

7.   Additional details regarding the Debtor, its business, and the facts and circumstances leading up to the Petition Date are set forth in the *Declaration of Robert Prusak in Support of Debtor's Bankruptcy Filing* [Docket No. 6].

## DEBTOR'S PREPETITION FINANCING AND CONSENT AND SUBORDINATION AGREEMENTS

8.   As of the Petition Date, the Debtor was party to a certain Construction Loan Agreement dated as of March 14, 2020 by and between the Debtor and Carolina Sawmills, L.P. (the "Prepetition Lender") as well as certain other agreements, modifications, documents, and instruments executed, delivered, and/or filed in connection with the foregoing (collectively, and

as the same has been amended, modified, restated or supplemented from time to time, the "Prepetition Loan Documents"). Pursuant to the Prepetition Loan Documents, the Debtor was indebted to the Prepetition Lender in the approximate principal amount of $75,000,000, plus prepetition interest, fees, expenses, and other amounts arising in respect of the Prepetition Loan Documents (such obligations, the "Prepetition Obligations").

9.    Prior to the Petition Date, the Prepetition Lender allowed its UCC-1 financing statement to lapse and the Prepetition Lender no longer retains an interest in any DIP Collateral. However, to the extent the Prepetition Lender is deemed to retain any interest in any DIP Collateral, the Prepetition Lender has consented to the Debtor's use of such property pursuant to that certain Consent and Subordination Agreement (the "Consent and Subordination") whereby the Prepetition Lender agreed to subordinate any prepetition liens and any right to payment and recovery thereon to the DIP Lender and the DIP Credit Facility.  *See* Consent and Subordination Agreement, ¶ 1 ("The Lenders hereby fully subordinate their right to payment of their claims or debt (whether principal, interest, or other costs or charges, and whether pursuant to the Specified Loan Agreements (as defined below) or otherwise), or any other recovery on their claims against the Company, its assets, and the proceeds thereof, to the payment, in full and in cash, of the DIP Loan Obligations."). A true and complete copy of the Consent and Subordination is attached to the DIP Order as **Exhibit D.**

## BASIS FOR RELIEF AND NEED FOR FINANCING

10. As more fully set forth in the Prusak Declaration and the Atkins Declaration, the Debtor has a critical need to obtain post-petition financing in order to pursue its efforts to maximize value of its estate in this Case. Specifically, due to liquidity constraints, if the Debtor does not

receive the proceeds of the DIP Credit Facility, it will be unable to maintain the Debtor's assets, fund professional expenses and other administrative expenses while pursuing a going-concern sale of its assets, and generally address its immediate need for liquidity.

11. Prior to the Petition Date, the Debtor, with the help of its advisors, pursued various financing alternatives. The Debtor was unable to locate any new capital source that was willing to provide financing in the form of unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code, as an administrative expense under 364(a) or (b) of the Bankruptcy Code, or in exchange for the grant of an administrative expense priority claim pursuant to section 364(a)(1) of the Bankruptcy Code, without the grant of liens on assets.

12. The DIP Lender, however, has indicated a willingness to provide the Debtor with certain financing, but only in compliance with the terms and conditions set forth in the DIP Note and other DIP Loan Documents, including the DIP Order. These funds will allow the Debtor to pursue a going-concern sale of substantially all of its assets which will maximize the value of the Debtor's estate. The DIP Credit Facility will also be used to cover the costs of administration of this Case and to pay for such other costs expressly agreed to by the DIP Lender in accordance with the Approved Budget.   Critically, the milestones required by the DIP Lender are sufficient for the Debtor to complete its sale process, and the DIP Lender is not seeking to non-consensually prime any party.

13. The Debtor has negotiated the DIP Credit Facility in good faith with the DIP Lender and has not been able to obtain alternative funding on terms that are more favorable than offered by the DIP Lender. The Debtor thus believes that the terms of the DIP Credit Facility are fair and reasonable, reflect the Debtor's exercise of its sound business judgment, and are supported by reasonably equivalent value and fair consideration.

## CONCISE STATEMENT PURSUANT TO BANKRUPTCY RULE 4001(c)(1)(B) AND LOCAL RULE 4001-2

14. In accordance with Bankruptcy Rule 4001(c)(1)(B) and Local Rule 4001-2, below is a summary of the terms of the proposed DIP Credit Facility: [3]

| | |
|---|---|
| **Borrower:** | Klausner Lumber Two, LLC |
| **DIP Lender:** | Legalist, Inc. (or its designees) |
| **DIP Credit Facility:** | Secured debtor-in-possession term credit facility in the maximum principal amount of $3,500,000. |
| **Closing Date:** | The date on which the funding of the DIP Credit Facility occurs. |
| **Maturity:** | The earliest to occur of: (a) 550 days after entry of the DIP Order; (b) if (x) the Debtor has filed a bid procedures motion for the sale of substantially all of its assets (the "Bid Procedures Motion") and (y) the Bankruptcy Court has entered an order approving the Bid Procedures Motion on or before 5 business days following an Event of Default, 90 days after an Event of Default has occurred, if any; and (c) if (u) the Debtor has not filed a Bid Procedures Motion or (v) the Bankruptcy Court has not entered an order approving the Bid Procedures Motion on or before 5 business days following an Event of Default, the acceleration of the DIP Credit Facility after an Event of Default has occurred, if any. |
| **Availability:** | The DIP Lender agrees to provide the Debtor with a term loan in the principal amount of up to $3,500,000. The aggregate principal amount outstanding pursuant to the DIP Note shall not exceed $3,500,000.00, plus any accrued capitalized interest and fees (including fees and expenses of the DIP Lender, underwriting fees, and commitment fees), subject to any limitation of credit extensions under the DIP Note and the DIP Order (the "Maximum Amount"). Amounts under the DIP Note may be borrowed and repaid, but may not be reborrowed. |
| **Interest Rate:** | The DIP Credit Facility will bear interest at a rate per annum equal to the sum of (a) ten and three quarters percent (10.75%) and (b) the greater of (i) the Prime Rate and (ii) 4.00%. The default rate, which will begin to accrue automatically and immediately upon an Event of Default, will be the rate otherwise in effect plus four and three quarters percent (4.75%), payable on demand. |

---

[3] The summaries contained in this motion are qualified in their entirety by the provisions of the DIP Order. To the extent anything in this motion is inconsistent with the DIP Order, the terms of the DIP Order shall control.

| | |
|---|---|
| **Use of Proceeds:** | Amounts borrowed under the DIP Note shall be used exclusively in accordance with the Approved Budget. |
| **Fees:** | <u>Commitment Fee</u>: $96,250.00, fully and irrevocably earned on, and capitalized and accruing from, entry of the DIP Order and payable to the DIP Lender upon the Maturity Date.<br><br><u>Underwriting Fee</u>: $61,250.00, fully and irrevocably earned on, and capitalized and accruing from, entry of the DIP Order and payable to the DIP Lender upon the Maturity Date.<br><br><u>Undrawn Line Fee</u>: Any undrawn portion of the Maximum Amount shall accrue a fee from entry of the DIP Order of 4.75% per year, which fee shall accrue monthly in arrears and be treated as Capitalized Interest under the DIP Note.<br><br><u>Makewhole Fee</u>: Any repayment of the DIP Credit Facility required to be made prior to 180 days after the date hereof shall accompanied by an additional fee of 3.00% of the amount required to be repaid.<br><br><u>Legal Fees</u>. All fees and expenses of the DIP Lender, including without limitation, legal and consulting fees and expenses shall be paid by the Debtor. The DIP Lender is authorized to capitalize such fees and expenses by capitalizing such fees and expenses on the last business day of each calendar month and by adding such capitalized fees and expenses to the principal amount due under the DIP Note. |
| **Scheduled Interest and Principal Payments:** | All interest due under the DIP Note (together with all fees, costs, and expenses described herein) shall be paid in kind by capitalizing such interest on the last business day of each calendar month (all accrued interest capitalized from time to time pursuant to the DIP Note is referred to herein as "<u>Capitalized Interest</u>") and by adding such Capitalized Interest to the principal amount due under the DIP Note. Capitalized Interest on such amounts shall be deemed for all purposes to be principal under the DIP Note (including, without limitation, with respect to the accrual of interest on any Capitalized Interest amounts), and interest shall begin to accrue on Capitalized Interest beginning on and including the date on which such Capitalized Interest is added to the principal amounts due under the DIP Note (including prior Capitalized Interest). The obligation of Debtor to pay all Capitalized Interest so added shall be automatically evidenced by the DIP Note. |
| **Mandatory Prepayments:** | The DIP Loan shall be mandatorily repaid to the extent of, and within 10 business days of the Debtor's receipt of, any net proceeds from the sale or other disposition of any DIP Collateral. No sale or disposition of the miscellaneous items listed in Docket No. 39 in the Debtor's Case shall be subject to these restrictions. |

| | |
|---|---|
| **Collateral:** | "<u>DIP Collateral</u>" shall mean all of Debtor's assets and properties, whether personal, intellectual, or otherwise, whether tangible or intangible, whether domestic, foreign, or international, that the Debtor now owns or hereafter acquires, or to or in which the Debtor, now or in the future, holds any right, title, or interest (whether fixed, contingent, inchoate, or otherwise), together with (in each case) all proceeds thereof, expressly including all Avoidance Actions Proceeds; provided that the DIP Collateral shall not include Excluded Collateral. |
| **Excluded Collateral:** | "<u>Excluded Collateral</u>" shall mean: (a) all real property in which the Debtor currently has or formerly had an interest; (b) that certain 2015 Caterpillar 988K Wheel Loader, Serial Number 988KPTWX00689, which is not located on the Debtor's premises; (c) those certain Caterpillar 988H, Serial Number 988HBXY05625, and Caterpillar 988H, Serial Number 988HBXY05626, which are not owned by the Debtor but may be located on the Debtor's premises; and (d) any forklifts in which the Debtor formerly had an interest. |
| **Conditions Precedent:** | The DIP Lender shall not be obligated to fund the DIP Credit Facility, if, as of the date thereof:<br><br>• the Court has not entered the DIP Order, or such order does not remain in full force and effect as so entered;<br>• the Debtor has not satisfied all applicable Cash-Management Requirements;<br>• the Debtor has not delivered an executed borrowing request (a "<u>Debtor Request</u>") substantially in the form attached to the DIP Note as Exhibit A and otherwise in form and substance reasonably acceptable to the DIP Lender in the amount requested by the Debtor, up to the Maximum Amount;<br>• any representation or warranty by the Debtor contained herein or in any other DIP Loan Documents shall be untrue or incorrect in any material respect (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of such date, except to the extent that such representation or warranty expressly relates to an earlier date;<br>• any Default or Event of Default shall have occurred and be continuing or would result after giving effect to the DIP Credit Facility;<br>• the outstanding principal amount of the DIP Credit Facility would exceed the Maximum Amount;<br>• the DIP Lender shall not have received and approved the Approved Budget in accordance with the DIP Note and the DIP Order; and |

| | |
|---|---|
| | • a Material Adverse Event shall have occurred. |
| **Documentation:** | The DIP Credit Facility will be subject to the terms and conditions set forth in the DIP Loan Documents. Such DIP Loan Documents will contain usual and customary provisions for financing of this kind, including, without limitation, conditions (including those described herein), representations and warranties, affirmative and negative covenants (including those described herein), assignment and participation provisions, indemnification, events of default (including without limitation, those described herein) and remedies. |
| **Certain Affirmative Covenants:** | Usual and customary affirmative covenants for financings of this kind, including, without limitation, the following:<br><br>• Upon the reasonable request of the DIP Lender, the Debtor will permit any officer, employee, attorney or accountant or agent of the DIP Lender to audit, review, make extracts from or copy, at the Debtor's expense, any and all corporate and financial and other books and records of the Debtor at all times during ordinary business hours, or promptly provide electronic copies of the same to the DIP Lender if so requested, upon reasonable advance notice and to discuss the Debtor's affairs with any of their directors, officers, employees, attorneys, or accountants. The Debtor will permit the DIP Lender, or any of its officers, employees, accountants, attorneys or agent, to examine and inspect any DIP Collateral or any other property of the Debtor at any time during ordinary business hours and upon reasonable prior notice. Notwithstanding the foregoing, the Debtor will not be required to disclose information to the DIP Lender (or any agent or representative thereof) that is prohibited by applicable law or is subject to attorney-client or similar privilege or constitutes attorney work product.<br>• Without any prior request from the DIP Lender, the Debtor shall deliver to the DIP Lender copies, within 24 hours of its receipt, of all offers (whether formal or informal, firm or contingent) to acquire the Debtor, the DIP Collateral, or any part thereof, together with all related correspondence; provided that Debtor shall not be obligated to deliver any information or documentation subject to a confidentiality agreement that expressly prevents its disclosure (after redaction to the extent necessary) to the DIP Lender.<br>• The Debtor will (i) comply with all requirements of applicable law, the non-compliance with which could reasonably be expected to have a Material Adverse Effect, except as otherwise excused by the Bankruptcy Code, and (ii) obtain, maintain in effect and comply with all permits, licenses and |

similar approvals necessary for the operation of its business as now or hereafter conducted other than to the extent contemplated by the Approved Budget or the DIP Order or to the extent such failure could not reasonably be expected to have a Material Adverse Effect.  For purposes of the DIP Note, "Material Adverse Effect" shall mean any change, event, development, occurrence, condition, or effect that has, or would reasonably be expected to have, individually or in the aggregate, a material adverse effect on DIP Collateral or other assets of the Debtor, the Debtor's premises, and the Debtor's business, each when taken as a whole; provided that a Material Adverse Effect will not be deemed to include (i) changes as a result of the commencement of the Bankruptcy Case and the financial condition of the Debtor since the commencement thereof, (ii) events or conditions arising from or related to changes in general business or economic conditions, (iii) events or conditions that generally affect the industry in which Debtor operates, (iv) the effect of any change in Law or accounting rules or interpretation or enforcement thereof, (v) the effect of any change arising in connection with earthquakes, hurricanes, tornadoes, floods, hostilities, pandemics, contagion, or disease (including COVID-19, or any derivation or mutation thereof), acts of war, sabotage or terrorism or military actions or any material escalation or worsening thereof, or (vi) compliance by Debtor with the terms of the DIP Note and the other DIP Loan Documents; provided the Debtor has first requested, and the DIP Lender has declined, to waive such term potentially giving rise to such Material Adverse Effect.

- Subject to the Approved Budget, the Debtor will pay or discharge, or will cause to be paid or discharged, when due, (i) all taxes, assessments and governmental charges levied or imposed upon it or upon its income or profits, upon any properties of the Debtor (including, without limitation, the DIP Collateral) or upon or against the creation, perfection or continuance of the security interest, prior to the date on which penalties attach thereto, except in each case (1) where the same are being contested in good faith by appropriate proceedings diligently conducted and adequate reserves in accordance with GAAP are being maintained by the Debtor, (2) to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect, and (3) taxes the nonpayment of which is permitted or required by the Bankruptcy Code, (ii) all federal, state and local taxes required to be withheld by it, and (iii) all lawful claims for labor,

materials and supplies which, if unpaid, might by law become a lien or charge upon any properties of Debtor.

- The Debtor will keep and maintain the DIP Collateral and all of its other properties necessary or useful in its business in substantially the same condition it is as of the date hereof (normal wear and tear excepted) other than to the extent contemplated by the Approved Budget or the DIP Order, (ii) the Debtor will defend the DIP Collateral against all claims or demands of all Persons (other than Permitted Liens) claiming the DIP Collateral or any interest therein, and (iii) the Debtor will keep all DIP Collateral free and clear of all security interests, liens and encumbrances, except Permitted Liens.

- The Debtor will obtain, or arrange for others to obtain, and at all times maintain, or arrange for others to maintain, insurance with responsible and reputable insurers, in such amounts and against such risks as are typical in the Debtor's industry. Without limiting the generality of the foregoing, the Debtor will at all times keep all tangible DIP Collateral insured with any loss payable to the DIP Lender in an amount at all times in excess of the Debtor's obligations under the DIP Note, and shall provide within 10 days of entry of the DIP Order evidence that all policies of such insurance contain a loss payable endorsement in favor of the DIP Lender (which shall also be listed as an additional insured thereunder) in Approved Form.

- The Debtor will preserve and maintain its existence and all of its rights, privileges and franchises necessary or desirable in the normal conduct of its business, except to the extent contemplated by the Approved Budget or the DIP Order.

- The Debtor shall satisfy all Cash-Management Requirements at all times.

- The Debtor shall take all actions necessary to cause each of the following to occur (each a "<u>Milestone</u>" and collectively, the "<u>Milestones</u>"):
    - Obtain Bankruptcy Court approval of bid procedures for sale(s) of substantially all assets of the Debtor within 200 days after entry of the DIP Order;
    - Obtain Bankruptcy Court approval of sale(s) of substantially all assets of the Debtor within 350 days after entry of the DIP Order; and
    - Close on sale(s) of substantially all assets of the Debtor within 500 days after entry of the DIP Order.

- The Debtor shall timely pay all DIP Lender Expenses and other DIP Obligations.

13

| | |
|---|---|
| | • The Debtor shall at all times operate its business in a manner consistent with the Approved Budget. |
| **Certain Negative Covenants:** | Usual and customary negative covenants for financings of this kind, including, without limitation, the following:<br><br>• The Debtor shall not, directly or indirectly, by operation of law or otherwise, (i) form or acquire any subsidiary, or (ii) merge with, consolidate with, acquire all or substantially all of the assets or capital stock of, or otherwise combine with or acquire, any person.<br>• The Debtor shall not create, incur, assume or permit to exist any Indebtedness for borrowed money in an amount in excess of $50,000 in the aggregate, except (without duplication), to the extent not prohibited by the DIP Order and Approved Budget and for Permitted Indebtedness.<br>• Subject to the Carve Out and Permitted Liens, the Debtor shall not create, incur, assume or permit to exist any Lien securing obligations in an amount in excess of $50,000 in the aggregate on or with respect to any of the DIP Collateral (whether now owned or hereafter acquired).<br>• The Debtor shall not assume, guarantee, endorse or otherwise become directly or contingently liable in connection with any obligations of any other person.<br>• The Debtor shall not convey, sell, lease, assign, transfer or otherwise dispose of any of its property, business or assets, whether now owned or hereinafter acquired, or engage any third party provider to assist in disposition of the foregoing, whether pursuant to Sections 327, 328, or 363 of the Bankruptcy Code or otherwise, other than (a) the sale of inventory in the ordinary course of business and in accordance with the Approved Budget and the DIP Order, (b) the sale or disposition of obsolete equipment in an aggregate amount not to exceed (at fair market value) $50,000, (c) the sale of miscellaneous items listed in Docket No. 39 in the Debtor's Bankruptcy Case, and (d) the sale of other property in Approved Form.<br>• Except for (i) claims of employees for unpaid wages, bonuses, accrued vacation and sick leave time, business expenses and contributions to employee benefit plans for the period immediately preceding the Petition Date and prepetition severance obligations, in each case to the extent permitted to be paid by order of the Bankruptcy Court, (ii) cure payments made in accordance with Section 365(b)(l)(A) of the Bankruptcy Code, and (iii) utility deposits made in accordance with Section 366 of the Bankruptcy Code, in each case as |

| | |
|---|---|
| | permitted by the DIP Order and the Approved Budget, the Debtor shall not make any payment in respect of, or repurchase, redeem, retire or defease any, prepetition Indebtedness, except for payments consented to by the DIP Lender in advance in writing. |
| | • The Debtor shall not make any investment in, or make loans or advances of money to, any person, through the direct or indirect lending of money, holding of securities or otherwise. |
| | • The Debtor shall not commence any action, file any motion, application or proposed order, or make any other submission in the Bankruptcy Court pertaining to the sale or disposition of the DIP Collateral, or the use of the DIP Collateral in any way deviating from the Approved Budget, or otherwise affecting the DIP Credit Liens or DIP Superpriority Claims, other than in Approved Form. |
| | • The Debtor shall not use the proceeds of the DIP Credit Facility for any purpose other than the Permitted Uses. |
| | • The Debtor shall not make any other payment not contemplated by the Approved Budget. |
| | • Subject to the Carve Out, the Debtor shall not incur or permit to exist administrative-priority claims entitled to priority senior or equal to the DIP Superpriority Claims. |
| **Budget:** | The Debtor shall not pay any expense other than those set forth in the Approved Budget. The Approved Budget reflects, on a line-item basis, anticipated cash receipts and expenditures on a weekly basis and includes all necessary and required expenses that the Debtor expects to incur during each month of the Approved Budget. The Debtor shall be authorized to use the proceeds of the DIP Credit Facility only for payment of such items as are set forth in the Approved Budget and subject to the terms and conditions set forth in the DIP Loan Documents and the DIP Order. The Approved Budget shall be revised every two weeks during the term of this DIP Credit Facility and delivered to the DIP Lender in Approved Form; provided that the aggregate expedite for the entirety of this Case shall not exceed the Maximum Amount. |
| | Permitted Variance: Any amount included in the Approved Budget that is not incurred or paid during a particular week shall be permitted to be carried over into subsequent weeks of the Approved Budget. The Debtor may reallocate amounts in the Approved Budget among the various line items as necessary in its discretion, so long as the total disbursements in any given week do not exceed the Approved Budget for that week (plus any carryovers, per the previous sentence) by 10%; provided, further, that the DIP Lender may agree (in its sole discretion) in writing to the use of Cash Collateral in a manner or |

| | |
|---|---|
| | amount which does not conform to the manner or amount, as applicable, set forth in the Approved Budget. |
| **Expenses and Indemnification:** | The Debtor shall indemnify the DIP Lender and its Affiliates (expressly including Legalist, Inc.), together with their respective partners, directors, officers, managers, partners, investors, employees, contractors, agents, administrators, advisors (including attorneys), and representatives, against, and hold each such Person (each an "<u>Indemnified Person</u>") harmless from, all liabilities, obligations, losses, damages, penalties, claims, actions, causes of action, judgments, suits, costs, expenses, fees, and disbursements, of any kind or nature whatsoever, whether direct, indirect, special, exemplary, or consequential and whether based on federal, state, foreign, or international laws, statutes, rules, or regulations, that may be imposed on, incurred by, or asserted against such Indemnified Person, in connection with, arising from, or relating to the Debtor or this Case, any DIP Loan Document, any transaction contemplated thereby, or any action taken or not taken pursuant thereto (including any exercise of rights or remedies (and expressly including all collection efforts)) (collectively, the "<u>Indemnified Losses</u>"); provided that such indemnity shall not be available to an Indemnified Person in the event that any Indemnified Loss has been determined by a court of competent jurisdiction, in a final and non-appealable order, to have resulted from the gross negligence or willful misconduct of such Indemnified Person. |

## DISCLOSURES

15. Pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2, a debtor in possession, seeking authority to use cash collateral or obtain financing must disclose the presence and location of certain provisions contained in the documentation evidencing the cash collateral usage or financing. The debtor in possession must also justify the inclusion of such provisions. Set forth below are the disclosures required in accordance with such rules:

    a. Local Rule 4001-2(a)(i)(A) requires debtor to disclose whether it has granted cross-collateralization to a pre-petition secured creditor in connection with the debtor's cash collateral usage or additional financing. **The proposed DIP Order does not provide for the granting of cross-collateralization to any pre-petition secured creditor.**

    b. Local Rule 4001-2(a)(i)(B) and Bankruptcy Rule 4001(c)(1)(B)(iii) require the disclosure of provisions or findings of fact that (i) bind the estate or other parties in interest with respect to the validity, perfection, or amount of

16

a secured creditor's prepetition lien or (ii) the waiver of claims against the secured creditor without first giving parties in interest at least 5 days from the entry of the order and the Committee at least 60 days from the date of its formation to investigate such matters. **The proposed DIP Order contains certain limited findings and admissions by the Debtor related to the validity, perfection, enforceability and amount of the prepetition liens and claims, as set forth therein. DIP Order, ¶ B and C.**

c.  Local Rule 4001-2(a)(2)(C) and Bankruptcy Rule 4001(c)(1)(B)(x) require the disclosure of provisions that seek to waive a debtor's right without notice under section 506(c) of the Bankruptcy Code. **The proposed DIP Order provides that the Debtor waives irrevocably all claims and rights, if any, it or its estates might otherwise assert against the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code. DIP Order, ¶ 11.**

d.  Local Rule 4001-2(a)(i)(D) and Bankruptcy Rule 4001(c)(I)(B)(xi) require disclosure of provisions that immediately grant to pre-petition secured creditor liens on the debtor's claims and causes of action arising under sections 544, 545, 547, 58, and 549 of the Bankruptcy Code. **The DIP Collateral includes proceeds of avoidance actions, except for actions under section 549 of the Bankruptcy Code. DIP Order, ¶ 8.**

e.  Local Rule 4001-2(a)(i)(E) requires disclosure of provisions that deem prepetition secured debt to be post-petition debt or use post-petition loans from a pre-petition secured creditor to pay part or all of that secured creditor's pre-petition debt (other than as provided in section 522(b) of the Bankruptcy Code). **The proposed DIP Order does not contain provisions that deem pre-petition secured debt to be post-petition debt or use pre-petition loans from a pre-petition secured creditor to pay part or all of that secured creditor's pre-petition debt (other than as provided in section 522(b) of the Bankruptcy Code).**

f.  Local Rule 4001-2(a)(i)(F) requires disclosure of provisions that provide disparate treatment for the professionals retained by a creditors' committee from those professionals retained by debtor with respect to a professional fee carve-out. **The proposed DIP Order does not provide for disparate treatment for Committee professionals.**

g.  Local Rule 4001-2(a)(i)(G) requires disclosure of provisions that provide for the priming of any secured lien without the consent of the lienholder. **The proposed DIP Order does not provide for priming of any secured lien without consent of the lienholder.**

h.  Local Rule 4001-2(a)(i)(H) requires disclosure of provisions that affect the Court's power to consider the equities of this Case under 11 U.S.C. section

552(b)(1). **The proposed DIP Order does not include any provision that affects this Court's power to consider the equities of this Case.**

i.  Bankruptcy Rule 4001(c)(1)(B)(ii) requires disclosure of the provisions of adequate protection or priority for claims arising prior to the commencement of the Case. **The proposed DIP Order does not include any provision for adequate protection or priority for claims arising prior to the commencement of this Case.**

j.  Bankruptcy Rule 4001(c)(1)(B)(iv) requires disclosure of the provisions that constitute a waiver or modification of the automatic stay. **The proposed DIP Order describes the modification of the automatic stay to the extent necessary to implement the DIP Order. DIP Order, ¶ 12.**

k.  Bankruptcy Rule 4001(c)(1)(B)(v) requires disclosure of a waiver or modification of an entity's authority or right to file a plan, seek an extension of time in which the debtor has the exclusive right to file a plan, request the use of cash collateral under section 363(c) or request authority to obtain credit under section 364. **The proposed DIP Order does not include any such provisions.**

l.  Bankruptcy Rule 4001(c)(1)(B)(vi) requires disclosure of the establishment of deadlines for filing a plan of reorganization, for approval of disclosure statement, for a hearing on confirmation, or for entry of a confirmation order. **The proposed DIP Order does not include any such provision.**

m.  Bankruptcy Rule 4001(c)(1)(B)(vii) requires disclosure of provisions that waive or modify the applicability of non-bankruptcy law relating to the perfection of a lien on property of the estate. **The proposed DIP Order includes provisions that provide for the automatic perfection and validity of the DIP Credit Lien without the necessity of any further filing or recording under the laws of any jurisdiction. DIP Order, ¶ 13.**

n.  Bankruptcy Rule 4001(c)(1)(B)(viii) requires disclosure of a release, waiver, or limitation on any claim or other cause of action belonging to the estate or the trustee, including any modification of the statute of limitations or other deadlines to commence an action. **The proposed DIP Order does not include any such provision.**

o.  Bankruptcy Rule 4001(c)(1)(B)(ix) requires disclosure of the indemnification of any party. **The DIP Note provides that the Debtor will indemnify (subject to customary carve-outs for gross negligence and willful misconduct) the DIP Lender and its respective affiliates against any liabilities arising out of the transaction.**

## APPLICABLE AUTHORITY

18

**A.     The Debtor Should be Permitted to Obtain Post-Petition Financing Pursuant to Sections 364(c) and 364(d)(1) of the Bankruptcy Code.**

16. Section 364(c) of the Bankruptcy Code requires a finding, made after notice and a hearing, that the debtor seeking post-petition financing on a secured basis cannot "obtain unsecured credit allowable under section 503(b)(1) of the [Bankruptcy Code] as an administrative expense." 11. U.S.C. section 364(c). In addition, section 364(d)(1) of the Bankruptcy Code, which governs the incurrence of post-petition debt secured by "priming" liens, provides that the Court, after notice and a hearing, may:

> (d)(1) authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to alien only if –
>
> (A) the [debtor] is unable to obtain credit otherwise; and
>
> (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. section 364(d)(1).

17. In evaluating proposed post-petition financing under section 364(c) and 364(d) of the Bankruptcy Code, courts perform a qualitative analysis and generally consider similar factors, including whether:

> a.   unencumbered credit or alternative financing without superpriority status is available to the debtor;
>
> b.   the credit transactions are necessary to preserve the assets of the estate;
>
> c.   the terms of the financing documents are fair, reasonable, and adequate; and
>
> d.   the proposed financing documents were negotiated in good faith and entry thereto is an exercise of sound and reasonable business judgment and in the best interests of the debtor's estate and its creditors. *See e.g. In re Aqua Assoc.*, 132 B.R. 192 (Bankr. E.D. Pa. 1991); *In re Crouse Group, Inc.,* 71 B.R. 544 (Bankr. E.D. Pa. 1987); *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003).

18. For the reasons discussed below, the Debtor satisfies the standards required to access post-petition financing on secured superpriority basis under section 364(c) and 364(d) of the Bankruptcy Code.

**B.     The Debtor Was Unable to Obtain Financing on More Favorable Terms.**

19. The Debtor solicited several alternative financing proposals prior to the filing of this Motion. However, the Debtor was unable to procure unsecured financing. The current proposal was on the terms that were most beneficial to the estate. The Debtor believes its efforts to obtain post-petition financing therefore satisfy the standard required under section 364(c) of the Bankruptcy Code. *See, e.g.*, *In re Los Angeles Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("The Court 'may not approve any credit transactions under subsection (c) [of section 364] unless the debtor demonstrates that it has attempted but failed to obtained unsecured credit under section 364(a) or (b).'"); *In re Simasko Production Co.*, 47 B.R. 444, 448-449 (D. Colo. 1985) (authorizing interim financing stipulation where debtor's best business judgment indicated financing was necessary and reasonable for benefit of estates); *In re Ames Dept. Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to post-petition credit, courts "permit debtors in possession to exercise their basic business judgment consistent with their fiduciary duties"); I*n re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988) (where few lenders can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing").

20. Additionally, given the immediate and critical need for the Debtor to obtain financing, the Debtor does not have an unlimited amount of time to find more favorable terms. *See, e.g.*, *In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (stating that section 364(d) of

the Bankruptcy Code "imposes no duty to seek credit from every possible lender, particularly when time is of the essence to preserve a vulnerable seasonal enterprise").

**C.     The DIP Credit Facility Is Necessary to Preserve and Maximize the Assets of the Debtor's Estate.**

21. As a debtor-in-possession, the Debtor has a fiduciary duty to protect and maximize the assets of its estate. *See In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004). The DIP Credit Facility allows the Debtor to satisfy such obligation. As noted *supra*, the Debtor needs financing. Without the agreement of the DIP Lender to provide the Debtor with financing, the Debtor would be unable to pursue a going-concern sale of its assets pursuant to Section 363 of the Bankruptcy Code, which will enable the Debtor to maximize value and recovery to its creditors. The Debtor immediately needs financing for critical expenses, including to maintain the Debtor's assets and fund professional and other administrative expenses. Without such cash infusion at this juncture, the Debtor's estate will be subject to irreparable harm as a result of Debtor's inability to successfully implement a sale of its assets.

**D.     The Terms of the DIP Credit Facility Are Fair, Reasonable and Appropriate.**

22. In considering whether the terms of post-petition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also In re Ellingsen MacLean Oil Co.*, 65 B.R. 385, 365 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds).

23. Prior to the Petition Date, Asgaard and Cypress, on behalf of the Debtor, reached out to a number of parties to solicit interest in providing postpetition financing to the Debtor. As a result of these efforts, only four potential lenders (one being the DIP Lender) were serious about providing a post-petition loan to the Debtor. The DIP Facility was negotiated in good faith

between the Debtor and the DIP Lender, and the terms of the DIP Credit Facility were the best terms available to the Debtor under the circumstances. The Debtor's negotiations with the DIP Lender resulted in an agreement which will allow the Debtor to immediately secure and maintain its assets and pursue an orderly sale of its assets which will maximize value for the estate.

**E.       Entry into the DIP Credit Facility Reflects the Debtor's Sound Business Judgment.**

24. A debtor's decision to enter into a post-petition financing arrangement under section 364 of the Bankruptcy Code is governed by the business judgment standard. *See, e.g.*, *In re Los Angeles Dodgers LLC*, 457 B.R. at 313; *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 38 (Bankr.S.D.N.Y. 1990) (financing decisions under section 364 of the Bankruptcy Code must reflect a debtor's business judgment).

25. Bankruptcy courts generally will defer to a debtor-in-possession's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious. *In re Curlew Valley Assocs.*, 14 B.R. 506, 511-13. (Bankr. D. Utah 1981). The court will generally not second-guess a debtor-in-possession's business decisions involving a "business judgment made in good faith, upon a reasonable basis, and within the scope of [its] authority under the [Bankruptcy] Code." *Id.* at 513-14.

26. As noted above, the Debtor has exercised sound business judgment in determining that the DIP Credit Facility satisfies the legal prerequisites to incur debt under section 364 of the Bankruptcy Code. As reflected in the DIP Loan Documents, the Debtor believes the DIP Credit Facility provides the best terms that are available under the circumstances. The DIP Credit Facility is essential to enable the Debtor to avoid irreparable harm to the value of the Debtor's assets and the Debtor's stakeholders.

27. Therefore, pursuant to sections 364(c) and 364(d) of the Bankruptcy Code, the Debtor respectfully submits that it should be granted authority to enter the DIP Credit Facility and to obtain the DIP Credit Facility on the secured and administrative superpriority basis described herein.

**F.      Section 363 of the Bankruptcy Code Authorizes the Debtor's Use of Cash Collateral.**

28. Section 363(c)(2) of the Bankruptcy Code provides that a debtor in possession may not use cash collateral unless (a) each entity that has an interest in such cash collateral provides consent, or (b) the court approves the use of cash collateral after notice and a hearing. *See* 11 U.S.C. § 363(c). Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an interest in property used . . . or proposed to be used . . . by the [debtor in possession], the court . . . shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).

29. By this Motion, the Debtor seeks authority to use Cash Collateral whenever or wherever acquired in accordance with the terms of the DIP Loan Documents, including the Approved Budget and on terms consistent with the DIP Order. Bankruptcy Rule 4001(b) permits a court to approve a debtor's request for use of cash collateral during the 14-day period following the filing of a motion requesting authorization to use cash collateral, "only . . . as is necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Bankruptcy Rule 4001(b)(2). In examining requests for relief under this rule, courts apply the same business judgment standard applicable to other business decisions. *See, e.g.*, *In re Simasko Production Co.*, 47 B.R. 444, 449 (D. Colo. 1985); *see also In re Ames Dep't Stores Inc.,* 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990). After the 14-day period, the request for use of cash collateral is not limited to those amounts necessary to prevent harm to the debtor's business.

30. Absent access to Cash Collateral, the Debtors would face immediate and irreparable harm. The Debtor's inability to secure and preserve its assets during this Case would result in the loss of going concern value at the expense of the Debtor's stakeholders. Thus, access to Cash Collateral pursuant to the terms of the proposed DIP Order is essential to the Debtor's continued viability and ability to successfully consummate a sale of substantially all of Debtor's assets.

## **WAIVER OF BANKRUPTCY RULE 6004(a) AND 6004(h)**

31. To implement the foregoing successfully, the Debtor seeks a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## **NOTICE**

32. The Debtor will provide notice of this Motion to: (a) the Office of the United States Trustee for the District of Delaware, Attn: Rosa Sierra, 844 King Street, Suite 2207, Wilmington, Delaware 19801, rosa.sierra@usdoj.gov; (b) the Committee; (c) counsel to the DIP Lender; (d) counsel to the Prepetition Lender; (e) any party that has requested notice pursuant to Bankruptcy Rule 2002; (f) any party that has asserted a lien against the Debtor; and (g) any such other party entitled to notice pursuant to Rule 9013-1(m) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware. The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

## **NO PRIOR REQUEST**

33. No prior request for the relief sought in this Motion has been made to this Court or any other court.

## <u>CONCLUSION</u>

WHEREFORE, the Debtor requests that this Court enter the DIP Order substantially in the form attached hereto as **<u>Exhibit A</u>** and grant such other and further relief as the Court may deem necessary and proper.

Dated:  August 13, 2020

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

*/s/Daniel B. Butz*
Robert J. Dehney (No. 3578)
Eric Schwartz (No. 3134)
Daniel B. Butz (No. 4227)
Nader A. Amer (No. 6635)
1201 N. Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
Email:    dbutz@mnat.com
            namer@mnat.com

*and*

**WESTERMAN BALL EDERER**
**MILLER ZUCKER & SHARFSTEIN, LLP**
Thomas A. Draghi (admitted *pro hac vice*)
Alison Ladd (admitted *pro hac vice*)
1201 RXR Plaza
Uniondale, New York 11556
Telephone: (516) 622-9200
Facsimile: (516) 622-9212
Email:    tdraghi@westermanllp.com
            aladd@westermanllp.com

*and*

**DINSMORE & SHOHL, LLP**
Kim Martin Lewis (admitted *pro hac vice*)
Travis Bayer (*pro hac vice* pending)
Alexandra S. Horwitz (admitted *pro hac vice*)
255 E. Fifth Street, Suite 1900
Cincinnati, Ohio 45202
Telephone: (513) 977-8200
Facsimile: (513) 977-8141
Email:    kim.lewis@dinsmore.com
            travis.bayer@dinsmore.com
            allie.horwitz@dinsmore.com

*Co-counsel to Klausner Lumber Two LLC*