**EXHIBIT C**

Stalking Horse APA

ASSET PURCHASE AGREEMENT

by and between

KLAUSNER LUMBER TWO LLC,

SELLER

and

MAYR-MELNHOF HOLZ HOLDING AG,

BUYER

DATED AS OF NOVEMBER 6, 2020

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "***Agreement***"), dated as of November 6, 2020, is entered into by and between Klausner Lumber Two LLC, a Delaware limited liability corporation ("***Seller***"), and Mayr-Melnhof Holz Holding AG, an   Austrian joint stock company (Aktiengesellschaft), or any subsidiary thereof (collectively, "***Buyer***").

WHEREAS, Seller owns a sawmill in North Carolina that is still in the commissioning phase and never commenced commercial operations;

WHEREAS, Seller commenced a voluntary case (the "***Bankruptcy Case***") under title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "***Bankruptcy Code***"), in the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***") on June 10, 2020 (the "***Petition Date***");

WHEREAS, Seller wishes to sell and assign to Buyer, and Buyer wishes to purchase and assume from Seller, certain specified assets and certain specified liabilities of Seller, all in the manner and subject to the terms and conditions set forth in this Agreement and in accordance with sections 105, 363, and 365 and other applicable provisions of the Bankruptcy Code;

WHEREAS, the Purchased Assets (as defined below) and Assumed Liabilities (as defined below) are assets and liabilities of Seller that are to be purchased by Buyer pursuant to the Sale Order (as defined below), free and clear of all Encumbrances (as defined below) other than Permitted Encumbrances (as defined below), all in the manner and subject to the terms and conditions set forth in this Agreement and the Sale Order and in accordance with the applicable provisions of the Bankruptcy Code;

WHEREAS, the transactions contemplated by this Agreement are subject to the approval of the Bankruptcy Court and will be consummated only pursuant to the Sale Order approving such sale free and clear of all Encumbrances, all as more specifically provided in this Agreement, and in accordance with sections 105, 363 and 365 of the Bankruptcy Code and other applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***") and the Bidding Procedures Order (as defined below); and

WHEREAS, Seller and Buyer have negotiated in good faith and at arm's length for the purchase and sale of the Purchased Assets, the assumption of certain Assumed Liabilities associated therewith and for certain bid protections in connection therewith, subject to the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

# ARTICLE I

## DEFINITIONS

The following terms have the meanings specified or referred to in this **Article I**:

"***Action***" means any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena or investigation of any nature, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity.

"***Affiliate***" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise. Notwithstanding the foregoing, under no circumstance will Buyer and Seller be deemed Affiliates of one another notwithstanding the possession by Buyer (whether or not exercised) of any rights of control with respect to Seller.

"***Agreement***" has the meaning set forth in the preamble.

"***Allocable Consideration***" has the meaning set forth in Section 2.6.

"***Allocation Schedule***" has the meaning set forth in Section 2.6.

"***Alternative Transaction***" means any transaction or series of related transactions (other than pursuant to this Agreement), whether effectuated pursuant to a merger, consolidation, tender offer, exchange offer, share exchange, amalgamation, stock acquisition, asset acquisition, business combination, restructuring, recapitalization, liquidation, dissolution, joint venture or similar transaction, whether or not proposed by Seller, pursuant to which Seller sells, transfers, leases or otherwise disposes of, directly or indirectly, including through an acquisition, asset sale, stock sale, purchase, merger, reorganization, recapitalization or other similar transaction with or involving any equity securities in Seller or other interests in the Purchased Assets, including a stand-alone plan of reorganization, plan of liquidation, or refinancing, any or all of the Purchased Assets (or agrees to any of the foregoing) in a transaction or series of transactions to a party or parties other than Buyer or its Affiliates.

"***Ancillary Documents***" means the Bill of Sale, the Assignment and Assumption Agreement, the Financing Option Letter, the Contingent Obligations Rider, the Confidentiality Agreement, and the other agreements, instruments and documents required to be or otherwise delivered in connection with the transactions contemplated herein.

"***Assigned Contracts***" has the meaning set forth in Section 2.1(b).

"***Assignment and Assumption Agreement***" has the meaning set forth in Section 3.2(a)(iii).

"***Assignment Effective Date***" has the meaning set forth in Section 6.13(a).

"**_Assumed Liabilities_**" has the meaning set forth in <u>Section 2.3</u>.

"**_Auction_**" means an auction conducted by Seller in accordance with the Bid Procedures and Bidding Procedures Order.

"**_Back-Up Bid_**" has the meaning set forth in the Bid Procedures.

"**_Back-Up Bidder_**" has the meaning set forth in the Bid Procedures.

"**_Bankruptcy Case_**" has the meaning set forth in the Recitals.

"**_Bankruptcy Code_**" has the meaning set forth in the Recitals.

"**_Bankruptcy Court_**" has the meaning set forth in the Recitals.

"**_Bankruptcy Rules_**" has the meaning set forth in the Recitals.

"**_Base Amount_**" has the meaning set forth in <u>Section 2.5(a)</u>.

"**_Bid Procedures_**" means the bidding procedures approved by the Bankruptcy Court pursuant to the Bidding Procedures Order for purposes of seeking bids for the purchase of the Purchased Assets, which Bid Procedures shall be reasonably satisfactory to Buyer.

"**_Bidding Procedures Order_**" means an order of the Bankruptcy Court that, among other things, (i) establishes a date by which qualified bids meeting the requirements approved in the Bidding Procedures Order must be submitted by bidders, (ii) establishes procedures for the bidding and Auction process, which shall be in form and substance reasonably acceptable to Seller and Buyer, (iii) designates of Buyer as the "stalking horse bidder", (iv) approves the Break-Up Fee, (v) approves the Expense Reimbursement, (vi) for purposes of submitting a qualified competing bid, establishes an initial minimum overbid amount of not less than $250,000, or such other amount provided therein and (vii) for purposes of qualified bidders bidding at the Auction, establishes a subsequent minimum overbid amount in each bidding round of not less than $250,000, or such other amount therein.

"**_Bill of Sale_**" has the meaning set forth in <u>Section 3.2(a)(ii)</u>.

"**_Books and Records_**" has the meaning set forth in <u>Section 2.1(g)</u>.

"**_Break-Up Fee_**" has the meaning set forth in <u>Section 6.12(c)</u>.

"**_Business Day_**" means any day except Saturday, Sunday or any other day on which commercial banks located in New York, New York are authorized or required by Law to be closed for business.

"**_Buyer_**" has the meaning set forth in the preamble.

"**_Buyer Closing Certificate_**" has the meaning set forth in <u>Section 7.3(d)</u>.

"***Closing***" has the meaning set forth in <u>Section 3.1</u>.

"***Closing Date***" has the meaning set forth in <u>Section 3.1</u>.

"***Code***" means the Internal Revenue Code of 1986, as amended.

"***Company Used Intellectual Property***" means Seller's interest, if any, in all Intellectual Property owned or controlled by a Third Party and used or held for use in connection with the Purchased Assets, which to Seller's Knowledge, if it is material to the Purchased Assets, is listed in <u>Schedule 4.8(A)</u>.  Company Used Intellectual Property specifically excludes the Excluded Software.

"***Confidentiality Agreement***" means the Confidentiality and Non-Disclosure Agreement between Cypress Associates LLC, as representative of Seller, and Buyer entered into in connection with the potential disposition of Seller's assets.

"***Contingent Obligations Rider***" means that certain Amended Contingent Obligations Rider (attached as Exhibit B to the Notice of the Revised Settlement with the County and Objection Deadlines and Hearing Dates for its Approval filed on October 20, 2020) in the form of <u>Exhibit C</u> hereto.

"***Contract & Cure Schedule***" has the meaning set forth in <u>Section 6.13(a)</u>.

"***Contracts***" means all contracts, leases, deeds, mortgages, licenses, instruments, notes, commitments, undertakings, indentures, joint ventures, agreements, franchises, warranties, guaranties, bonds, instruments, consensual obligations, and all other agreements, commitments and legally binding arrangements, whether written or oral, to which Seller is a party.

"***County***" means Halifax County, North Carolina.

"***County Deferred Obligation***" means Seller's obligation to the County in the maximum aggregate amount of $3,287,500 which is being assumed by Buyer subject to, and in accordance with, the Contingent Obligations Rider.

"***County Deed***" has the meaning set forth in <u>Section 3.2(f)(i)</u>.

"***CSLP***" means Carolina Sawmills, L.P., a limited partnership organized under the laws of the State of North Carolina.

 "***Cure Claims***" has the meaning set forth in <u>Section 2.8</u>.

"***Default***" means (i) a violation, breach, or default, (ii) the occurrence of an event that, with the passage of time, the giving of notice or both, would constitute a violation, breach, or default, or (iii) the occurrence of an event that, with or without the passage of time, the giving of notice or both, would give rise to a right of damages, specific performance, termination, cancellation, renegotiation, or acceleration (including the acceleration of payment).

"***Deposit***" has the meaning set forth in <u>Section 2.5(b)</u>.

"***DIP Order***" means the *Final Order Authorizing Debtor to (A) Use Collateral, (B) Obtain Senior Secured Superpriority Postpetition Financing, and (C) Grant Adequate Protection and Provide Security and Other Relief* as entered by the Bankruptcy Court on September 8, 2020.

"***Dollars or $***" means the lawful currency of the United States.

"***EB-5 Program***" means the employment based fifth-preference immigrant investor program established by Congress in 1990 pursuant to Section 203(b)(5) of the Immigration and Nationality Act.

"***Encumbrance***" means any charge, claim (as defined in section 101(5) of the Bankruptcy Code), community property interest, pledge, condition, equitable interest, lien (statutory or other), option, security interest, mortgage, easement, encroachment, encumbrance, right of way, right of first refusal, other interest of any kind, or restriction of any kind, including any restriction on use, voting, transfer, receipt of income or exercise of any other attribute of ownership.

"***Escrow***" has the meaning set forth in Section 2.5(b).

"***Escrow Agreement***" has the meaning set forth in Section 2.5(b).

"***Escrow Holder***" has the meaning set forth in Section 2.5(b).

"***Excluded Assets***" has the meaning set forth in Section 2.2.

"***Excluded Contracts***" has the meaning set forth in Section 2.2(b).

"***Excluded Liabilities***" has the meaning set forth in Section 2.4.

"***Excluded Software***" means the software (including any improvements, additions, updates, changes or enhancements thereto) purported to be owned by an Affiliate of Mercer International Inc. set forth in Schedule 2.2(k).

"***Existing Insurance Policies***" has the meaning set forth in Section 4.6.

"***Expense Reimbursement***" means a reimbursement to Buyer in an amount not to exceed the amount set forth in Section 6.12(c) of Buyer's actual, reasonable and documented out-of-pocket expenses, including professional fees, incurred in connection with the drafting of, and negotiations with Seller or any Third Party, concerning this Agreement, the Bidding Procedures Order, the Sale Order, and/or the Ancillary Documents; diligence of Seller's assets and liabilities and Contracts; the hearing to consider entry of the Bidding Procedures Order; the Auction; the hearing to consider entry of the Sale Order; the Closing; any objections, litigation, or appeals with respect to any of the foregoing; and/or any of the transactions contemplated by this Agreement or Ancillary Documents.

"***Final Order***" means an order of the Bankruptcy Court or other court of competent jurisdiction: (i) as to which no appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been timely filed or, if any of the foregoing has been timely filed, it has been disposed of in a manner that

upholds and affirms the subject order in all respects without the possibility for further appeal or rehearing thereon; (ii) as to which the time for instituting or filing an appeal, motion for rehearing or motion for new trial shall have expired; and (iii) as to which no stay is in effect; provided, however, that the filing or pendency of a motion under Bankruptcy Rule 9024(b) shall not cause an order not to be deemed a "Final Order" unless such motion shall be filed within fourteen (14) calendar days of the entry of the order at issue.  In the case of (i) the Sale Order, a Final Order shall also consist of an order as to which an appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been filed, but as to which Buyer and Seller mutually elect to proceed with the Closing, and (ii) any other order that is required hereunder to be a Final Order, a Final Order shall also consist of an order as to which an appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been filed, but as to which Buyer and Seller mutually elect to proceed.

"*Financing Option Letter*" shall mean the financing option letter to be executed by Buyer and CSLP at Closing substantially in the form of Exhibit D.

"*Governmental Authority*" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any arbitrator, court or tribunal of competent jurisdiction.

"*Governmental Authorization*" means any approval, consent, ratification, waiver, license, permit, registration, certificate, variance or other authorization issued or granted by any Governmental Authority.

"*Governmental Order*" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority of competent jurisdiction.

"*Initial Deposit*" has the meaning set forth in Section 2.5(b).

"*Insurance Proceeds*" has the meaning set forth in Section 2.1(i).

"*Intellectual Property*" means any and all rights in, arising out of, or associated with any of the following in any jurisdiction throughout the world: (i) issued patents and patent applications (whether provisional or non-provisional), including divisionals, continuations, continuations-in-part, substitutions, reissues, reexaminations, extensions, or restorations of any of the foregoing, and other Governmental Authority-issued indicia of invention ownership (including certificates of invention, petty patents, and patent utility models) ("*Patents*"); (ii) trademarks, service marks, brands, certification marks, designs, logos, trade dress, trade names, brand names, certification marks, corporate names (including "Klausner Lumber Two" or any variations thereof), emblems, signs or insignia, slogans, and other similar indicia of source or origin, together with the goodwill connected with the use of and symbolized by, and all registrations, applications for registration, and renewals of, any of the foregoing (including any intent to use applications, supplemental registrations and any renewals or extensions of any of the foregoing) ("*Trademarks*"); (iii) copyrights and works of

authorship, whether or not copyrightable, and all registrations, applications for registration, and renewals of any of the foregoing ("***Copyrights***"); (iv) internet addresses, internet domain names and social media accounts or user names (including "handles"), all associated web addresses, URLs, websites and web pages, social media sites and pages, and all content and data thereon or relating thereto, whether or not Trademarks or Copyrights have been issued with respect thereto; (v) mask works, and all registrations, applications for registration, and renewals thereof; (vi) industrial designs, and all Patents, registrations, applications for registration, and renewals thereof; (vii) trade secrets, know-how, inventions (whether or not patentable), discoveries, improvements, technology, business and technical information, databases, data compilations and collections, tools, methods, processes, techniques and all rights therein ("***Trade Secrets***"); (viii) computer programs, operating systems, applications, source code, object code, application programming interfaces, data files, databases, protocols, specifications, accounting software and programs, historical accounting, and other documentation thereof, in whatever form ("***Software***"); and (ix) all other intellectual or industrial property and proprietary rights.

"***Inventory***" has the meaning set forth in <u>Section 2.1(a)</u>.

"***Kalmar***" has the meaning set forth in <u>Section 2.9(a)</u>.

"***Kalmar Forklifts***" has the meaning set forth in <u>Section 2.9(a)</u>.

"***Law***" means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, other requirement or rule of law of any Governmental Authority.

"***Liabilities***" means any and all claims, debts, liabilities and other legally enforceable obligations.

"***Liebherr***" has the meaning set forth in <u>Section 2.9(b)</u>.

"***Line of Credit Agreement***" has the meaning set forth in <u>Section 3.2(c)(ii)</u>.

"***Material Adverse Effect***" means any change, event, development, occurrence or effect that has, or would reasonably be expected to have, individually or in the aggregate, a material adverse effect on the Purchased Assets taken as a whole, including, domestic (a) riots, (b) hostilities, and/or (c) political or civil unrest or disturbances, to the extent that any such change has a materially disproportionate adverse effect on the Purchased Assets relative to the adverse effect that such change has on the industry in which Seller operates (a "**Domestic Disturbance MAE**"); <u>provided</u>, <u>however</u>, that a Material Adverse Effect will not be deemed to include (i) changes as a result of the commencement of the Bankruptcy Case and the financial condition of Seller, (ii) events or conditions arising from or related to changes in general business or economic conditions, (iii) events or conditions that generally affect the industry in which Seller operates, (iv) the effect of any change in Law or accounting rules or interpretation or enforcement thereof, (v) excluding a Domestic Disturbance MAE, the effect of any change arising in connection with hostilities, pandemics, or disease (including COVID-19, or any derivation or mutation thereof), acts of war, sabotage or terrorism or military actions or any escalation or material worsening thereof, or (vi) compliance by Seller with the terms of this Agreement; <u>provided</u>, <u>further</u>, that, notwithstanding anything to the contrary, in the event of the failure of the condition in <u>Section 7.2(e)</u> of this Agreement based upon a

Domestic Disturbance MAE, Seller shall be entitled to retain the full amount of the Deposit, this Agreement shall automatically terminate, Seller shall not be entitled to any further compensation, damages or otherwise from Buyer (all of which are hereby waived by Seller), and Seller and Buyer shall not owe each other any further obligations under this Agreement, the Bidding Procedures Order or any related documents, agreements or instruments entered into in connection with any of the foregoing.

"***Missing Purchased Asset***" has the meaning set forth in Section 6.1(b).

"***Missing Purchased Asset Notice***" has the meaning set forth in Section 6.1(b).

"***Order***" means any judgment, order, writ, decree, injunction or other determination whatsoever of any Governmental Authority of competent jurisdiction or any other entity or body whose finding, ruling or holding is legally binding or is enforceable as a matter of right (in any case, unless otherwise indicated, whether preliminary or final).

"***Ordinary Course***" means the ordinary course of business following the Petition Date consistent with recent past custom and practice, subject to any Orders of the Bankruptcy Court and Seller's status as, and maintenance of its business as, a debtor-in-possession.

"***Outside Date***" means January 29, 2021, unless extended in writing by Buyer and Seller.

"***Permitted Encumbrances***" has the meaning set forth in Section 2.1.

"***Person***" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"***Petition Date***" has the meaning set forth in the Recitals.

"***Pre-Closing Tax Period***" means any taxable period ending on or before the Closing Date and, with respect to any taxable period beginning before and ending after the Closing Date, the portion of such taxable period ending on and including the Closing Date.

"***Pre-Auction Visit***" has the meaning set forth in Section 6.1(a)(iv).

"***Pre-Closing Visit***" has the meaning set forth in Section 6.1(a)(iii).

"***Premises***" means the real property, buildings, structures, appurtenances, fixtures (including fixed machinery and fixed equipment), private roads, rail lines, spurs and other infrastructure, easements, rights of way and other improvements located at, on or under the Real Property.

"***Private Sidetrack Agreement***" means that certain agreement among Seller, the County and CSX Transportation Inc. to be assumed by Buyer at Closing in accordance with the terms of the Contingent Obligations Rider.

"***Privileged Communications***" means any records, information, ledgers, files, invoices, documents, work papers, work product, drafts, presentations, analysis, correspondence, summaries,

or similar items that, in whole or part, constitutes privileged communications between Seller and Seller's counsel or other professional advisors.

"***Property Video***" has the meaning set forth in <u>Section 6.1(a)(iii)</u>.

"***Pump Station Agreement***" means that certain Pump Station Operation and Maintenance Agreement between Seller and the County to be assumed by Buyer in accordance with the terms of the Contingent Obligations Rider.

"***Purchase Price***" has the meaning set forth in <u>Section 2.5(a)</u>.

"***Purchased Assets***" has the meaning set forth in <u>Section 2.1</u>.

"***Railroad Lease***" certain Lease Agreement for Railroad Facilities between Seller and the County dated as of December 17, 2015.

"***Real Property***" has the meaning set forth in <u>Section 2.1(d)</u>.

"***Representative***" means, with respect to any Person, any and all directors, managers, officers, employees, consultants, financial advisors, counsel, accountants and other agents or representatives of such Person.

"***Sale Documents***" means this Agreement and the Ancillary Documents.

"***Sale Hearing***" has the meaning set forth in the Bid Procedures.

"***Sale Order***" has the meaning set forth in <u>Section 6.12(b)</u>.

"***Seller***" has the meaning set forth in the preamble.

"***Seller Closing Certificate***" has the meaning set forth in <u>Section 7.2(d)</u>.

"***Seller's Knowledge***" or any other similar knowledge qualification means the actual knowledge of Seller's chief restructuring officer, after reasonable inquiry into the relevant matter under the circumstances (including, Seller's limited (i) resources, (ii) personnel and (iii) books and records).

"***Successful Bid***" has the meaning set forth in the Bid Procedures.

"***Successful Bidder***" has the meaning set forth in the Bid Procedures.

"***Supplemental Deposit***" has the meaning set forth in <u>Section 2.5(b)</u>.

"***Tangible Personal Property***" has the meaning set forth in <u>Section 2.1(d)</u>.

"***Tax***" or "***Taxes***" means all federal, state, local, foreign and other income, gross receipts, sales, use, production, ad valorem, transfer, documentary, franchise, registration, profits, license,

lease, service, service use, withholding, payroll, employment, unemployment, estimated, excise, severance, environmental, stamp, occupation, premium, property (real or personal), real property gains, windfall profits, customs, duties or other taxes, fees, assessments or charges of any kind whatsoever, together with any interest, additions or penalties with respect thereto and any interest in respect of such additions or penalties.  Tax shall also include any tax liability incurred by any Third Party for which Seller is liable pursuant to Law or by contract.

"***Tax Return***" means any return, declaration, report, claim for refund, information return or statement or other document relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"***Third Party***" means any Person and/or group of Persons other than Seller, Buyer or any of their respective Affiliates.

"***Volvo***" has the meaning set forth in Section 2.9(b).

**ARTICLE II**

**PURCHASE AND SALE**

2.1    **Purchase and Sale of Assets**.  Pursuant to sections 105, 363, and 365 of the Bankruptcy Code and subject to the terms and conditions set forth herein and the Sale Order, at the Closing, Seller shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase from Seller, free and clear of all Encumbrances, other than the Encumbrances identified on Schedule 2.1 (collectively, "***Permitted Encumbrances***"), all of Seller's right, title and interest in, to and under all of Seller's assets, properties and rights of every kind and nature, whether real, personal or mixed, tangible or intangible (including goodwill), wherever located (whether at the Premises or any other location), in the physical possession of Seller or another Person (other than the Excluded Assets), including those which are used or held for use in connection with, or which are related to, the Seller's intended business prior to the Petition Date (collectively, the "***Purchased Assets***"), including the following (provided, that if any Purchased Assets are not located at the Premises, Buyer shall be solely responsible for all costs and expenses associated with obtaining possession of any such Purchased Assets and delivering such Purchased Assets to the Premises):

(a)    Inventory.  All inventory and packaging owned by Seller (collectively, the "***Inventory***");

(b)    Contracts.  All of the rights of Seller under all Contracts set forth in the Contract & Cure Schedule to the extent such Contracts are assumed and assigned to Buyer pursuant to Section 6.13 (collectively, the "***Assigned Contracts***");

(c)    Tangible Personal Property.  All furniture, fixtures, equipment, machinery, rolling stock, if any (other than Excluded Assets), construction materials, furnishings, and other personal property owned by Seller including all trade fixtures, maintenance and repair supplies, spares (including grease, oils, chemicals and containers in which any of them are stored), desks, chairs, tables, tools, all computer equipment, telephones, other office equipment, replacement parts,

and all other tangible personal property, including the items listed on <u>Schedule 2.1(c)</u> (collectively, the "***Tangible Personal Property***");

(d)    <u>Real Property</u>.  The real property set forth on <u>Schedule 2.1(d)</u> (collectively, the "<u>Real Property</u>";

(e)    <u>Governmental Authorizations</u>.  All Governmental Authorizations to the extent assignable or otherwise transferable, if any;

(f)    <u>Books and Records</u>.  All available books, records, files and papers, including all advertising materials, client and customer lists, supplier and vendor lists, purchase orders, sales and purchase invoices, production and operations reports, technical manuals, information and records, personnel and employment records, and financial and accounting records, other than the items described in <u>Section 2.2(c)</u> and <u>Section 2.2(o)</u> hereof (collectively, the "***Books and Records***");

(g)    <u>Correspondence</u>.  All written paper correspondence with or to any Governmental Authority in Seller's physical possession, including letters, minutes and official contact reports relating to any aspect of Seller or the Seller's intended business prior to the Petition Date (collectively, "***Correspondence***");

(h)    <u>Goodwill</u>.  All the goodwill of the Seller and/or its intended business prior to the Petition Date including, without limitation, the right to own and use all trade names used by the Seller;

(i)    <u>Insurance Proceeds</u>. All proceeds received or receivable in respect of the Purchased Assets under the Existing Insurance Policies with respect to any damage, loss, act, matter or thing occurring or existing after the date hereof to the Closing Date ("***Insurance Proceeds***"), including, for greater certainty any amounts paid after Closing and irrespective of whether a claim has been filed or, if filed, accepted by the provider thereof prior to Closing; and

2.2    <u>Excluded Assets</u>.  Notwithstanding the foregoing, the Purchased Assets shall not include the following assets of Seller (collectively, the "***Excluded Assets***"):

(a)    cash and cash equivalents, except for any Insurance Proceeds received as contemplated by <u>Section 2.1(i)</u>;

(b)    all Contracts other than Assigned Contracts, if any (the "***Excluded Contracts***");

(c)    the corporate seals, organizational documents, minute books, stock books, Tax Returns, books of account or other records having to do with the corporate organization or tax matters of Seller;

(d)    all benefit plans and assets attributable thereto;

(e)    the assets, properties and rights specifically set forth on <u>Schedule 2.2(e)</u> (the "***Specifically Excluded Assets Schedule***"), together with any additions to such schedule that Buyer

shall deliver to Seller not later than three (3) days prior to the Auction (subject to <u>Section 2.2(p)</u> hereof);

    (f)  all promissory notes and loans of any kind or nature,

    (g)  deposits held by Seller in connection with any Excluded Contracts, and any deposits made by Seller in connection with the Bankruptcy Case;

    (h)  royalties, fees, income, payments, and other proceeds with respect to Intellectual Property that accrued prior to the Closing Date and any security, claim, remedy or other right related to any of the foregoing;

    (i)  the rights which accrue or will accrue to Seller under this Agreement and the Ancillary Documents;

    (j)  Company Used Intellectual Property;

    (k)  Excluded Software;

    (l)  all claims, rights, credits, cross claims, causes of action, Actions, defenses and rights of set-off and other rights of Seller to the extent not a Purchased Asset or Assumed Liability or related to a Purchased Asset or Assumed Liability;

    (m)  all insurance, utility, and tax deposits or refunds owing to Seller that are not Purchased Assets;

    (n)  all insurance policies and insurance agreements, including any directors and officers' insurance policies;

    (o)  all Actions, causes of actions or claims of Seller;

    (p)  books and records (i) that relate to corporate governance or tax matters of the Seller or its intended business prior to the Petition Date, or (ii) that constitute Privileged Communications; and

    (q)  at any time prior to or during the Bankruptcy Court hearing to consider the Sale Order, Buyer shall have the right, exercisable in Buyer's sole discretion, to designate any of the Purchased Assets as Excluded Assets; <u>provided</u>, <u>however</u>, that designating Purchased Assets as Excluded Assets shall not affect the Purchase Price.

  2.3  <u>Assumed Liabilities</u>.  Subject to the terms and conditions set forth herein, Buyer shall assume and agree to pay, perform and discharge only the following Liabilities of Seller (collectively, the "***Assumed Liabilities***"), and no other Liabilities:

    (a)  all Liabilities in respect of the Assigned Contracts, if any, to the extent that such Liabilities thereunder arise from a period *after* the Closing Date;

(b)      all Liabilities arising from the conduct of the business or the use or operation of the Purchased Assets by Buyer *from and after* the Closing Date;

(c)      the Cure Claims in connection with Assigned Contracts, if any;

(d)      Taxes, and any related filing requirements, that arise out of the consummation of the transactions contemplated hereby;

(e)      all Liabilities under the Railroad Lease, the Private Sidetrack Agreement and Pump Station Agreement.

(f)      the County Deferred Obligation.

2.4      <u>Excluded Liabilities</u>.  Notwithstanding the provisions of <u>Section 2.3</u> or any other provision in this Agreement to the contrary, Buyer shall not assume and shall not be responsible to pay, perform or discharge any Liabilities of Seller or related to Seller's intended business prior to the Petition Date or the Purchased Assets of any kind or nature whatsoever other than the Assumed Liabilities (collectively, the "***Excluded Liabilities***").  Without limiting the generality of the foregoing, the Excluded Liabilities shall include, but not be limited to, the following:

(a)      all Liabilities arising out of or incurred in connection with the negotiation, preparation, investigation and performance of this Agreement, the Ancillary Documents and the transactions contemplated hereby and thereby, including fees and expenses of counsel, accountants, consultants, advisers and others;

(b)      all Liabilities for (i) Taxes of Seller (or any stockholder or Affiliate of Seller) or relating to Seller, the Purchased Assets or the Assumed Liabilities for any Pre-Closing Tax Period, except as set forth in <u>Section 2.3(d)</u>; or (ii) other Taxes of Seller (or any stockholder or Affiliate of Seller) of any kind or description (including any Liability for Taxes of Seller (or any stockholder or Affiliate of Seller) that becomes a Liability of Buyer under any common law doctrine of de facto merger or transferee or successor liability or otherwise by operation of contract or Law;

(c)      all Liabilities relating to or arising out of the Excluded Assets (unless and until such time as an Excluded Asset, with respect to the Liabilities relating to or arising out of such Excluded Asset, expressly becomes a Purchased Asset pursuant to the terms of this Agreement);

(d)      all Liabilities in respect of any pending or threatened Action arising out of, relating to or otherwise in respect of the Seller's intended business prior to the Petition Date or the Purchased Assets to the extent such Action relates to the Seller's intended business prior to the Petition Date or the Purchased Assets for any period on or prior to the Closing Date;

(e)      all recall, design defect or similar claims arising from any products manufactured or sold or any service performed by Seller prior to the Closing Date;

(f)      all product Liability or similar claim for injury to a Person or property which arises out of or is based upon any express or implied representation, warranty, agreement or guaranty made by Seller, or by reason of the improper performance or malfunctioning of a product, improper

design or manufacture, failure to adequately package, label or warn of hazards or other related product defects of any products at any time manufactured or sold or any service performed by Seller prior to the Closing Date;

(g)     all Liabilities arising under or in connection with any present or former employee benefit plan providing benefits to any present or former employee of Seller;

(h)     all Liabilities to present or former investors, equity holders, members, managers, employees, officers, directors, retirees, independent contractors or consultants of Seller, including, unless otherwise expressly assumed under this Agreement as Assumed Liabilities, all Liabilities associated with any claims arising under the EB-5 Program including any claim of indebtedness to CSLP through the Construction Loan Agreement dated March 14, 2014, and its associated Promissory Notes, or for wages or other benefits, bonuses, accrued vacation, workers' compensation, employee deferred compensation including stock option plans, grants and agreements, severance, retention, termination or other payments;

(i)     all trade accounts payable;

(j)     all Liabilities of Seller or its Affiliates relating to or arising from unfulfilled commitments, quotations, purchase orders, customer orders or work orders that do not constitute part of the Purchased Assets or Assumed Liabilities;

(k)     all Liabilities to indemnify, reimburse or advance amounts to any present or former officer, director, employee or agent of Seller (including with respect to any breach of fiduciary obligations by same);

(l)     all Liabilities under the Excluded Contracts;

(m)     all Liabilities associated with debt, loans or credit facilities of Seller and/or its Affiliates with respect to the Purchased Assets other than the County Deferred Obligation, including without limitation, any Liabilities relating to the New Markets Tax Credit Program; and

(n)     all Liabilities arising out of, in respect of or in connection with the failure by Seller to comply with any Law or Governmental Order.

2.5     Purchase Price and Deposit.

(a)     The purchase price for the Purchased Assets shall be: (i) $30,000,000.00 in cash (the "***Base Amount***"), underlined plus (ii) the assumption of the Assumed Liabilities, including without limitation, the County Deferred Obligation (collectively, the "***Purchase Price***").    At the Closing, Buyer shall pay Seller the Base Amount, in cash *minus* the Deposit as provided below.

(b)     Contemporaneously with Buyer's delivery of this Agreement to Seller, Buyer deposited into an account (the "***Escrow***") maintained by an escrow holder identified and established by Seller (the "***Escrow Holder***"), in immediately available funds, an amount equal to ten percent (10%) of the Purchase Price (the "***Initial Deposit***") pursuant to the escrow agreement among Buyer, Seller and the Escrow Holder dated on or about the date hereof (the "***Escrow Agreement***").    If Buyer

is declared the Successful Bidder at the Auction, Buyer shall, if necessary, within three (3) Business Days of the close of the Auction, supplement the Initial Deposit such that Buyer's deposit shall be equal to an amount that is ten (10%) percent of the cash portion of the Purchase Price to be paid in cash at Closing to Seller included in Buyer's final bid submitted at the Auction (the "*Supplemental Deposit*" and together with the Initial Deposit, the "*Deposit*").  Upon receipt of any amount of the Deposit, the Escrow Holder shall immediately place and maintain such amount of the Deposit into a non-interest-bearing escrow account and such funds shall be disbursed in accordance with the terms of this Agreement, the Escrow Agreement and the Bidding Procedures Order.

(c)    If Buyer is the successful bidder, at the Closing, Buyer and Seller shall direct the Escrow Holder to deliver the Deposit to Seller and such Deposit shall automatically be deemed to be credited toward payment of the Purchase Price in accordance with Section 2.5(a).

(d)    In the event Seller and Buyer terminate this Agreement under Section 8.1(a) or Section 8.1(d) of this Agreement, Buyer shall direct the Escrow Holder to disburse (and the Escrow Holder shall disburse) the Deposit to Buyer without set-off or deduction within five (5) Business Days to be retained by Buyer for Buyer's own account.

(e)    In the event Buyer terminates this Agreement under Section 8.1(b) of this Agreement, Buyer shall direct the Escrow Holder to disburse (and the Escrow Holder shall disburse) the Deposit to Buyer without set-off or deduction within five (5) Business Days to be retained by Buyer for Buyer's own account.

(f)    In the event Seller terminates this Agreement under Section 8.1(c)(i) or Section 8.1(c)(ii)(y) of this Agreement, Seller shall direct the Escrow Holder to disburse the Deposit to Seller within five (5) Business Days to be retained by Seller for Seller's own account in full and final settlement of damages resulting from such termination.

(g)    In the event Seller terminates this Agreement under Section 8.1(c)(ii)(x) of this Agreement, Seller shall direct the Escrow Holder to immediately disburse the Deposit to Buyer without any setoff or deduction to be retained by Buyer for Buyer's own account.

(h)    If this Agreement shall be automatically terminated under Section 8.1(e) of this Agreement, Seller and Buyer shall direct the Escrow Holder to disburse the Deposit to Buyer without set-off or reduction within five (5) Business Days to be retained by Buyer for Buyer's own account.

2.6    Allocation of Purchase Price.  Seller and Buyer agree that the Purchase Price and the Assumed Liabilities as well as any other items constituting the amount realized for Tax purposes (the "*Allocable Consideration*") will be allocated among the Purchased Assets in a manner consistent with Section 1060 of the Code and any Treasury Regulations promulgated thereunder. Buyer will, no later than sixty (60) days following the Closing Date, prepare and deliver to Seller a schedule setting forth the allocation of the Allocable Consideration in accordance with the preceding sentence (the "*Allocation Schedule*").  Buyer and Seller will endeavor for a period of not less than thirty (30) days to resolve any disputes related to the Allocation Schedule.  Neither Buyer nor Seller will take any position that is contrary to or inconsistent with the Allocation Schedule for any Tax purpose,

including with respect to any Tax Return (including amended Tax Returns). In the event that the Allocation Schedule is disputed by any Governmental Authority, the party receiving notice of such dispute will promptly notify the other party and the parties will consult in good faith as to how to resolve such dispute in a manner consistent with the agreed upon Allocation Schedule. Notwithstanding any provision of this Section 2.6 to the contrary, if Buyer and Seller are not able to agree to the Allocation Schedule, each party shall be allowed to use that party's own formulation with respect to the allocation of the Purchase Price and the Assumed Liabilities.

2.7    Third Party Consents. Notwithstanding the Sale Order or any provision of the Bankruptcy Code, to the extent that Seller's rights under any Contract constituting a Purchased Asset, may not be assigned to Buyer without the consent of another Person which has not been obtained, this Agreement shall not constitute an agreement to assign the same if an attempted assignment would constitute a breach thereof or be unlawful, provided, however, that, subject to the satisfaction or waiver of the conditions contained in Article VII, the Closing shall occur and not be delayed notwithstanding the foregoing without any adjustment to the Purchase Price on account thereof, and Seller and Buyer, each at its own expense, shall use commercially reasonable efforts, and shall cooperate with each other, to obtain any such required consent(s) as promptly as possible.

2.8    Cure Claims. With respect to each of the Assigned Contracts assigned to Buyer, Buyer shall assume and pay on the Assignment Effective Date for each such Assigned Contract, all Cure Claims. Within five (5) Business Days after the Closing Date, Buyer shall provide to Seller a written certification that all Cure Claims required to be paid on the Closing Date have been satisfied and paid in full by Buyer. Upon the reasonable request of Seller, Buyer shall provide to Seller documentation evidencing the full payment and satisfaction of any Cure Claim.

2.9    Purchase Option.

(a)    If Buyer is the Successful Bidder, Buyer shall have the option to purchase one or more of the Kalmar forklifts identified on Schedule 2.9 (the "***Kalmar Forklifts***") pursuant to the terms of Seller's settlement with Kalmar USA Inc. ("***Kalmar***"), at the applicable purchase price for each such Kalmar Forklift set forth on Schedule 2.9 or such other price as Buyer and Kalmar may agree. In order to exercise the option to acquire one or more of the Kalmar Forklifts, Buyer shall provide written notice of such exercise not less than two (2) Business Days prior to the Auction identifying the Kalmar Forklifts to be purchased by Buyer. In the event that Buyer timely exercises such option and Buyer is the Successful Bidder (or Buyer is the Back-up Bidder and Seller fails to close with the Successful Bidder), Seller shall facilitate the sale of the applicable Kalmar Forklifts to Buyer on or about the Closing Date and Seller and its Affiliate shall be entitled to an aggregate commission equal to 15% of the purchase price for any Kalmar Forklift purchased by Buyer. In event that Buyer is not the Successful Bidder (or Buyer is the Back-up Bidder and Seller closes with the Successful Bidder), Buyer shall not have the option to purchase the Kalmar Forklifts (unless otherwise agreed in writing by Seller).

(b)    If Buyer is the Successful Bidder, Buyer shall have the option to purchase the (i) Volvo 180E Wheel Loader (the "***Volvo***"), and/or (ii) the Liebherr 924 Excavator (the "***Liebherr***") identified on Schedule 2.9. In order to exercise the option to acquire the Volvo and/or the Liebherr, Buyer shall provide written notice of such exercise not less than two (2) Business Days prior to the

Auction identifying the item(s) of equipment to be purchased by Buyer.  In the event that Buyer timely exercises such option and Buyer is the Successful Bidder (or Buyer is the Back-up Bidder and Seller fails to close with the Successful Bidder), Seller shall sell such item(s) of equipment to Buyer on or about the Closing Date.  In event that Buyer is not the Successful Bidder (or Buyer is the Back-up Bidder and Seller closes with the Successful Bidder), Buyer shall not have the option to purchase the Volvo or the Liebherr (unless otherwise agreed in writing by Seller).

## ARTICLE III

## CLOSING

3.1     <u>Closing</u>. Subject to the terms and conditions of this Agreement, including without limitation the adjournment provisions contained in <u>Section 6.1(b)</u>, the consummation of the transactions contemplated by this Agreement (the "***Closing***") shall take place remotely via the exchange of documents and signatures, or in such other manner as will be mutually acceptable between Buyer and Seller, (i) on or before December 29, 2020 or as soon thereafter as reasonably practicable, or (ii) at the option of Buyer and Seller, on the fifteenth (15th) day following entry of the Sale Order unless at that time the Sale Order shall not yet be a Final Order, then within two (2) Business Days following the date that the Sale Order and if that is the case, becomes a Final Order but in no event later than the Outside Date.  The date on and time at which the Closing actually occurs is herein referred to as the "***Closing Date***".

3.2     <u>Closing Deliverables</u>.

(a)     At the Closing, Seller shall deliver to Buyer the following:

(i)     The Purchased Assets, including the deed(s) with respect to the Real Property in the form of <u>Exhibit E</u> (the "***Deed***");

(ii)     a bill of sale substantially in the form of <u>Exhibit A</u> hereto with such revisions as agreed to by Buyer and Seller (the "***Bill of Sale***") and duly executed by Seller;

(iii)     an assignment and assumption agreement substantially in the form of <u>Exhibit B</u> hereto with such revisions as agreed to by Buyer and Seller (the "***Assignment and Assumption Agreement***") and duly executed by Seller;

(iv)     the Seller Closing Certificate;

(v)     a copy of the Sale Order entered by the Bankruptcy Court;

(vi)     a copy of an Order of the Bankruptcy Court approving the transfer of the Real Property from the County to Seller for purposes of transferring the Real Property to Buyer;

(vii)     joint instructions to the Escrow Holder to deliver the Deposit to Seller; and

(viii) such other customary instruments of transfer, assumption, filings or documents, in form and substance reasonably satisfactory to Buyer, as may be required to give effect to this Agreement.

(b) At the Closing, Buyer shall deliver to Seller the following:

(i) the Base Amount, *minus* the Deposit;

(ii) the Assignment and Assumption Agreement, duly executed by Buyer;

(iii) the Buyer Closing Certificate;

(iv) joint instructions to the Escrow Holder to deliver the Deposit to Seller.

(c) At the Closing, Buyer shall deliver to County the following:

(i) the Contingent Obligations Rider duly executed by Buyer.

(d) At the Closing, Buyer shall deliver to CSLP the following:

(i) the Financing Option Letter.

(e) At the Closing, County shall deliver to Buyer and Seller the following:

(i) Consent to Transfer of Real Property;

(ii) Consent to Assignment of Railroad Lease;

(iii) Consent to Assignment of Private Sidetrack Agreement; and

(iv) Consent to Assignment of Pump Station Agreement.

(f) At or prior to the Closing, County shall deliver to Seller the following:

(i) the deed(s) with respect to the Real Property in the form of <u>Exhibit F</u> (the "***County Deed***").

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF SELLER

As a material inducement to Buyer to enter into this Agreement and to consummate the transactions contemplated herein, Seller represents and warrants to Buyer that the statements contained in this <u>Article IV</u> are true and correct as of the date hereof and shall be true and correct as of the Closing Date, it being acknowledged and agreed that the representations and warranties set forth in this <u>Article IV</u> shall not survive the Closing.

4.1     <u>Organization and Qualification of Seller</u>.  Seller is a limited liability company duly organized, validly existing and in good standing under the Laws of the state of Delaware and is qualified to do business and in good standing under the Laws of the state of North Carolina. Seller commenced the Bankruptcy Case, which is currently pending in the Bankruptcy Court.

4.2     <u>Authority of Seller</u>.  Subject only to entry of the Sale Order in the Bankruptcy Case, Seller has full corporate power and authority to enter into this Agreement and the Ancillary Documents to which it is or will be a party and to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  The execution and delivery by Seller of this Agreement and any Ancillary Document to which Seller is or will be a party, the performance by Seller of its respective obligations hereunder and thereunder and the consummation by Seller of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of Seller.  This Agreement has been duly executed and delivered by Seller, and (assuming due authorization, execution and delivery by Buyer) this Agreement constitutes a legal, valid and binding obligation of Seller enforceable against Seller in accordance with its terms.  When each Ancillary Document to which Seller is or will be a party has been duly executed and delivered by Seller (assuming due authorization, execution and delivery by each other party thereto), such Ancillary Document will constitute a legal and binding obligation of Seller enforceable against it in accordance with its terms.

4.3     <u>No Conflicts; Consents</u>.  Subject to entry of the Sale Order, neither the execution, delivery nor performance of this Agreement by Seller, nor the consummation by Seller of the transactions contemplated by this Agreement, will: (a) conflict with or violate Seller's organizational documents; (b) result in a breach or Default under, or create in any Person the right to terminate, cancel, accelerate or modify, or require any notice, consent or waiver under, any Assigned Contract; (c) violate any Law applicable to Seller or the Purchased Assets; (d)  result in the creation of any Encumbrance on any Purchased Asset which will not be removed or satisfied at or prior to Closing, or (e) require the consent, notice, declaration, or filing with or other action by any Person or require any permit, license, or Governmental Authorization (except in the case of clauses (b) or (c) of this <u>Section 4.3</u> that has not had, and would not reasonably be expected to have, a Material Adverse Effect); (provided it is acknowledged by Buyer that Buyer will be required to obtain certain permits, licenses or governmental authorizations to operate the Purchased Assets).

4.4     <u>Title to Purchased Assets</u>.  To Seller's Knowledge, subject to (x) delivery of the County Deed to Seller at or prior to Closing and (y) <u>Section 4.10</u> below with respect to the Real Property, no Person other than Seller has title to the Purchased Assets (other than any Purchased Assets that are subject to Assigned Contracts).  Subject to entry of the Sale Order, at Closing, Buyer will be vested with good and marketable title to, or in the case of leaseholds, valid leasehold interests in, all of the Purchased Assets, which Purchased Assets shall be conveyed free and clear of all Encumbrances other than Permitted Encumbrances.

4.5     <u>Status of Purchased Assets.</u> To Seller's Knowledge, except as set forth on <u>Schedule 4.5</u>, since the Petition Date, no Tangible Personal Property has been removed or transferred from the Premises or otherwise sold, leased assigned or transferred, except for any of the foregoing that totals less than (a) $10,000 individually and (b) $100,000 in the aggregate; and in either case would not materially adversely affect the operations of the Purchased Assets.

4.6     Insurance.  To Seller's Knowledge, Schedule 4.6 sets forth a true and complete list of all insurance policies (the "***Existing Insurance Policies***") maintained by Seller and County with respect to the Purchased Assets, together with the insurer, the amount of the coverage, the type of insurance, the policy number and any pending Claims thereunder.  Seller is up-to-date in the payment of all premiums and other amounts payable under the Existing Insurance Policies that it carries to maintain the Existing Insurance Policies in full force and effect, and Seller shall continue to make such payments until Closing. To Seller's Knowledge, as of the date hereof, all such policies are in full force and effect in all material respects and are sufficient for compliance by Seller with all applicable Laws.

4.7     Contracts.  To Seller's Knowledge, Schedule 4.7 sets forth a complete and accurate list of all Contracts of Seller that are still in effect related to the ownership and/or operation of the Purchased Assets or Seller's intended business prior to the Petition Date.

4.8     Intellectual Property.

(a)     To Seller's Knowledge, Schedule 4.8(A) sets forth any material Company Used Intellectual Property.  To Seller's Knowledge, none of the Company Used Intellectual Property is assignable to Buyer (without the consent of the applicable licensor or other counterparty).

(b)     To Seller's Knowledge, the Seller does not own any material Intellectual Property.  To Seller's Knowledge, except as set forth on Schedule 4.8(B) there are no inquiries, investigations or Actions, and Seller has not received written notice from any Third Party: (i) alleging infringement by Seller of Intellectual Property rights of any Person; or (ii) challenging or threatening to challenge Seller's right, title, or interest with respect to its use of, or continued use of Company Used Intellectual Property as currently used.

4.9     Taxes.  To Seller's Knowledge, except as set forth in Schedule 4.9, there are no Encumbrances for Taxes (other than for current Taxes not yet due and payable or for Taxes filed as a result of the Bankruptcy Case) upon the Purchased Assets.

4.10    Real Property.  On or prior to the Closing Date, the County shall convey the Real Property to Seller and such conveyance shall be approved by an Order of the Bankruptcy Court.  At Closing, Seller will convey the Real Property to Buyer free and clear of all Encumbrances other than Permitted Encumbrances.  Seller has no leases of any real property other than pursuant to the Railroad Lease.  With respect to the Real Property, subject only to receiving title to the Property from the County, Seller has good and marketable fee simple title, free and clear of all Encumbrances, other than Permitted Encumbrances and Encumbrances to be paid off or otherwise extinguished on the Closing Date. On the Closing Date, Seller shall convey to Buyer at the Closing good and marketable fee simple title to the Real Property, free and clear of all Encumbrances, including, without limitation all Encumbrances (i) arising under or in connection with the EB-5 Program and/or any individuals investors in such program, (ii) of CSLP or its members, managers, employees, investors, directors, officers, or other related Persons, or (iii) the County, other than Permitted Encumbrances. Notwithstanding anything in this Agreement to the contrary, with respect to the Permitted Encumbrances, Seller shall convey to Buyer at Closing good and marketable fee simple title to the Owned Real Property, free and clear of all rights of reverter or reconveyance in favor of the County.

Seller has not leased or otherwise granted to any Person the right to use or occupy the Owned Real Property or any portion thereof, and there are no Persons in possession or Person having the right to occupy or use any of the Real Property.  The civic address of the Real Property is 260 Piper Lane, Enfield, North Carolina 27823.

4.11    <u>Legal Proceedings</u>.   Other than as disclosed (a) to Buyer in writing or (b) in the filings under the Bankruptcy Case, to Seller's Knowledge, there are no Actions pending or threatened against or by Seller that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement and, to Seller's Knowledge, other than as disclosed by legal counsel to Seller to legal counsel to Buyer, no event has occurred or circumstances exist that are reasonably likely to give rise or serve as a basis for any such Action.

4.12    <u>Full Disclosure.</u>  There has been no event, transaction or information regarding the Purchased Assets that has come to Seller's Knowledge that has not been disclosed to Buyer in writing that could reasonably be expected to have a Material Adverse Effect.

4.13    <u>No Other Representations and Warranties.</u> Except for the representations and warranties contained in this <u>Article IV</u>, neither Seller nor any other Person has made or makes any other express or implied representation or warranty, either written or oral, on behalf of Seller, including any representation or warranty as to the accuracy or completeness of any information regarding the Seller's intended business prior to the Petition Date and the Purchased Assets furnished or made available to Buyer and its Representatives, management presentations or in any other form in expectation of the transactions contemplated hereby) or as to the future revenue, profitability or success of the intended business, or any representation or warranty arising from statute or otherwise in law.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF BUYER

As a material inducement to Seller to enter into this Agreement and to consummate the transactions contemplated herein, subject to the entry of the Sale Order, Buyer represents and warrants to Seller that the statements contained in this <u>Article V</u> are true and correct as of the date hereof and shall be true and correct as of the Closing Date, it being acknowledged and agreed that the representations and warranties set forth in this <u>Article V</u> shall not survive the Closing.

5.1    <u>Organization of Buyer</u>.    Buyer is an Austrian joint stock company (Aktiengesellschaft) duly organized, validly existing and in good standing under the Laws of Austria.

5.2    <u>Authority of Buyer</u>.  Buyer has full corporate power and authority to enter into this Agreement and the Ancillary Documents to which Buyer is or will be a party and to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery by Buyer of this Agreement and any Ancillary Document to which Buyer is or will be a party, the performance by Buyer of its respective obligations hereunder and thereunder and the consummation by Buyer of the transactions contemplated hereby and thereby

have been duly authorized by all requisite corporate action on the part of Buyer.  This Agreement has been duly executed and delivered by Buyer, and (assuming due authorization, execution and delivery by Seller) this Agreement constitutes a legal, valid and binding obligation of Buyer enforceable against Buyer in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally. When each Ancillary Document to which Buyer is or will be a party has been duly executed and delivered by Buyer (assuming due authorization, execution and delivery by each other party thereto), such Ancillary Document will constitute a legal and binding obligation of Buyer enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally.

5.3     No Conflicts; Consents.  The execution, delivery, and performance by Buyer of this Agreement and the Ancillary Documents to which Buyer is or will be a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) violate or conflict with any provision of the articles of incorporation, bylaws, or other organizational or governing documents of Buyer, as applicable; (b) violate or conflict with any provision of any Law or Governmental Order applicable to Buyer; or (c) require the consent, notice, declaration, or filing with or other action by any Person or require any permit, license, or Governmental Order.

5.4     Brokers.  No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or any Ancillary Document based upon arrangements made by or on behalf of Buyer.

5.5     Sufficiency of Funds.  Buyer has sufficient cash on hand to enable it to make payment of the Purchase Price and consummate the transactions contemplated by and in the timeframe set forth in this Agreement.

5.6     Legal Proceedings.  There are no Actions pending or, to Buyer's knowledge, threatened against or by Buyer that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement; and no event has occurred or circumstances exist that may give rise or serve as a basis for any such Action.

5.7     Full Disclosure.  Buyer does not have knowledge of any facts or circumstances that would constitute a breach of any representation or warranty made by Seller pursuant to this Agreement."As Is" Transaction. BUYER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN ARTICLE IV ABOVE, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE PURCHASED ASSETS INCLUDING EXPENSES TO BE INCURRED IN CONNECTION WITH THE PURCHASED ASSETS, THE PHYSICAL CONDITION OF ANY REAL OR PERSONAL PROPERTY COMPRISING A PART OF THE PURCHASED ASSETS OR WHICH IS THE SUBJECT OF ANY OTHER LEASE OR OTHER CONTRACT TO BE ASSUMED BY BUYER AT THE CLOSING, THE ENVIRONMENTAL CONDITION OR OTHER MATTER RELATING TO THE PHYSICAL CONDITION OF ANY REAL PROPERTY OR IMPROVEMENTS, THE ZONING OF ANY SUCH REAL PROPERTY OR IMPROVEMENTS, THE VALUE OF THE PURCHASED ASSETS (OR ANY PORTION THEREOF), THE TRANSFERABILITY OF PROPERTY

CONSTITUTING THE PURCHASED ASSETS, THE TERMS, AMOUNT, VALIDITY OR ENFORCEABILITY OF ANY ASSUMED LIABILITIES, THE MERCHANTABILITY OR FITNESS OF THE PERSONAL PROPERTY OR ANY OTHER PORTION OF THE PURCHASED ASSETS FOR ANY PARTICULAR PURPOSE, OR ANY OTHER MATTER OR THING RELATING TO THE PURCHASED ASSETS OR ANY PORTION THEREOF. WITHOUT IN ANY WAY LIMITING THE FOREGOING, SELLER HEREBY DISCLAIMS ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE PURCHASED ASSETS. BUYER FURTHER ACKNOWLEDGES THAT BUYER HAS CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF SUCH OTHER MATTERS RELATING TO OR AFFECTING THE PURCHASED ASSETS AS BUYER DEEMED NECESSARY OR APPROPRIATE AND BUYER IN PROCEEDING WITH ITS ACQUISITION OF THE PURCHASED ASSETS, EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN ARTICLE IV, IS DOING SO BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS. ACCORDINGLY, BUYER WILL ACCEPT THE PURCHASED ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS."

**ARTICLE VI**

**COVENANTS**

6.1     <u>Access to Information and Premises</u>.

(a)     Provided that (x) Buyer shall not be entitled to access any materials containing Privileged Communications, and (y) prior to Closing, without the prior written consent of Seller, which may be withheld for any reason, Buyer shall not have the right to perform invasive or subsurface investigations of the Premises or any other property used or occupied by Seller, from and after the date hereof and until the Closing Date or earlier termination of this Agreement pursuant to <u>Article VIII</u>, Seller shall, upon reasonable advance notice and subject to any operating restrictions, curfews, and lockdown orders or advisories issued by any Governmental Authority, afford Buyer's officers, independent public accountants, counsel, consultants and other representatives, reasonable access during normal business hours to the Premises and Purchased Assets and all records pertaining to the Purchased Assets in Seller's possession and under Seller's control including the following:

(i)     the right of Buyer and/or its Representatives to copy, at Buyer's expense, such documents and records as Buyer may request in furtherance of the purposes described above;

(ii)     at Seller's option (in lieu of permitting copying by Buyer pursuant to clause (i) above), Seller's copying and delivering to Buyer such documents or records as Buyer may request, but only to the extent Buyer furnishes Seller with reasonably detailed written descriptions of the materials to be so copied and Buyer reimburses Seller for the reasonable costs and expenses thereof;

(iii)     the right of Buyer and/or its Representatives to access the Premises on the third (3rd) Business Day prior to the Closing Date (or such other date agreed to between Buyer

and Seller, acting reasonably) to confirm that the Purchased Assets, including Inventory and Tangible Personal Property (other than any Excluded Assets) which appear in the video provided by Seller to Buyer (the "***Property Video***") are located at the Premises and appear in substantially the same condition as they appear in the Property Video (the "***Pre-Closing Visit***"); and

(iv)    the right of Buyer and/or its Representatives to access the Premises not later than three (3) Business Days prior to the Auction and not earlier than five (5) Business Days prior to the Auction to confirm that the Purchased Assets which appear in the Property Video are located at the Premises and appear in substantially the same condition as they appear in the Property Video (the "***Pre-Auction Visit***").

(b)    In the event that Buyer believes that any Purchased Asset in the Property Video is no longer located at the Premises as of Buyer's Pre-Auction Visit or Pre-Closing Visit, as applicable, Buyer shall provide Seller with written notice of any such missing Purchased Asset(s) (the "***Missing Purchased Asset(s)***") not later than two (2) Business Days following the applicable visit and in the case of the Pre-Auction Visit, prior to the Auction (the "***Missing Purchased Asset Notice***") and Seller, at its sole cost and expense, will have until Closing to locate and deliver or otherwise replace (and install if previously installed, which installation shall be at Seller's sole cost and expense) any Missing Purchased Asset(s) identified in the Missing Purchased Asset Notice, all of which, in the case of replacement, shall be in at least the same condition as the applicable Missing Purchased Asset(s); provided, that in the event that Seller receives a Missing Purchased Asset Notice, Seller shall have the right to adjourn the Closing for up to five (5) Business Days upon written notice to Buyer (unless the replacement value of the Missing Purchased Asset(s) in the Missing Purchased Asset Notice exceeds ten percent (10%) of the Purchase Price in which case Seller shall have the right to adjourn the Closing for up to ten (10) Business Days upon written notice to Buyer). In the event that Seller is not able to locate and deliver or otherwise replace any Missing Purchased Asset within such period, Buyer and Seller shall negotiate in good faith to agree on a reduction in the Purchase Price based on the replacement value of the Missing Purchased Asset(s), or if no agreement is reached by the parties, as otherwise determined by the Bankruptcy Court; provided, however, in the event the value of such Missing Purchased Asset(s) (individually or in the aggregate) exceeds ten percent (10%) of the Purchase Price, Buyer shall have the right to terminate this Agreement upon written notice to Seller.

(c)    From and after the date of this Agreement until the Closing Date, Buyer may not communicate with any counterparty to any Contracts without the prior written consent of Seller except as set forth in the Confidentiality Agreement (which the parties acknowledge remains in full force and effect).

(d)    Seller shall (i) upon selecting Buyer as the Successful Bidder close the virtual data room and (ii) on the Closing Date give notice under any non-disclosure or confidentiality agreements entered into with other parties to return or destroy any Confidential Information.

6.2    <u>Operation of the Business.</u> Until the Closing Date, except: (i) as required by Law, including in connection with the Bankruptcy Case; (ii) as expressly set forth in this Agreement; or

(iii) as otherwise consented to by Buyer in writing, Seller shall not, with respect to the Purchased Assets:

(i)    incur any capital expenditures (other than for reasonably necessary repairs) or any obligations or Liabilities (which will not otherwise be paid at or prior to Closing or otherwise adequately reserved for by Seller at Closing and reduced on a dollar-for-dollar basis from the cash portion of the Purchase Price) in respect thereof which individually exceed $10,000 or in the aggregate $50,000;

(ii)    enter into, amend or modify in any material respect or terminate or reject any Contract on the Contract & Cure Schedule;

(iii)    waive or release any material right or claim of the Seller relating to the Assigned Contracts, if any, or, without first obtaining Buyer's express written consent, such consent not to be unreasonably withheld or delayed, any of the Purchased Assets;

(iv)    sell, lease, remove from the Premises, transfer, license or otherwise dispose of, abandon or permit to lapse, fail to take any material action necessary to maintain, enforce or protect, or create any Encumbrance on, any assets or properties (other than Excluded Assets);

(v)    take any other action that could reasonably be expected to materially and adversely affect the value of the Purchased Assets;

(vi)    agree to take any of the foregoing actions; or

(vii)    except as consented to or approved in writing by Buyer, from the date of this Agreement until Closing, Seller shall use commercially reasonable efforts to preserve intact the Purchased Assets, reasonable wear and tear excepted, or as necessary to keep all of the Purchased Assets in substantially the same condition as they are on the date of this Agreement.

6.3    Notice of Certain Events.

(a)    From the date hereof until the Closing, Seller shall promptly notify Buyer in writing of:

(i)    any notice or other communication from any Governmental Authority in connection with the transactions contemplated by this Agreement;

(ii)    any Actions commenced or, to Seller's Knowledge, threatened against, relating to or involving or otherwise affecting the Purchased Assets or the Assumed Liabilities;

(iii)    the occurrence, or failure to occur, of any event, which occurrence or failure would be likely to cause any of the representations or warranties of Seller contained in this Agreement or in any Ancillary Document to be untrue or inaccurate in any material respect (or, if already qualified by materiality, in all respects); and

(iv)    the occurrence of any fact or circumstance that could reasonably be expected to have a Material Adverse Effect.

(b)    Buyer's receipt of information pursuant to this <u>Section 6.3</u> shall not (i) operate as a waiver or otherwise affect any representation, warranty or agreement given or made by Seller in this Agreement or (ii) give Buyer an independent right to terminate this Agreement, provided that the content of such notice may give rise to such a right.

6.4    <u>Confidentiality</u>. Buyer acknowledges and agrees that the Confidentiality Agreement remains in full force and effect and, in addition, covenants and agrees to keep confidential, in accordance with the provisions of the Confidentiality Agreement (other than as may be permitted or required under this Agreement), information provided to, or reviewed or accessed by, Buyer or its Representatives pursuant to this Agreement, including under <u>Section 6.1</u>.  If this Agreement is, for any reason, terminated prior to the Closing, the Confidentiality Agreement and the provisions of this <u>Section 6.4</u> shall nonetheless continue in full force and effect.

(b)    Notwithstanding anything to the contrary in this Agreement or the Confidentiality Agreement, the Confidentiality Agreement shall terminate on the Closing Date.

(c)    Each of the parties hereto agrees that after the Closing Date Seller and Buyer (and its Affiliates) and their successors and assigns will have the following rights regarding Privileged Communications.   Seller shall continue to hold and control the privilege with respect to all Privileged Communications that existed prior to the Closing Date.  Seller shall have no obligation to include in the Books and Records any records of any Privileged Communications.  It may be impracticable to remove from the Books and Records all records of any Privileged Communications. No attorney-client privilege, attorney work product or other applicable evidentiary privilege or protection shall be waived or is intended to be waived with respect to any such Privileged Communications.  Buyer (to the extent marked "privileged", on law firm letterhead or otherwise reasonably ascertainable as attorney-client privileged by a non-attorney) and Seller shall protect all Privileged Communications from disclosure or release.  In the event that a dispute arises between Buyer, on the one hand, and a Third Party, on the other hand, Buyer or any of its Affiliates may assert the attorney-client privilege to prevent the disclosure of any Privileged Communications to such Third Party; <u>provided</u>, <u>however</u>, that neither Buyer nor any of its Affiliates may waive such privilege without the prior written consent of Seller or unless ordered by a court of competent jurisdiction.  Likewise, in the event that a dispute arises between Seller, on the one hand, and a Third Party, on the other hand, Seller may assert the attorney-client privilege to prevent the disclosure of any privileged communications to such Third Party; <u>provided</u>, <u>however</u>, that Seller may not waive such privilege without the prior written consent of Buyer or unless ordered by a court of competent jurisdiction.

6.5    <u>Books and Records</u>.  In order to facilitate the resolution of any claims made against or incurred by Seller, the continuing administration of the Bankruptcy Case (including the pursuit of any avoidance, preference or similar actions), or for any other reasonable purpose, for a period of two (2) years after the Closing Date (subject to extension if agreed to in writing by Buyer and Seller), Buyer shall: retain the Books and Records (and, to the extent acquired hereunder, the computer servers upon which any such Books and Records are maintained) and any Correspondence relating to

periods prior to the Closing in a manner reasonably consistent with the manner in which Buyer maintains its own records; and upon reasonable notice and at Seller's own cost and expense, afford Seller's Representatives reasonable access (including the right to make, at Seller's expense, photocopies), during normal business hours, to such Books and Records and Correspondence.

6.6     Closing Conditions.  From the date hereof until the Closing, each party hereto shall use commercially reasonable efforts to take such actions as are necessary to expeditiously satisfy the closing conditions set forth in Article VII hereof.

6.7     Applicable Laws.  From the date hereof until Closing, Seller shall comply with all applicable Laws as same pertain to Purchased Assets to the extent that failure to comply with any such applicable Laws would result in the occurrence of a Material Adverse Effect. Seller shall use commercially reasonable efforts to ensure that the Sale Order shall provide either that (a) Seller has complied with any applicable bulk sale or bulk transfer Laws of any jurisdiction in connection with the transactions contemplated by this Agreement, including delivering all notifications to taxing authorities as required under applicable law or (b) compliance with such Laws described in clause (a) is not necessary or appropriate under the circumstances.

6.8     Insurance.      From the date hereof until the Closing Date, Seller shall cause the Existing Insurance Policies that it carries not to be cancelled or terminated or any other coverage thereunder to lapse, unless simultaneously with such terminations, cancellation or lapse, replacement policies underwritten by insurance companies providing the current coverage or insurance companies of nationally recognized standing providing coverage equal to or greater than the coverage under the cancelled, terminated or lapsed policies, and where possible, for substantially similar premiums, are in full force and effect. Seller shall use commercially reasonable efforts to have the County similarly maintain and continue to make payments on the Existing Insurance Policies that it carries.

6.9     Transfer Taxes.  Any sales, purchases, transfer, stamp, documentary stamp, use, or similar taxes that may be payable by reason of the sale of the Purchased Assets under this Agreement or the transactions contemplated herein shall be borne and timely paid by Buyer.

6.10     Prorations.Rent, Taxes (other than Taxes imposed or assessed on income and Taxes payable by Buyer pursuant to Section 6.9), utilities, and prepaid expenses related to the Purchased Assets shall be prorated between Seller and Buyer as of the Closing Date; provided, however, that for the avoidance of doubt, all property Taxes shall be pro-rated based on the period to which the tax applies without regard to the date of assessment.  All rent, Taxes (other than Taxes imposed or assessed on income), utilities, and prepaid expenses related to the Purchased Assets due in respect of periods prior to and including the Closing Date (other than Cure Claims), shall be the obligations of Seller, and all rent, Taxes (other than Taxes imposed or assessed on income and Taxes payable by Buyer pursuant to Section 6.9), utilities, and prepaid expenses related to the Purchased Assets due in respect of periods after the Closing Date shall be the obligations of and shall be paid in full or otherwise satisfied by Buyer; provided, further, however, that amounts that Buyer is obligated to pay under this Section 6.10 shall be treated as a credit to Seller at Closing (and paid by Buyer to Seller) to the extent that the amount either (i) was already paid by Seller prior to the Closing or (ii) is a Tax for

which the Sale Order provides for such obligation to attach to the Purchase Price, in which case such Tax obligation shall be retained by Seller.  Buyer and Seller agree that for the 2020 tax year, the prorations pursuant to this Section 6.10 shall include the proration of assumed real property taxes in the aggregate amount of $438,666.57 and personal property taxes in the aggregate amount of $760,989.01.  Rent shall be prorated on the basis of a thirty (30) day month.  If, at Closing, the Real Property or any part thereof shall have been affected by an assessment or assessments, which are or may become payable in annual installments, of which the first installment is then a charge or lien, then for the purposes of this Agreement, all the unpaid installments of any such assessment due and payable in calendar years prior to the year in which the Closing occurs shall be paid by Seller and all installments becoming due and payable after the delivery of the Deed shall be assumed and paid by Buyer, except, however, that any installments which are due and payable in the calendar year in which the Closing occurs shall be adjusted pro rata.  However, if such an assessment or assessments shall be due in one lump sum payment, then to the extent such assessment(s) is for improvements in place or substantially in place as of the date of this Agreement, then such assessment(s) shall be paid by Seller but if such assessment(s) is for improvements to be made subsequent to the date of this Agreement, then the same shall be paid by Buyer.

6.11   Further Assurances.  Following the Closing, each of the parties hereto shall, and Buyer shall cause its Affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement and the Ancillary Documents.

6.12   Bankruptcy Court Matters.

(a)   This Agreement is subject to approval by the Bankruptcy Court and the consideration by Seller of higher or better competing bids.  Until the designation of a Successful Bidder in accordance with the Bid Procedures and Bidding Procedures Order, Seller is permitted to cause Seller's Representatives to initiate contact with, solicit, or encourage submission of any inquiries, proposals, or offers by, any Person (in addition to Buyer and Buyer's Affiliates and Representatives) in connection with any sale or other disposition of the Purchased Assets.  In addition, Seller may, in accordance with the Bid Procedures and Bidding Procedures Order, respond to any inquiries or offers to purchase all or any part of the Purchased Assets or equity interests in Seller and perform any and all other acts related thereto that are required under the Bankruptcy Code, the Bidding Procedures Order, or other applicable Law, including supplying information relating to the Seller's intended business prior to the Petition Date and the assets of Seller to prospective purchasers.

(b)   If Buyer is designated as the Successful Bidder, Seller shall seek an order of the Bankruptcy Court (the "*Sale Order*") that, among other things, (i) approves the sale of the Purchased Assets to Buyer, and authorizes Seller to proceed with the sale of the Purchased Assets to Buyer on the terms and conditions set forth in this Agreement, (ii) includes a finding that Buyer and any designee of Buyer under Section 9.7 of this Agreement is a good faith purchaser of the Purchased Assets within the meaning of section 363(m) of the Bankruptcy Code and is entitled to the protections of section 363(m) of the Bankruptcy Code, (iii) states that the sale of the Purchased Assets to Buyer shall be free and clear of all Encumbrances other than Permitted Encumbrances,

(iv) provides that cash proceeds generated from the transactions contemplated by this Agreement shall be paid to the Lender (as defined in the DIP Order) in accordance with the terms and conditions of the DIP Order, until such time as the DIP Obligations (as defined in the DIP Order) have been paid in full, (v) Seller's assumption and assignment to Buyer of the Assigned Contracts, if any, pursuant to section 365 of the Bankruptcy Code subject to Buyer's payment of applicable Cure Claims and ability to demonstrate to the Bankruptcy Court adequate assurance of future performance under the Assigned Contracts, (vi) provides that all claims of (a) the County (other than those arising under the Contingent Obligations Rider), (b) investors in the EB-5 Program and all claims arising under or in connection with the EB-5 Program, and (c) CSLP, shall attach to the proceeds derived from the sale of the Purchased Assets (subject to whatever defenses Seller may have to such claims), and (vii) includes findings of fact and conclusions of law that Buyer is not a successor to Seller and shall have no liability as a successor to Seller; provided, that nothing in the Sale Order or this Agreement (x) releases, nullifies, precludes, or enjoins the enforcement of any police or regulatory liability to a governmental unit that any entity would be subject to as the post-sale owner or operator of property after the Closing Date or (y) authorizes the transfer or assignment of any governmental license, permit, registration, authorization, or approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law. On or prior to the date hereof, Buyer provided Seller with such financial and other information supporting Buyer's ability to comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B) of the Bankruptcy Code, including Buyer's financial wherewithal and willingness to perform under the Assigned Contracts, if any, in a form that allows Seller to serve such information on any counterparties to the Assigned Contracts, if any, in accordance with the Bidding Procedures Order. Both Buyer's and Seller's obligations to consummate the transactions contemplated in this Agreement are conditioned upon the Bankruptcy Court's entry of the Sale Order.

(c)    In the event that this Agreement is terminated pursuant to Section 8.1(e), contemporaneously with the closing of an Alternative Transaction, Seller shall pay to Buyer a cash amount equal to two percent (2%) of the Base Amount (the "**Break-Up Fee**") plus the Expense Reimbursement in an amount not to exceed one percent (1%) of the Base Amount.

(d)    No bidder other than Buyer shall be entitled to a Break-Up Fee or Expense Reimbursement. For the avoidance of doubt, the amount of the Break-Up Fee and Expense Reimbursement shall act as a credit toward any Closing by Buyer as the high bidder or as the Back-up Bidder.

(e)    Seller and Buyer agree that, in the event that Buyer is not the Successful Bidder at the Auction, and the Alternative Transaction with the Successful Bidder does not close, if and only if Buyer is the Back-Up Bidder, Buyer shall promptly consummate the transactions set forth in this Agreement upon the terms and conditions as set forth herein, including the Purchase Price as the same may be modified by Buyer at the Auction. Buyer's obligation to remain as the Back-Up Bidder shall not terminate until the earlier to occur of (i) the closing of the Alternative Transaction with the Successful Bidder and (ii) the Outside Date. Buyer and Seller acknowledge that time is of the essence in achieving Closing and shall undertake all commercially reasonable efforts to reach Closing in a timely manner.

(f)    Seller and Buyer will use their respective good faith and commercially reasonable efforts to cause the Sale Order to become a Final Order as soon as practicable after its entry.

(g)    Seller shall:

(i)    obtain entry by the Bankruptcy Court of the Bidding Procedures Order by 11:59 p.m. prevailing Eastern time on or before November 30, 2020, or such other date as agreed by the parties;

(ii)    obtain entry by the Bankruptcy Court of the Sale Order by 11:59 p.m. prevailing Eastern time on or before December 24, 2020, or such other date as agreed by the parties; and

(iii)    consummate the Closing as promptly as practicable after entry of the Sale Order, but in no event later than the Outside Date, unless otherwise agreed in writing by Buyer and Seller.

(h)    Seller will provide Buyer with a reasonable opportunity to review and comment upon all motions, applications, petitions, schedules and supporting papers relating to the transactions contemplated by this Agreement prepared by Seller (including forms of Orders and notices to interested parties) prior to the filing thereof in the Bankruptcy Case.  Seller shall use commercially reasonable efforts to obtain entry of the Sale Order.  From and after the date hereof, and subject to the terms herein, Seller shall not take any action that is reasonably likely to result in, or fail to take any action that could reasonably likely result in, the reversal, voiding, modification or staying of the Sale Order.

(i)    Seller will promptly take such actions as are reasonably requested by Buyer to assist in obtaining entry of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of providing necessary assurances of performance by Seller of its obligations under this Agreement and all other agreements, instruments, certificates and other documents to be entered into or delivered in connection with the transactions contemplated by this Agreement and demonstrating that Buyer is a good faith buyer under section 363(m) of the Bankruptcy Code.

(j)    If an appeal is taken, or petition for certiorari or motion for rehearing or re-argument filed, or a stay pending appeal is requested from the Bidding Procedures Order, the Bidding Procedures Order, or the Sale Order, Seller will promptly notify Buyer in writing of such appeal, petition, motion or stay request and Seller, with input from Buyer, will take all reasonable steps to defend against such appeal, petition, motion or stay request.  Notwithstanding the foregoing, nothing in this Agreement precludes the parties from consummating the transactions contemplated by this Agreement if the Sale Order has been entered and has not been stayed and Buyer and Seller mutually waive in writing the condition to Closing that the Sale Order be a Final Order.

(k)    Seller and Buyer shall comply with all of their respective obligations under the Bidding Procedures Order and Sale Order (after the entry of such order by the Bankruptcy Court).

(l)     Seller shall comply with all applicable notice and other requirements of the Bankruptcy Code, Bankruptcy Rules and the terms of the Bidding Procedures Order in connection with the transactions contemplated herein.

6.13    <u>Assumption & Rejection of Executory Contracts</u>.

(a)     <u>Schedule 6.13</u> (the "***Contract & Cure Schedule***") sets forth a list of all Contracts that Buyer has advised Seller it wants to assume and Seller to assign to Buyer under section 365 of the Bankruptcy Code and in accordance with <u>Section 6.13(b)</u> below, which schedule Buyer shall deliver to Seller not later than three (3) days prior to Closing.  The Cure Claims in respect of each Contract based upon the most recent financial information available to Seller are set forth in the Contract & Cure Schedule.  From the date of this Agreement until the conclusion of the Auction, or if Buyer is designated as the Successful Bidder or Back-Up Bidder at the Auction, at any time prior to the Closing Date, Buyer, in its sole and absolute discretion, may amend the Contract & Cure Schedule to (i) add any Contract as an Assigned Contract provided that Buyer pays any applicable Cure Claims with respect to such newly added Assigned Contract on the Assignment Effective Date or (ii) remove any Contract (and be relieved of any obligation to pay any applicable Cure Claims with respect to such Contract), and provide notice to any counterparty to any additional Contract that will be an Assigned Contract shall be given by Seller in accordance with the notice and service provisions set forth in the Bidding Procedures and Bidding Procedures Order; <u>provided</u>, <u>however</u>, that Buyer is required to assume the (i)  the "Lease Agreement for Railroad Facilities" dated December 17, 2015, between Halifax County, as Lessor, and Klausner Lumber Two LLC, as Lessee, (ii) the Private Sidetrack Agreement between CSX Transportation, Inc., Klausner Lumber Two LLC and the County, identified as Agreement No. CSX786468 and (iii) "Pump Station Maintenance and Operation Agreement" executed by the County, as Owner, and Klausner Lumber Two LLC, as Operator.  Unless the Bankruptcy Court orders otherwise, each Contract included on the Contract & Cure Schedule will be deemed to have been assigned to Buyer and become an Assigned Contract on the date (the "***Assignment Effective Date***") that is the later of: (i) the Closing Date, or (ii) contemporaneously with the resolution of any objections to the assumption and assignment of such Contract or to a proposed Cure Claim.

(b)     No designation of any Contract for assumption and assignment in accordance with this <u>Section 6.13</u>, the Bidding Procedures Order, the Bidding Procedures Order or the Sale Order will give rise to any right to any adjustment to the Purchase Price; <u>provided</u>, <u>however</u>, for the avoidance of doubt, Buyer shall be responsible and liable for payment of any and all Cure Claims for any Assigned Contract.

6.14    <u>Use of Intellectual Property Following Closing</u>.

(a)     For the avoidance of doubt and notwithstanding anything in this Agreement to the contrary, from and after the Closing Date, Seller shall cease and discontinue any and all use or other exploitation of all Company Used Intellectual Property; <u>provided</u>, <u>however</u>, that Seller shall have the right on a royalty-free basis to continue to use the name "Klausner Lumber Two LLC" and the financial data for the purposes of filing tax returns and administering the Bankruptcy Case and or the Bankruptcy estate, which right shall terminate on the date on which the Bankruptcy Case is either dismissed, converted to a case under Chapter 7 of the Bankruptcy Code, or closed pursuant to a final

decree or order of the Bankruptcy Court.  Furthermore, Buyer shall, for a period of two (2) years from the Closing Date, permit Seller reasonable access to those Books and Records while they are in Seller's possession or control to the extent that access is required by Seller to file tax returns or administer the Bankruptcy Case and/or the Bankruptcy estate, but Buyer shall not be responsible or liable to Seller or any other Person for, or as a result of, any loss or destruction of or damage to any such Books and Records, and provided that Buyer shall have no obligation to provide access to any Books and Records pursuant to <u>Section 6.5</u> or this <u>Section 6.14</u> to the extent such Books and Records contain any confidential information (including intellectual property or trade secret information) of Buyer or the Purchased Assets, the disclosure of which would be prejudicial to the business, operations or assets of Buyer, subject to Law.  Seller shall be responsible for all reasonable out-of-pocket costs and expenses incurred, directly or indirectly, by Buyer in connection with any access contemplated by <u>Section 6.5</u> or this <u>Section 6.14</u>.

(b)     From and after the Closing Date, to the extent that Buyer desires to use any Company Used Intellectual Property, Buyer will seek from the applicable vendor or licensor of such item of Company Used Intellectual Property the right to use such item of Company Used Intellectual Property, which may require Buyer to pay a license or assignment fee to such vendor or licensor.

6.15     <u>Transfer of Governmental Authorizations</u>.

(a)     From and after the date hereof Seller, and Buyer shall reasonably cooperate (at Buyer's sole cost and expense) to transfer (to the extent transferable) to Buyer as of the Closing Date (or as soon as reasonably practicable thereafter) all Governmental Authorizations included in the Purchased Assets; <u>provided</u>, <u>however</u>, that any reasonable, documented out-of-pocket costs associated with such cooperation by Seller after the Closing Date (including the *pro rata* portion of the costs of any employee, consultant or independent contractor directly providing such cooperation after the Closing Date, as determined by the amount of time dedicated by such employee, consultant or independent contractor to such cooperation as a proportion of all time dedicated by such employee, consultant or independent contractor to Seller) shall be borne by Buyer.

(b)     In addition, no less than three (3) days prior to the Closing Date, Buyer may, at its sole discretion and at its sole expense, request for Seller to maintain in effect any Governmental Authorization or for up to three (3) months after the Closing for the purposes of passing through the benefits of such Governmental Authorization to Buyer, and (i) provided Buyer timely pays any costs associated with such Governmental Authorization, including any costs referred to in clause (iii) below, Seller shall use commercially reasonable efforts to maintain in effect such Governmental Authorization, (ii) Seller and Buyer shall use commercially reasonable efforts to agree on arrangements for the purposes of passing through the benefits of such Governmental Authorization to Buyer, and (iii) any such arrangements described in the foregoing shall be at the sole expense of Buyer (including all statutory and other costs required to be paid or otherwise incurred in the Bankruptcy Case, counsels' and other professionals fees and expenses, to the extent such costs would not have been incurred but for this <u>Section 6.15</u>).

6.16     <u>Excluded Contracts; Consents</u>.

(a)     At any time prior to the Closing Date, Buyer may, at its sole discretion and at its sole expense, request for Seller to maintain in effect any Excluded Contract or for up to three (3) months after the Closing for the purposes of passing through the benefits of such Excluded Contract to Buyer, and (i) provided Buyer timely pays any costs associated with such Excluded Contract, including any costs referred to in clause (iii) below, Seller shall maintain in effect such Excluded Contract and not reject such Excluded Contract, (ii) Seller and Buyer shall use commercially reasonable efforts to agree on arrangements for the purposes of passing through the benefits of such Excluded Contract to Buyer, and (iii) any such arrangements described in the foregoing shall be at the sole expense of Buyer (including all statutory and other costs required to be paid or otherwise incurred in the Bankruptcy Case, counsels' and other professionals fees and expenses, to the extent such costs would not have been incurred but for this Section 6.16); provided, that in no event shall Seller be required to maintain any Excluded Contract beyond the effective date of a confirmed plan in the Bankruptcy Case.

(b)     Notwithstanding any other provision of this Agreement, this Agreement does not affect an assignment of any Assigned Contract to the extent that such Assigned Contract is not assignable under the Bankruptcy Code without the consent of the other party or parties thereto, and the consent of such other party has not been given or received, as applicable, as of the Closing Date. As to any such Assigned Contract so designated in writing by Buyer, Seller and Buyer will use commercially reasonable efforts to obtain as promptly as practicable prior to and after the Closing, if necessary, the consent of the other parties to such Assigned Contract or, if required, novation thereof to Buyer or, alternatively, written confirmation from such parties reasonably satisfactory to Seller and Buyer that such consent is not required.  In no event, however, will Seller be obligated to pay any money to any Person or to offer or grant financial or other accommodations to any Person in connection with obtaining any consent, waiver, confirmation, novation or approval with respect to any such Assigned Contract.  If any consent, waiver, confirmation, novation or approval is not obtained with respect to any such Assigned Contract, then to the extent permitted by applicable Law, Seller and Buyer will cooperate to establish an agency type or other similar arrangement reasonably satisfactory to Seller and Buyer under which Buyer would obtain (including by means of subcontracting, sublicensing or subleasing arrangement), to the extent practicable, all rights, and assume the corresponding Liabilities thereunder or under which Seller would enforce, for the benefit of Buyer, with Buyer assuming and agreeing to pay Seller's Liabilities and expenses, any and all rights of Seller against a Third Party to any such Assigned Contract.  In such event (i) Seller will promptly pay to Buyer when received all moneys relating to the period on or after the Closing Date received by it under any Assigned Contract not transferred pursuant to this Section 6.16(b) and (ii) Buyer will promptly pay, perform or discharge when due any Liabilities arising thereunder after the Closing Date but not transferred to Buyer pursuant to this Section 6.16(b).  The failure by Buyer or Seller to obtain any required consent, waiver, confirmation, novation or approval with respect to any Assigned Contract will not relieve any party from its obligation to consummate at the Closing the transactions contemplated by this Agreement.  Buyer acknowledges that no adjustment to the Purchase Price will be made for any such Assigned Contracts that are not assigned and that Buyer will have no claim against Seller in respect of any such unassigned Contracts.

6.17   Employees.  Following the Closing only, Buyer shall have the right, but not the obligation, to extend an offer of at will employment to the former employees, consultants or independent contractors of Seller selected by Buyer.

## ARTICLE VII

## CONDITIONS TO CLOSING

7.1     <u>Conditions to Obligations of All Parties</u>.    The obligations of each party to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or waiver by both Buyer and Seller in writing, at or prior to the Closing, of each of the following conditions:

(a)     The Bankruptcy Court shall have entered the Bidding Procedures Order, in form and substance reasonably acceptable to Seller and Buyer, and the Bidding Procedures Order must be a Final Order.

(b)     The Bankruptcy Court shall have entered the Sale Order in form and substance reasonably acceptable to Seller and Buyer, and the Sale Order must be a Final Order.

(c)     No injunction, stay, or similar Order issued by any Governmental Authority shall be in effect that restrains, enjoins, stays, or prohibits the consummation of the transactions set forth in this Agreement and there must not be in effect any Law that would prohibit or make illegal the consummation of the transactions contemplated by this Agreement.

(d)     The Real Property shall have been conveyed to Seller by County pursuant to an Order of the Bankruptcy Court, and such Order must be a Final Order.

(e)     The Stipulation Regarding Motion to Approve County Settlement among Klausner Lumber Two LLC, Halifax County, North Carolina and Carolina Sawmills L.P. filed with the Bankruptcy Court on November 5, 2020 [Dkt. No. 375-1], shall have been approved by entry an Order of the Bankruptcy Court, and such stipulation and Order shall be reasonably satisfactory to Buyer.

7.2     <u>Conditions to Obligations of Buyer</u>.  The obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Buyer's waiver, at or prior to the Closing, of each of the following conditions:

(a)     The representations and warranties of Seller contained in <u>Article IV</u> of this Agreement shall be true and correct in all material respects, at and as of the date hereof, and on the Closing Date (except for representations and warranties made as of a specified date, the accuracy of which shall be determined as of that specified date and except for representations and warranties that are qualified by materiality, which shall be true in all respects).

(b)     Seller shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement and each of the Ancillary Documents to be performed or complied with by it prior to or on the Closing Date; <u>provided</u>, <u>however</u>, that with respect to agreements, covenants and conditions that are qualified by materiality, Seller shall have performed such agreements, covenants and conditions, as so qualified, in all respects.

(c)    Seller shall have delivered to Buyer duly executed counterparts to the Ancillary Documents and such other documents and deliveries set forth in <u>Section 3.2(a)</u> and County shall have delivered to Buyer and/or Seller, as applicable, duly executed counterparts to the documents and deliveries set forth in <u>Section 3.2(e)</u>.

(d)    Buyer shall have received a certificate, dated the Closing Date and signed by a duly authorized officer of Seller, in such person's capacity as an officer and not in such person's individual capacity, that each of the conditions set forth in <u>Section 7.2(a)-7.2(c)</u> have been satisfied (the "***Seller Closing Certificate***").

(e)    Since the date of this Agreement there shall not have occurred any Material Adverse Effect; provided, that Buyer shall give written notice to Seller within five (5) days of becoming aware of the occurrence of such Material Adverse Effect.

7.3    <u>Conditions to Obligations of Seller</u>.  The obligations of Seller to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Seller's waiver, at or prior to the Closing, of each of the following conditions:

(a)    The representations and warranties of Buyer contained in <u>Article V</u> of this Agreement shall be true and correct in all respects at and as of the date hereof, as though made at and as of the date hereof (except for representations and warranties made as of a specified date, the accuracy of which shall be determined as of that specified date), with only such exceptions as do not have and would not reasonably be expected to have a material adverse effect on Buyer or the transactions contemplated by this Agreement.

(b)    Buyer shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement and each of the Ancillary Documents to be performed or complied with by it prior to or on the Closing Date; <u>provided</u>, <u>however</u>, that with respect to agreements, covenants and conditions that are qualified by materiality, Buyer shall have performed such agreements, covenants and conditions, as so qualified, in all respects.

(c)    Buyer shall have delivered to Seller, CSLP or County duly executed counterparts to the Ancillary Documents and such other documents and deliveries set forth in <u>Sections 3.2(b), 3.2(c) and 3.2(d)</u> and County shall have delivered to Buyer and/or Seller, as applicable, duly executed counterparts to the documents and deliveries set forth in <u>Section 3.2(e)</u>.

(d)    Seller shall have received a certificate, dated the Closing Date and signed by a duly authorized officer of Buyer, in such person's capacity as an officer and not in such person's individual capacity, that each of the conditions set forth in <u>Section 7.3(a)-(c)</u> have been satisfied (the "***Buyer Closing Certificate***").

## ARTICLE VIII

## TERMINATION

8.1    <u>Termination</u>.  This Agreement may be terminated at any time prior to the Closing:

(a)      by the mutual written consent of Seller and Buyer;

(b)      by Buyer by written notice to Seller if:

(i)      Buyer is not then in material breach of any provision of this Agreement and there has been a breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Seller pursuant to this Agreement that would give rise to the failure of any of the conditions specified in Article VII and such breach, inaccuracy or failure has not been cured by Seller within five (5) Business Days of Seller's receipt of written notice of such breach from Buyer;

(ii)      any of the conditions set forth in Section 7.1 or Section 7.2 shall not have been, or if it becomes reasonably apparent that any of such conditions will not be, fulfilled by the Outside Date, unless such failure shall be due to the failure of Buyer to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing;

(iii)      pursuant to Section 6.1(b), the value of any missing Purchased Assets, in the aggregate, exceeds ten (10%) of the Purchase Price; or

(iv)      (x) the Bankruptcy Case is dismissed or converted into a case under chapter 7 of the Bankruptcy Code or (y) an examiner with expanded powers that affect the Purchased Assets or prevent the Closing from occurring or a trustee is appointed in the Bankruptcy Case.

(c)      by Seller by written notice to Buyer if:

(i)      Seller is not then in material breach of any provision of this Agreement and there has been a breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Buyer pursuant to this Agreement that would give rise to the failure of any of the conditions specified in Article VII and such breach, inaccuracy or failure has not been cured by Buyer within ten (10) Business Days of Buyer's receipt of written notice of such breach from Seller; or

(ii)      any of the conditions set forth in (x) Section 7.1 or (y) Section 7.3 shall not have been, or if it becomes reasonably apparent that any of such conditions will not be, fulfilled by the Outside Date, unless such failure shall be due to the failure of Seller to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing; or

(d)      by Buyer or Seller by written notice to the other party if:

(i)      there shall be any Law that makes consummation of the transactions contemplated by this Agreement illegal or otherwise prohibited, or (ii) any Governmental Authority shall have issued a Governmental Order restraining or enjoining the transactions contemplated by this Agreement, and such Governmental Order shall have become final and non-appealable or will cause the closing to occur or reasonably likely to occur after the Outside Date; or

(ii)    there is in effect a Final Order restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement; provided, however, that the right to terminate this Agreement under this Section 8.1(d)(ii) will not be available to any party whose failure to fulfill any covenant or obligation under this Agreement is the cause of or resulted in the action or event described in this Section 8.1(d)(ii) occurring.

(e)    This Agreement shall terminate automatically (i) in the event that an Alternative Transaction has been consummated following approval by the Bankruptcy Court, or (ii) in the event that Buyer is not chosen at the Auction to be the Successful Bidder or the Back-Up Bidder, in each case subject to Buyer's right to payment of the Break-Up Fee and Expense Reimbursement in accordance with the Section 6.12(c) and the refund of the Deposit in accordance with Section 2.5(h).

8.2    Effect of Termination.   In the event of the termination of this Agreement in accordance with this Article VIII this Agreement shall forthwith become void and there shall be no Liability on the part of any party hereto except:

(a)    as set forth in this Article VIII, Section 2.5(d)-(h), and Section 6.12(c) hereof; and

(b)    that nothing herein shall relieve any party hereto from Liability to the other party for any willful breach of any provision hereof.

## ARTICLE IX

## MISCELLANEOUS

9.1    Expenses.  Except as otherwise expressly provided herein, including with respect to the Expense Reimbursement, all costs and expenses, including fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses, whether or not the Closing shall have occurred.

9.2    Notices.   All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt) with a copy by email; (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested) with a copy by email; (c) on the date sent by email of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid with a copy by email.  Notwithstanding anything to the contrary herein, any and all notices, requests, consents, claims, demands, waivers and other communications hereunder not otherwise transmitted by email shall additionally transmit such communications by email to any and all respective parties on the date such notice, request, consent, claim, demand, waiver, or other communication was otherwise transmitted (with confirmation of transmission).  Such communications must be sent to the respective parties at the following addresses

(or at such other address for a party as shall be specified in a notice given in accordance with this <u>Section 9.2</u>.

       If to Seller:        Klausner Lumber Two LLC
PO Box C
Redding Ridge, CT 06876
Attention: Robert Prusak, CRO
Email:    bprusak@asgaardcapital.com

       with a copy (that shall not constitute notice) to:

                c/o Asgaard Capital LLC
1934 Old Gallows Road, Suite 350
Vienna, VA 22182
United States
Attention: Charles Reardon, Senior Managing Director
Email:    creardon@asgaardcapital.com

                Westerman Ball Ederer Miller Zucker & Sharfstein LLP
1201 RXR Plaza
Uniondale, NY 11556
Attention Thomas A. Draghi; William C. Heuer
Email:    wheuer@westermanllp.com
            tdraghi@westermanllp.com

                and

                Morris, Nichols, Arsht & Tunnell LLP
1201 North Market St.
Wilmington, Delaware 19801
Attention: Eric Schwartz, Daniel B. Butz
Email:    dbutz@mnat.com

       with a copy to counsel to the Creditors Committee:

                Elliott Greenleaf, P.C.
1105 Market Street
Suite 1700
Wilmington, DE 19801
Attention: Eric M. Sutty
Email:    ems@elliottgreenleaf.com

       If to Buyer:      Mayr-Melnhof Holz Holding AG
Turmgasse 67, 8700 Leoben
Austria
Attention: DI Richard Stralz, Vorstandsvorsitzender/CEO
Email:  richard.stralz@mm-holz.com

with a copy (that shall not constitute notice) to:

> Schoenherr Rechtsanwaelte GmbH
> Schottenring 19, A-1010, Vienna
> Austria
> Attention: Miriam Simsa
> Email:  m.simsa@schoenherr.eu
>
> and
>
> Hogan Lovells US LLP
> 1999 Avenue of the Stars #1400
> Los Angeles, CA 90067
> Attention: Erin N. Brady
> Email:  erin.brady@hoganlovells.com
>
> and
>
> Hogan Lovells US LLP
> 390 Madison Avenue
> New York, New York 10017
> Attention: Christopher R. Bryant
> Email:  chris.bryant@hoganlovells.com

9.3    <u>Interpretation</u>.  For purposes of this Agreement, (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole. Unless the context otherwise requires, references herein: (x) to Articles, Sections, Schedules and Exhibits mean the Articles and Sections of, Schedules and Exhibits attached to, this Agreement; (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted.  The Schedules and Exhibits referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

9.4    <u>Headings</u>.  The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

9.5    <u>Severability</u>.  If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.  Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually

acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

9.6    <u>Entire Agreement</u>.  This Agreement, including the Exhibits, the Schedules and the Ancillary Documents, the Bidding Procedures Order (once entered) and the Sale Order (once entered), if Buyer is the Successful Bidder, constitute the entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement and those in the Ancillary Documents, the Exhibits, and the Schedules, the statements in the body of this Agreement will control, except as otherwise provided in the Sale Order.

9.7    <u>Assignment, Successors and No Third-Party Rights</u>.This Agreement binds and benefits the parties and their respective successors (including any trustee, receiver, receiver-manager, interim receiver or monitor or similar officer appointed in any respect of Seller under chapter 11 or chapter 7 of the Bankruptcy Code and any entity appointed as a successor to Seller pursuant to a confirmed chapter 11 plan).  No party may delegate any performance of its obligations under this Agreement, except that Buyer may at any time delegate its rights and the performance of its obligations to any Affiliate of Buyer so long as Buyer remains fully responsible for the performance of the delegated obligation. Buyer may designate one or more Affiliates, including any special purpose entities that may be organized by Buyer for the purpose of purchasing the Purchased Assets (including the Volvo, Kalmar Forklifts and Liebherr) and assuming the Assumed Liabilities, or any portion thereof at closing, and upon written notice to Seller of any such designation by Buyer, Seller agrees that such designee of Buyer shall be deemed to be Buyer hereunder for all purposes and Seller further agrees to execute and deliver all instruments of transfer with respect to the Purchased Assets directly to, and in the name of, Buyer's designees.  Nothing expressed or referred to in this Agreement will be construed to give any Person, other than the parties to this Agreement, any legal or equitable right, remedy or claim under or with respect to this Agreement or any provision of this Agreement, except such rights as may inure to a successor or permitted assignee under this <u>Section 9.7</u>.

9.8    <u>Amendment and Modification; Waiver</u>**.**  This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving.  No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or Default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

9.9    <u>Governing Law; Submission to Jurisdiction; Waiver of Jury Trial</u>.

(a)    THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH FEDERAL BANKRUPTCY LAW, TO THE EXTENT APPLICABLE,

AND WHERE STATE LAW IS IMPLICATED THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF, INCLUDING AS TO MATTERS OF CONSTRUCTION, VALIDITY, AND PERFORMANCE.

(b)    BUYER AND SELLER AGREE THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION OVER ALL DISPUTES AND OTHER MATTERS RELATING TO (i) THE INTERPRETATION AND ENFORCEMENT OF THIS AGREEMENT OR ANY ANCILLARY DOCUMENT AND (ii) THE PURCHASED ASSETS AND ASSUMED LIABILITIES, AND SELLER AND BUYER EXPRESSLY CONSENT TO AND AGREE NOT TO CONTEST SUCH EXCLUSIVE JURISDICTION.    EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY ACTION ARISING OUT OF OR RELATED TO THIS AGREEMENT, ANY ANCILLARY DOCUMENT, OR THE TRANSACTIONS CONTEMPLATED HEREBY.

## ARTICLE X

10.1    <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**SELLER:**
**KLAUSNER LUMBER TWO LLC**

By: _____

Name: Robert Prusak

Title: Chief Restructuring Officer


**BUYER:**
**MAYR-MELNHOF HOLZ HOLDING AG**


By: _____

Name:

Title:

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**SELLER:**
KLAUSNER LUMBER TWO LLC


By: _____
Name:  Robert Prusak
Title: Chief Restructuring Officer


**BUYER:**
MAYR-MELNHOF HOLZ HOLDING AG


By: _____
Name:  DI Richard Stralz
Title:   Chairman of the Managing Board


By: _____
Name:  DI Michael Markus Wolfram
Title:   Member of the Management Board

**EXHIBIT A**

**FORM OF BILL OF SALE**[1]

This BILL OF SALE (this "Bill of Sale"), is executed and delivered as of [_____ __], 2020, by KLAUSNER LUMBER TWO LLC ("Seller") for the benefit of _____, a _____ ("Buyer").

WHEREAS, on the terms and subject to the conditions of the Asset Purchase Agreement, dated as [_____ __], 2020, by and between Seller and Buyer (as modified, amended, or supplemented, the "Asset Purchase Agreement"), Seller agreed to, on the Closing Date, sell, convey, transfer, assign, and deliver to Buyer the Purchased Assets free and clear of all Encumbrances.

NOW, THEREFORE, for the consideration set forth in the Asset Purchase Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged:

1.    Defined Terms.  All initially capitalized terms used but not defined herein have the meaning ascribed to such terms in the Asset Purchase Agreement.

2.    Transfer of Purchased Assets.  On the terms and subject to the conditions set forth in the Asset Purchase Agreement, Seller hereby sells, conveys, transfers, assigns, and delivers to Buyer, and Buyer's successors and assigns, all of the right, title, and interest of Seller in and to the Purchased Assets owned by Seller free and clear of all Encumbrances.

3.    Further Assurances.  If Buyer shall consider or be advised that any deeds, bills of sale, instruments of conveyance, assignments, assurances, or any other actions or things are necessary or desirable to vest, perfect, or confirm ownership (of record or otherwise) in Buyer, Buyer's right, title, or interest in, to, or under any or all of the Purchased Assets transferred and conveyed by Seller hereunder, Seller shall execute and deliver all deeds, bills of sale, instruments of conveyance, powers of attorney, assignments, and assurances and take and do all such other actions and things as may be reasonably requested by Buyer in order to vest, perfect, or confirm any and all right, title, and interest in, to, and under such rights, properties, or assets in Buyer, in each case at Buyer's cost and expense.

4.    Binding on Successors; No Third-Party Beneficiaries.  This Bill of Sale shall be binding upon and inure to the benefit of the parties hereto and the successors in interest and permitted assigns of such parties.  This Bill of Sale is not intended to confer any rights or remedies upon any Person other than the parties hereto.

5.    Counterparts.  This Bill of Sale may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.  A manual signature on this Bill of Sale or other documents to be delivered pursuant to this Bill of Sale, an image of which shall have been transmitted electronically, will constitute an

---

[1] This form is subject to revisions agreed to between Buyer and Seller.

original signature for all purposes.  The delivery of copies of this Bill of Sale or other documents to be delivered pursuant to this Bill of Sale, including executed signature pages where required, by electronic transmission will constitute effective delivery of this Bill of Sale or such other document for all purposes.

6.     <u>Governing Law</u>.    THIS BILL OF SALE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH FEDERAL BANKRUPTCY LAW, TO THE EXTENT APPLICABLE, AND WHERE STATE LAW IS IMPLICATED THIS BILL OF SALE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF, INCLUDING AS TO MATTERS OF CONSTRUCTION, VALIDITY, AND PERFORMANCE.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, Seller has executed this Bill of Sale as of the day and year first above written.

**SELLER:**
KLAUSNER LUMBER TWO LLC


By: _____

Name: _____

Title: _____

[*Signature page to Bill of Sale*]

**EXHIBIT B**

**FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT**[2]

This ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement") is executed and delivered as of [_____ __], 2020, by and between KLAUSNER LUMBER TWO LLC ("Seller"), as debtor and debtor-in-possession, to [_____], a [_____] ("Buyer"), pursuant to the Asset Purchase Agreement (as hereinafter defined).

WHEREAS, on the terms and subject to the conditions of the Asset Purchase Agreement, dated as [_____ __], 2020, by and between Buyer and Seller (as modified, amended, or supplemented, the "Asset Purchase Agreement"), Seller agreed to, on the Closing Date, sell, convey, transfer, assign, and deliver to Buyer the Purchased Assets free and clear of all Encumbrances.

NOW, THEREFORE, for the consideration set forth in the Asset Purchase Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

1.    Defined Terms.  All initially capitalized terms used but not defined herein have the meaning given them in the Asset Purchase Agreement.

2.    Assignment of Assigned Contracts.  On the terms and subject to the conditions set forth in the Asset Purchase Agreement, Seller hereby sells, conveys, transfers, assigns, and delivers to Buyer, and Buyer's successors and assigns, all right, title and interest of Seller in and to (a) the Assigned Contracts set forth on attached Schedule A.

3.    Assumption of Assumed Liabilities.  On the terms and subject to the conditions set forth in the Asset Purchase Agreement, hereby assumes and agrees to discharge or perform when due (in accordance with the respective terms and subject to the respective conditions of the Assigned Contracts in the case of the Assigned Contracts), the Assigned Contracts and all other Liabilities of Seller that constitute Assumed Liabilities.  Other than the obligations under the Assigned Contracts, and the other liabilities of Seller that constitute Assumed Liabilities, Buyer has not assumed any Liability of any nature or kind whatsoever of Seller.

4.    Binding on Successors; No Third-Party Beneficiaries.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and the respective successors in interest and permitted assigns of such parties.  This Agreement is not intended to confer any rights or remedies upon any person or entity other than the parties hereto.

5.    Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.  A manual signature on this Agreement or other documents to be delivered pursuant to this Agreement, an image of which shall have been transmitted electronically, will constitute an original signature for all purposes.  The delivery of copies of this Agreement or other documents to

---

[2] This form is subject to revisions agreed to between Buyer and Seller.

be delivered pursuant to this Agreement, including executed signature pages where required, by electronic transmission will constitute effective delivery of this Agreement or such other document for all purposes.

      6.    <u>Governing Law</u>.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH FEDERAL BANKRUPTCY LAW, TO THE EXTENT APPLICABLE, AND WHERE STATE LAW IS IMPLICATED THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF, INCLUDING AS TO MATTERS OF CONSTRUCTION, VALIDITY, AND PERFORMANCE.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the undersigned hereby execute this Assignment and Assumption Agreement the day and year first above written.

**BUYER**:

_____

By: _____

Name: _____

Title: _____

**SELLER:**

KLAUSNER LUMBER TWO LLC

By: _____

Name: _____

Title: _____

[*Signature page to Assignment and Assumption Agreement*]

## Schedule A
Assigned Contracts

## EXHIBIT C

### FORM OF AMENDED CONTINGENT OBLIGATIONS RIDER

_____ (the "Buyer") and Halifax County, North Carolina (the "County") hereby agree to the following as of the date hereof. All initially capitalized terms used but not defined herein have the meaning given them in the Asset Purchase Agreement by and between Klausner Lumber Two LLC, as Seller, and Mayr-Melnhof Holz Holding AG, as Buyer, dated as of November __, 2020.

**A.     The County's Obligations and Commitments**

Subject to the occurrence of the Closing Date:

1.     Transfer of Records.  The County shall transfer to the Buyer all records of the County with respect to the real property identified on Schedule I hereto (the "Property") (other than any County communications, notes, minutes, memos, or the like) relating to the period following the date on which the employees of Klausner Lumber Two LLC, a Delaware limited liability company (the "Debtor") vacated the Property on or about March 16, 2020.

2.     Transfer of Property; Consent of Transfer.  The County will consent to the Property being transferred from the Debtor to the Buyer pursuant to the provisions of the APA and Sale Order. The Buyer shall take the Property free and clear of all Encumbrances imposed on the Property by or through the County, and all reversionary interests in favor of the County, and shall be subject only to Permitted Encumbrances and any of the following accruing, covering or otherwise due and owing for the period from and after the Closing Date: (a) utility charges if owed to the County or any governmental agency operating under the County's control, and (ii) any claims and liens for unpaid real and personal property taxes due to the County, or accrued but not then due and payable.

3.     Consent to Assignment of Railroad Lease.  The County will consent to the assignment of that certain "Lease Agreement for Railroad Facilities" dated December 17, 2015, between Halifax County, as Lessor, and Klausner Lumber Two LLC, as Lessee, to the Buyer.

4.     Consent to Assignment of Private Sidetrack Agreement.  The County will consent to the assignment of the Private Sidetrack Agreement between CSX Transportation, Inc., Klausner Lumber Two LLC and the County, identified as Agreement No. CSX786468.

5.     Consent to Assignment of Pump Station Agreement.  The County will consent to the assignment of a Pump Station Operation and Maintenance Agreement executed by the County as Owner, and Klausner Lumber Two LLC, as Operator, regarding a force main sewer line and pump station that was substantially completed in July, 2017.

**B.     The Buyer's Obligations and Commitments**

Subject to the occurrence of the Closing Date:

1.     Jobs Commitment.  The Buyer will create 150 full-time jobs at the facility on the Property not later than the second anniversary of the closing of the conveyance of the Property to the

Buyer (the "Compliance Testing Date"), and will retain that number of full time jobs during the twelve month period  immediately following the Compliance Testing Date  (the "Compliance Testing Period").  At the option of the Buyer, the Compliance Testing Date may be the date that the Buyer actually creates 150 full-time jobs at the Facility if that date is sooner than the second anniversary of the Closing Date.

2.      Quarterly Reporting.  As evidence of full-time job creation and maintenance of full-time jobs the Buyer will provide the County with a copy of its Quarterly Tax and Wage Statement filed with the North Carolina Department of Commerce, Division of Employment Security ("DES"), for each calendar quarter following the date of conveyance of the Property to the Buyer through the end of the Compliance Testing Period.  Each copy shall be provided within 15 days after its submission to DES.

3.      Equal Employment Opportunity. The Buyer will provide equal opportunity to all of its employees and applicants for employment and to assure that there shall be no discrimination against any person on the basis of race, color, religion, creed, national origin, sex, age, physical or mental handicap, marital status or political beliefs unless related to a bona fide occupational requirement.

4.      Failure to Create or Retain Full-time Jobs.  Should the Buyer fail to satisfy the jobs commitment requirement in Section B(1) above (the "Jobs Commitment") (whether with respect to the creation of full time jobs or the retention of full time jobs), the sole consequence shall be the Buyer's obligation to make the Recovery Payment to the County as described in Section 5 below, and no such failure shall constitute a default, event of default, or breach hereunder, under any lease or other agreement by and between the County and the Buyer or its successors and/or assigns executed in connection therewith or herewith, or the Agreement.

If it is reasonably determined that the Buyer was unable to satisfy its Job Commitment primarily as a result of force majeure (to include pandemics) affecting the Property and its operations during the twelve month period immediately prior to the Compliance Testing Date or during the Compliance Testing Period, the Buyer shall have an additional twelve months to satisfy the Jobs Commitment.

The Buyer shall be permitted to convey the Property to a third party who agrees in writing to assume all of the Buyer's obligations herein and in such event, the Buyer shall be released from the obligations hereunder.  The Buyer shall also be permitted to lease the property to a third party, provided that such party agrees to operate the property as a sawmill and comply with the terms hereof.  In such event, performance by the lessee shall be deemed to constitute performance by the Buyer (and non-performance by the lessee shall trigger all obligations of the Buyer hereunder).

For purposes of this Agreement, "Full-time Job" shall mean a job at the Property (whether such job was created prior to or after the commencement of the Buyer's operations at the Property), with no predetermined end date, with a regular work week of thirty hours or more on average for the entire normal year of local company operations.  Part-time jobs will not be counted on a full-time equivalent basis.

5.      Recovery Payment.  In the event the Buyer fails to create 150 full-time jobs as of the Compliance Testing Date, the Buyer shall pay to the County an amount (the "Recovery Payment")

equal to the product of 150 minus the number of full-time jobs at the Property as of the Compliance Testing Date, multiplied by $21,916.67. Should the Buyer create the required number of full-time jobs but subsequently fail to retain an average of 150 full-time jobs as of the end of the Compliance Testing Period, the Buyer shall pay to the County an amount (again, the "Recovery Payment") equal to the product of 150 minus the average number of full-time jobs as of the end of Compliance Testing Period, multiplied by $21,916.67. The Recovery Payment shall be due and payable on or before the date which is six months following the Compliance Testing Date or the Compliance Testing Period. If the Buyer complies with its Jobs Commitment as to both the creation and retention of full-time jobs, the Buyer shall have no obligation to make any Recovery Payment to the County and the County Deferred Obligation shall be deemed satisfied and released in its entirety. For the avoidance of doubt, the maximum amount that the Buyer may be required to pay the County under this Section 5 is $3,287,500.

6.    <u>Assumption of Railroad Lease</u>.  The Buyer will assume all obligations of Klausner Lumber Two LLC under that certain "Lease Agreement for Railroad Facilities" dated December 17, 2015, between Halifax County, as Lessor, and Klausner Lumber Two LLC, as Lessee.

7.    <u>Assumption of Private Sidetrack Agreement</u>.  The Buyer will assume all obligations of Klausner Lumber Two LLC under a Private Sidetrack Agreement between CSX Transportation, Inc., Klausner Lumber Two LLC and the County, identified as Agreement No. CSX786468.

8.    <u>Assumption of Pump Station Agreement</u>.  The Buyer will assume all obligations of Klausner Lumber Two LLC under that certain "Pump Station Maintenance and Operation Agreement" executed by the County, as Owner, and Klausner Lumber Two LLC, as Operator, regarding the force main sewer line and pump station that was substantially completed in July, 2017.

7.    <u>Binding on Successors; No Third-Party Beneficiaries</u>.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and the respective successors in interest and permitted assigns of such parties.  This Agreement is not intended to confer any rights or remedies upon any person or entity other than the parties hereto.

8.    <u>Counterparts</u>.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.  A manual signature on this Agreement or other documents to be delivered pursuant to this Agreement, an image of which shall have been transmitted electronically, will constitute an original signature for all purposes.  The delivery of copies of this Agreement or other documents to be delivered pursuant to this Agreement, including executed signature pages where required, by electronic transmission will constitute effective delivery of this Agreement or such other document for all purposes.

9.    <u>Governing Law</u>.   THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NORTH CAROLINA, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF, INCLUDING AS TO MATTERS OF CONSTRUCTION, VALIDITY, AND PERFORMANCE.

[This space intentionally blank.  Signatures follow.]

**COUNTY**

HALIFAX COUNTY, NORTH CAROLINA

By:_____

Name:

Title:

**BUYER**

_____

By:_____

Name:

Title:

### SCHEDULE I

THE REALTY

Those certain parcels of land, lying and being situate in Enfield Township, Halifax County, North Carolina, being shown and designated as Lot or Tract 1, containing 319.2693 acres; Lot or Tract 2, containing 58.6287 acres; and Lot or Tract 3, containing 51.0680 acres, all as shown on that certain plat of survey entitled "Property To Be Conveyed to Halifax County, Current Property of Michael A. Hedgepeth and Starlette J. Hedgepeth (Also Known As Shearin Site)," done by Green Engineering, dated March, 2013, and recorded in Book of Maps 2013, Page 41, Halifax Public Registry.

LESS AND EXCEPT THE FOLLOWING PARCELS OF LAND:

1.  A parcel of land containing 5.0505 acres and more particularly described in that certain deed from Klausner Lumber Two LLC to Halifax Electric Membership Corporation, dated January 6, 2014, and recorded in Book 2431, Page 174, Halifax Public Registry.

2.  A parcel of land containing 16.6988 acres and more particularly described in that certain deed from Klausner Lumber Two LLC to Halifax County, dated June 11, 2014, and recorded in Book 2442, Page 282, Halifax Public Registry.

3.  A parcel of land containing 34.6356 acres and more particularly described in that certain deed from Klausner Lumber Two LLC to Halifax County, dated April 1, 2015, and recorded in Book 2466, Page 337, Halifax Public Registry.

4.  A parcel of land containing .603 acre and more particularly described in that certain deed from Klausner Lumber Two LLC to Virginia Electric and Power Company, dated August 10, 2018, and recorded in Book 2571, Page 131, Halifax Public Registry.

The remainder being conveyed is a portion of the real property conveyed to Klausner Lumber Two LLC by deed of Halifax County dated January 6, 2014, and recorded in Book 2431, Page 127, Halifax Public Registry; reference to said plat and deed is made hereby for greater certainty of description.

**EXHIBIT D**

**FINANCING OPTION LETTER**

**CSLP Letterhead**

_____ __, 202_

[Buyer]

Dear _____:

Reference is made to that certain Stipulation Regarding Motion to Approve County Settlement among Klausner Lumber Two LLC ("KL2"), Halifax County, North Carolina ("County") and Carolina Sawmills L.P. ("CSLP") dated November __, 2020 (the "Settlement Stipulation"). This letter agreement is being entered into pursuant paragraph 5.c of the Settlement Stipulation and is the "Financing Option Letter" referred to therein. Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed thereto in the Settlement Stipulation.

Pursuant to and in accordance with the terms of the Settlement Stipulation, CSLP hereby agrees to extend to _____ ("Buyer") a line of credit in the amount of up to $_____ (the "Credit Line"). CSLP retains the right to reduce the amount of the Credit Line by the amount of any distributions made to any EB-5 Investors who elect to abandon their immigration petitions and by the amount of any cash needed to fund CSLP's operations.

The Buyer shall have the option in its sole discretion to draw funds under the Credit Line for as long as the Credit Line remains outstanding; provided, however, as conditions precedent to Buyer's initial draw under the Credit Line, the Buyer shall (i) execute and deliver to CSLP the Credit Line Documents in the forms mutually agreed to by CSLP and Buyer, (ii) file the UCC-1 Financing Statement(s) to be issued in connection with the Credit Line Documents in the appropriate jurisdiction(s), (iii) record the Credit Line Deed of Trust in the land records of Halifax County so as to create a first priority lien on the Sawmill property acquired by the Buyer, including the land, fixtures and personalty subject only to such exceptions to title identified as "Permitted Encumbrances" in the definitive asset purchase agreement executed by KL2 and Buyer ("363 Sale") and such other exceptions to title reasonably acceptable to CSLP, and (iv) if requested or otherwise required by the Buyer's primary lender, the Buyer must obtain and deliver the prior written consent of the Buyer's primary lender. For the avoidance of doubt, the Buyer shall not be required to execute any of the Credit Line Documents unless and until Buyer elects in its sole discretion to draw funds pursuant to the Credit Line.

The Credit Line shall remain available to the Buyer pursuant to this Financing Option Letter for at least one year from the date of the closing of 363 Sale, subject to extension by CSLP at its sole option annually, for up to five years upon written notice to Buyer given not less than thirty (30) days prior to the expiration of the then applicable one year term shall be reduced by the amount of time between the closing of the 363 Sale and the date of the initial draw under the Credit Line. Any amounts drawn under the Credit Line shall be due and payable three years from the date of closing of the applicable draw, or, if extended by CSLP, three years from the last date of extension under the Credit Line, unless otherwise agreed by the Buyer and CSLP in accordance with the terms of the Credit Line Documents.

This Financing Option Letter shall be governed by and construed in accordance with the laws of the State of Delaware without regard to the conflicts of law provisions. In any action or proceeding with respect to the interpretation and/or enforcement of the terms hereof, the prevailing party shall be entitled to recover from the non-prevailing party all costs and other expenses in connection with the action, including, without limitation, reasonable attorneys' fees, paid or incurred by the prevailing party. This Financing Option Letter may be executed in counterparts (including by "pdf", facsimile or other electronic signature), each of which shall be an original and all of which counterparts taken together shall constitute one and the same agreement.

[Signature Page Follows]

Very truly yours,

Carolina Sawmills L.P.

By:_____
Name:_____
Title: _____

Acknowledged and Agreed as of the date first set forth above:
[Buyer]

By:_____
Name:_____
Title: _____

**EXHIBIT E**

**FORM OF DEED**

[To come]

**EXHIBIT F**

**FORM OF COUNTY DEED**

Prepared by M. Glynn Rollins, Jr. Halifax County Attorney, P.O. Office Box 38, Halifax, NC 27839
(Title not examined by preparer)

Return to: Ellis & Winters LLP (CNA), P.O. Box 33550, Raleigh, NC 27636

NORTH CAROLINA

HALIFAX COUNTY                              Current Tax Parcel Numbers:
                                           04-00970 (Tracts 1 and 2)
                                           04-00503 (Tract 3)

     THIS SPECIAL WARRANTY DEED made and entered into this ____ day of _____,

2020, by and between **Halifax County**, a unit of local government, hereinafter sometimes

referred to as "Halifax," and **Klausner Lumber Two LLC**, a Delaware limited liability

company duly authorized to transact business in North Carolina, whose mailing address is 260

Piper Lane, Enfield, North Carolina 27823, attention: Robert Prusak, hereinafter sometimes

referred to as "Klausner;"

WITNESSETH:

     WHEREAS, Halifax and Klausner entered into that certain Economic Development

Agreement dated November 1, 2012 (hereinafter sometimes referred to as the "EDA"), whereby

Halifax agreed to provide certain incentives to Klausner for the location of sawmill facilities for

the production of Southern yellow pine wood products in Halifax County, North Carolina

(hereinafter sometimes referred to as the "Project"); and

WHEREAS, on January 6, 2014, pursuant to the EDA, by Special Warranty Deed dated January 6, 2014, recorded in Book 2431, Page 127 of the Halifax Public Registry (the "Vesting Deed"), Halifax conveyed title to 430 +/- acres of land it had acquired for the Project site (the "Property") to Klausner in fee simple subject to a condition subsequent, as more particularly described in Section 4.2 of the EDA and in the Vesting Deed (the "Condition Subsequent"); and

WHEREAS, Pursuant to the Condition Subsequent, Halifax reserved or retained a future interest in the Property known as a "right of entry or power of termination," which could be exercised by Halifax if Klausner failed to complete construction and commence operation of the sawmill facility within twenty-four months from the date of recording of the Vesting Deed; and

WHEREAS, Klausner's sawmill was not fully operational as of December 31, 2018, creating a default under the EDA; and

WHEREAS, on April 9, 2020, Halifax gave public notice of exercise of its right of entry and power of termination by recording same in Book 2615, Page 750 of the Halifax Public Registry; and

WHEREAS, on June 10, 2020, Klausner initiated a voluntary reorganization case (the "Bankruptcy Case") under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court in the District of Delaware (the "Bankruptcy Court"); and

WHEREAS, on October 21, 2020, Klausner and Halifax entered into an Amended and Restated Release and Settlement Agreement (the "Settlement"), pursuant to which, among other things, Halifax agreed to reconvey the Property to Klausner; and

WHEREAS, upon the *Motion of the Debtor Pursuant to Bankruptcy Rule 9019, Local Rule 9013-1, and 11 U.S.C. §§ 105(a) and 363(b), for Entry of an Order Authorizing Settlement*

2

*with the County* [D.I. 95] (the "Settlement Motion"), and the *Notice of the Revised Settlement*

*with the County and Objection Deadlines and Hearing Dates for Its Approval* [D.I. 346] (the

"Notice of Revised Settlement"), on November ___, 2020, the Bankruptcy Court entered an

*Order Approving Motion of the Debtor Pursuant to Bankruptcy Rule 9019, Local Rule 9013-1*

*and 11 U.S.C. §§ 105(a) and 363(b), for Entry of an Order Authorizing Revised Settlement with*

*the County* [D.I. ___] (the "Settlement Order"), a copy of which is attached hereto as <u>Exhibit A</u>;

and

      WHEREAS, pursuant to the terms of the Settlement Order, Halifax is to convey the

Property to Klausner as set forth in the Settlement; and

      WHEREAS, Halifax executes and delivers this Special Warranty Deed pursuant to, and

under the authority of, the Settlement Order.

      NOW, THEREFORE, Halifax County, for and in consideration of the sum of One

($1.00) Dollar, in cash paid by Klausner, the receipt of which is hereby acknowledged, and other

good and valuable consideration as set forth in the Settlement and the recitals above, has

bargained and sold and by these presents does hereby bargain, sell, grant and convey unto

Klausner, its successors and assigns, in **fee simple**, all those certain tracts or parcels of land

situate in Enfield Township, Halifax County, North Carolina, and more particularly described as

follows:

> Those certain parcels of land, lying and being situate in Enfield Township,
> Halifax County, North Carolina, being shown and designated as Lot or
> Tract 1, containing 319.2693 acres; Lot or Tract 2, containing 58.6287
> acres; and Lot or Tract 3, containing 51.0680 acres, all as shown on that
> certain plat of survey entitled "Property To Be Conveyed to Halifax
> County, Current Property of Michael A. Hedgepeth and Starlette J.
> Hedgepeth (Also Known As Shearin Site)," done by Green Engineering,
> dated March, 2013, and recorded in Book of Maps 2013, Page 41, Halifax
> Public Registry.

TOGETHER WITH, all right, title, and interest in and to (i) any fixtures affixed to and part of the Property and all improvements thereon, (ii) all easements and agreements appurtenant to and/or benefiting from the land and (iii) any personal property located on the Property or previously used by Klausner in operation of the Project.

LESS AND EXCEPT THE FOLLOWING PARCELS OF LAND:

1.    A parcel of land containing 5.0505 acres and more particularly described in that certain deed from Klausner Lumber Two LLC to Halifax Electric Membership Corporation, dated January 6, 2014, and recorded in Book 2431, Page 174, Halifax Public Registry.

2.    A parcel of land containing 16.6988 acres and more particularly described in that certain deed from Klausner Lumber Two LLC to Halifax County, dated June 11, 2014, and recorded in Book 2442, Page 282, Halifax Public Registry.

3.    A parcel of land containing 34.6356 acres and more particularly described in that certain deed from Klausner Lumber Two LLC to Halifax County, dated April 1, 2015, and recorded in Book 2466, Page 337, Halifax Public Registry.

4.    A parcel of land containing .603 acre and more particularly described in that certain deed from Klausner Lumber Two LLC to Virginia Electric and Power Company, dated August 10, 2018, and recorded in Book 2571, Page 131, Halifax Public Registry.

The remainder being conveyed is a portion of the real property conveyed to Klausner Lumber Two LLC  by deed of Halifax County dated January 6, 2014, and recorded in Book 2431, Page 127, Halifax Public Registry; reference to said plat and deed is made hereby for greater certainty of description.

TO HAVE AND TO HOLD the above described Property, together with all the rights, privileges and appurtenances thereunto belonging or in anywise thereto appertaining, unto Klausner, its successors and assigns, in **fee simple**.

Halifax County covenants with Klausner that Halifax County has the power and authority to convey the Property in fee simple, subject to the Permitted Encumbrances shown on <u>Exhibit B</u> attached hereto; that Halifax County has taken no action to impair the title to the above described

4

Property; and that Halifax County will warrant and defend the title against the lawful claims of all persons claiming by, under or through Halifax County.

IN WITNESS WHEREOF, as of the day and year first above written, Halifax County has caused this instrument to be signed in its corporate name by its duly authorized officials and its seal to be hereunto affixed.

(Separate signature page with notary acknowledgement follows Exhibits A and B.)

**EXHIBIT A**

SETTLEMENT ORDER

See attached.

**EXHIBIT B**

PERMITTED ENCUMBRANCES

(Special Warranty Deed from Halifax County to Klausner Lumber Two LLC)

Those exceptions enumerated as Items 2., 3., 4., 5., 6., 7., and 8. set forth in Schedule B, Policy No. 201300092RM issued on March 11, 2013, to Halifax County as Owner, by Investors Title Insurance Company, a copy of which is attached hereto.

IN WITNESS WHEREOF, Halifax County has caused this Special Warranty Deed to be duly executed on the day and year first written above.

HALIFAX COUNTY

By:    _____

Name:  _____

Title:  Chairman, Halifax County Board of
        Commissioners

ATTEST:        _____
               Deputy Clerk
               Halifax County Board of Commissioners

STATE OF NORTH CAROLINA

COUNTY OF HALIFAX

I, _____, a Notary Public of Halifax County, do hereby certify that _____ personally came before me this day and acknowledged that s/he is the Deputy Clerk to the Halifax County Board of Commissioners, and that by authority duly given and as the act of Halifax County, the foregoing instrument was signed in its name by _____, Chairman, Halifax County Board of Commissioners, and attested to by _____, as Deputy Clerk to the Board of Commissioners.

Witness my hand and notarial seal this the _____ day of _____, 20___.

_____
               Notary Public
Printed name: _____
My commission expires: _____

[Notary Seal]

8

# **SCHEDULES**

Schedule 2.1 -   Permitted Encumbrances
Schedule 2.1(c) – Tangible Personal Property
Schedule 2.1(d) – Legal Description of Property
Schedule 2.2(e) – Specifically Excluded Assets
Schedule 2.2(k) – Excluded Software
Schedule 2.9 – Equipment Subject to Purchase Options
Schedule 4.5 – Assets Removed From Premises
Schedule 4.6 – Existing Insurance Policies
Schedule 4.7 – List of Seller Contracts
Schedule 4.8(A) – Company Used Intellectual Property
Schedule 4.8(B) – Notice regarding Continued Use of Intellectual Property
Schedule 4.9 - Taxes
Schedule 6.13(a) – Contract & Cure Schedule (Contracts to be Assigned to Buyer)

## Schedule 2.1

## PERMITTED ENCUMBRANCES[1]

1. Title to that portion of the Land, if any, lying within the railroad right of way extending up to one hundred feet (100')on each side of the tracks or two hundred feet (200') in total width, whichever is greater.
2. Rights of way for railroad, switch tracks, spur tracks, railway facilities, easements, and other related interests, if any, on and across the Land.
3. Any right, easement, setback, interest, claim, encroachment, encumbrance, violation, variations or other adverse circumstance affecting the Title disclosed by plat(s) recorded in Book of Maps 2013, Page 41; Book of Maps 2014,Page 1; Book of Maps 2014, Page 59; and Book of Maps 2015, Page 44.
4. Easement of Right of Way in favor of Halifax Electric Membership Corporation recorded in Book 506, page 241.
5. Grant of Easement by and between Klausner Lumber Two LLC and Halifax County recorded in Book 2510, page 646.
6. Deed of Easement by and betweeen James M. Shearin II and Audrey Shearin to Billy Eason recorded in Book 2335, page 311.
7. Easement and Covenant Agreement by and between Halifax County and the N.C. Department of Environmental and Natural Resources, Division of Water Resources recorded in Book 2431, page 106.
8. Easement and Right of Way Agreement by and between Klausner Lumber Two LLC and Halifax County recorded in Book 2431, page 142.
9. Reservations of Easements and Rights of Way in that Deed to Halifax Electric Membership Corporation recorded in Book 2431, page 174.
10. Reservation of easements in those Deeds to Halifax County recorded in Book 2442, page 282 and Book 2466, page 337.
11. Grants of Easement in favor of Piemont Natural Gas Company, Inc. recorded in Book 2468, page 365 and Book 2468, page 372.
12. Easement Agreements in favor of Virginia Electric and Power Company recorded in Book 2528, page 524; Book 2528, page 536; and Book 2542, page 273.
13. Terms and conditions of that Lease Agreement for Land and Railroad Facilities dated December 17, 2015 by and between Halifax County and Klausner Lumber Two LLC, as evidenced by that Memorandum of Lease Agreement recorded in Book 2534, page 340 and that Affidavit recorded in Book 2534, page 717.
14. Easements and/or rights of way set forth in that Deed to Virginia Electric and Power Company recorded in Book 2571, page 127.

---

[1] To be confirmed based on updated Title

Schedule 2.1(c)

**TANGIBLE PERSONAL PROPERTY**

| | | Manufacturer/ Brand | Description | Year |
|---|---|---|---|---|
| | | | | |
| **Log Yard/Log Sorting** | | | | |
| | | Springer | Log Deck Infeed/ Conveyors | 2007 |
| | | Kaeser | CSD 75 Sigma Air Compressor x2 | 2015 |
| | | Kaeser | KADPS Air Dryer | 2015 |
| | | Caterpillar | SM Hydraulic Unit | 2015 |
| | | Caterpillar | Stationary/Electric 519 Log Loader | 2015 |
| | | Klausner | Electrical/Server Cotrol Rooms x5 | 2015 |
| | | Hainzl | Hydraulic Units x 2 | 2007 |
| | | ALPHA | Controls/Software | 2018 |
| | | Springer | Bark/Residue Conveyors | 2007 |
| | | Nicholson | A-8 31" Ring Debarker | 2007 |
| | | ALPHA | 3D Scanners and Containment x 2 | 2018 |
| | | Springer | 3 Stationary Saw Merchandizing Table | 2007 |
| | | Measuretronic | Metal Detector and Cradle | 2007 |
| | | Springer | 72 Bin Sorting Line | 2007 |
| | | Hainzl | Central Lubrication | 2007 |
| | | Ermco | 2000 KVA Transformer | 2015 |
| | | Pre-Cast | 46 Concrete Bunks | 2015 |
| | | | | |
| **Sawline** | | | | |
| | | Linck | Sawline Log Infeed System | 2007 |
| | | Caterpillar | Stationary/Electric 519 Log Loader | 2015 |
| | | Caterpillar | SM Hydraulic Unit | 2015 |
| | | ALPHA | 3D Scanners and Containment x 2 | 2018 |
| | | Linck | Linck Controls and Software | 2007 |
| | | Siemens | PLC's | 2007 |
| | | Linck | Positioning Infeed x 2 | 2007 |
| | | Linck | VM 50 Two Side Canters x 2 | 2007 |
| | | Linck | 1, DV90 and 1, DV70 Cant Turners | 2007 |
| | | Linck | VPK 450 Profilers, F1,F2 F4,and F5 | 2007 |
| | | Linck | CSMK 425 Side Board Saws, S1 and S3 | 2007 |
| | | Linck | MKV Double Arbor Gang Saw | 2007 |
| | | Kone | 10 Ton Rail Crane | 2015 |
| | | Linck | Side Board Chutes to 4 Conveyor Belts | 2007 |
| | | Linck | Board Conveyor Belts to Sorting x 5 | 2007 |
| | | Linck | Sawline Hydraulic Units x 7 | 2007 |
| | | Hainzl | Central Lubrication System | 2007 |
| | | BEKA | Central Lubrication System | 2007 |
| | | Ermco | 2500 KVA Transformers x 5 | 2015 |
| | | | | |

| | | Manufacturer/ Brand | Description | Year |
|---|---|---|---|---|
| **Sharpening Room** | | | | |
| | | Ultrashall | Ultrasonic cleaning Tank | 2007 |
| | | Vollmer | CHD 251 Top Face Saw Grinder | 2007 |
| | | Vollmer | LG 21H Sldering Unit | 2007 |
| | | Vollmer | CHHF 21H Flank Grinder | 2014 |
| | | Vollmer | CHC 22H Top Face Grinder | 2007 |
| | | E. Petschhauer GMBH | Tensioning Stand SP800P | 2007 |
| | | Weinig Group | Rondamat 980 Planer Knife Sharpener | 2006 |
| | | Bandelin Sonorex | Ultrasonic Planer Head Cleaning Tank | 2014 |
| | | Ledinek | GML 700 Planer Head Sharpener | 2014 |
| | | Gockel | G 50 RSEL Knife Grinder | 2015 |
| | | | | |
| **Sawmill Lumber Sorter Lines** | | | | |
| | A1 | Springer | 15 Tray Horizontal Sorter | 2007 |
| | A1 | Springer | Accumulation Chains/Lumber Grading Chains x 2 | 2007 |
| | A1 | Brookhuis | FMI Inline Moisture Meter | 2007 |
| | A1 | ALPHA | Controls and Software | 2018 |
| | A1 | BEKA | Central Lubrication | 2007 |
| | A1 | ALPHA | Dimension Scanner | 2018 |
| | A1 | Siemens | PLC's | 2015 |
| | A1 | Hainzl | Hydraulic Unit | 2007 |
| | | | | |
| | A2 | Springer | 30 Tray Slanted Sorter | 2007 |
| | A2 | Springer | Accumulation Chains/Lumber Grading Chains x 2 | 2007 |
| | A2 | Hainzl | Hydraulic Unit | 2007 |
| | | | | |
| | A3 | Springer | Landing Table For Sawline Main Boards | 2007 |
| | A3 | Springer | 5 Section Lumber Accumulation Chain To Stacker | 2007 |
| | A3 | ALPHA | Controls and Software | 2018 |
| | A3 | Hainzl | Hydraulic Unit | 2007 |
| | | | | |
| | | Manufacturer/ Brand | Description | Year |
| **Stacking** | | | | |
| | A1 | BEKA | Central Lubrication | 2007 |
| | A1 | Springer | Accumulation/Trimsaws Before Stacker | 2007 |
| | A1 | ALPHA | Controls and Software | 2018 |
| | A1 | Springer | 3 Saw Trim System | 2007 |
| | A1 | | Ink Jet In Line Lumber ID Printer | 2018 |
| | A1 | Springer | 6 Manual Load Stick Magazine Stick System | 2007 |
| | A1 | Springer | Stacker | 2007 |

| | | | | |
|---|---|---|---|---|
| | A1 | Hainzl | Hydraulic Unit | 2007 |
| | A1 | Springer | Package Outfeed | 2007 |
| | | | | |
| | A2 | BEKA | Central Lubrication | 2007 |
| | A2 | Springer | Accumulation/Trimsaws Before Stacker | 2007 |
| | A2 | Springer | 6 Manual Load Stick Magazine Stick System | 2007 |
| | A2 | Springer | Stacker | 2007 |
| | A2 | Hainzl | Hydraulic Unit | 2007 |
| | A2 | Springer | Package Outfeed | 2007 |
| | | | | |
| | | | | |
| | A3 | BEKA | Central Lubrication | 2007 |
| | A3 | Springer | Accumulation/Trimsaws Before Stacker | 2007 |
| | A3 | ALPHA | Controls and Software | 2018 |
| | A3 | Springer | 10 Manual Load Stick Magazine Stick System | 2007 |
| | A3 | Springer | Stacker | 2007 |
| | A3 | Hainzl | Hydraulic Unit | 2007 |
| | A3 | Springer | Package Outfeed | 2007 |
| | | | | |
| **Packaging** | | | | |
| | | Springer | Pack Press/Strapper x 3 | 2007 |
| | | Springer | Pack Wrap Dispenser | 2007 |
| | | ALPHA | Controls and Software | 2018 |
| | | Hainzl | Hydraulic Unit | 2007 |
| | | | | |
| **Kilns and Boiler** | | | | |
| | | Mahild | Kiln Block 1, 12 Package Kilns | 2015 |
| | | Mahild | Kiln Block 2, 16 Package Kilns | |
| | | Eaton | Main Disconnect and Panels x 2 | 2015 |
| | | Clayton | Steam Boiler System, 2 x 10MW Gas Boilers | 2015 |
| | | Mahild | Boiler Controls and Software provided by Mahild | |
| | | Atlas Copco | 1, 40hp and 1, 50hp Air Compressors | 2015 |
| | | Ermco | 1500 KV Transformer | 2015 |
| | | Ermco | 2500 KV Transformer | 2015 |
| | | | | |
| | | **Manufacturer/ Brand** | **Description** | **Year** |
| | | | | |
| **Fire Suppression** | | | Fire Fly System Planer and Silo | 2018 |
| | | | Fire Suppression Riser and Room x 2 | 2018 |
| | | VSC Fire and Security | Fire Suppression Pump House | 2019 |
| | | VSC Fire and Security | Fire Suppression Fuel Tank | 2019 |
| | | | | |
| **Planer Dry End** | | | | |
| | | Springer | Tilt Hoist to Planer Infeed Table | 2007 |
| | | Springer | Tilt Hoist Rough Dry Planer By Pass | 2007 |
| | | Springer | Stacking Stick Handler | 2007 |

| | | Ledinek | Power Infeed 200-S900 | 2015 |
|---|---|---|---|---|
| | | Ledinek | Planer Controls and Software | 2018 |
| | | Ledinek | Stratoplan 4V - S900 Planer | 2015 |
| | | | | |
| | | Springer | Planer Outfeed Belt | 2007 |
| | | Springer | Rough Dry Outfeed Belts x 2 | 2007 |
| | | Springer | Slow Down Belts x 2 | 2007 |
| | | Siemens | Controllers | 2015 |
| | | RMW | Tool Change Hoists x 2 | 2015 |
| | | ALPHA | Planer Outfeed Controls | 2018 |
| | | | | |
| **Dry Shavings/Dust Collection** | | | | |
| | | R+R Beth Filtration | Silo | 2015 |
| | | R+R Beth Filtration | Planer and Dust Suction System | 2018 |
| | | SHW | Screw Extractors | 2015 |
| | | | | |
| **Waste Management** | | | | |
| | | Rudnick and Enners | Chip/Dust Belt Conveyors Under Sawline | 2007 |
| | | Rudnick and Enners | Chip/Dust Incline Drag Chain Conveyors | 2007 |
| | | Rudnick and Enners | Chip Classifier Shaker Screens x 3 | 2007 |
| | | Rudnick and Enners | Saw Dust Shaker Screen | 2007 |
| | | Rudnick and Enners | Return Belt Conveyors | 2007 |
| | | Rudnick and Enners | Bucket Elevators x 2 | 2007 |
| | | Measurtronic | Metal Detector and Cradle | 2007 |
| | | Rudnick and Enners | Vibrating Waste Conveyor To Chipper | 2007 |
| | | Rudnick and Enners | 930mm Drum Chipper | 2007 |
| | | Rudnick and Enners | 780mm Drum Chipper | 2007 |
| | | ALPHA | Controls and Software | 2018 |
| | | | | |
| **Inbound/Outbound Scale System** | | | | |
| | | Mettler Toledo | Scales x 2 | 2015 |
| | | Mettler Toledo | Remote Scale Ticket Printers x 2 | 2015 |
| | | | Log Truck Unbinding Station | 2015 |
| | | | Scale House | 2015 |
| | | | | |
| | | | | |
| | | **Manufacturer/ Brand** | **Description** | **Year** |

| | | | | |
|---|---|---|---|---|
| **Shop and Fabrication** | | | | |
| | | Phoenix | Welding Rod Oven | 2015 |
| | | Optimum | 560 x 1500 Metal Lathe | 2007 |
| | | Optimum | Drill Press | 2007 |
| | | Stadelmann | Hydrualic Press | 2007 |
| | | Mack | Horizontal Band Saw | 2007 |
| | | Eaton | Service Disconnect amd Panels | 2015 |
| | | Kaeser | ASD 40 S Air Compressors x 3 (Mill Air) | 2015 |
| | | Kaeser | SECOTEC TF280 Air Dryer | 2015 |
| | | | | |
| **Miscellaneous** | | | | |
| | | Raimann | Multi Saw | 2007 |
| | | Holtek | Cross Cut Saw x 2 | 2017 |
| | | | Lable Printers, Unbinding Station, Scale House, Stacking A1, A2, A3 | 2015 |
| | | | Rail Spur x 2 With 1 Switch Track | 2015 |
| | | | | |
| | | | | |

This list is not all inclusive, and certain additional personal property may be located at the facility. [Machinery and equipment listed above includes any firmware and other embedded code provided by the vendor or manufacturer.]

**Schedule 2.1(d)**

## LEGAL DESCRIPTION OF PROPERTY

Those certain parcels of land, lying and being situate in Enfield Township, Halifax County, North Carolina, being shown and designated as Lot or Tract 1, containing 319.2693 acres; Lot or Tract 2, containing 58.6287 acres; and Lot or Tract 3, containing 51.0680 acres, all as shown on that certain plat of survey entitled "Property To Be Conveyed to Halifax County, Current Property of Michael A. Hedgepeth and Starlette J. Hedgepeth (Also Known As Shearin Site)," done by Green Engineering, dated March, 2013, and recorded in Book of Maps 2013, Page 41, Halifax Public Registry.

LESS AND EXCEPT THE FOLLOWING PARCELS OF LAND:

1.  A parcel of land containing 5.0505 acres and more particularly described in that certain deed from Klausner Lumber Two LLC to Halifax Electric Membership Corporation, dated January 6, 2014, and recorded in Book 2431, Page 174, Halifax Public Registry.

2.  A parcel of land containing 16.6988 acres and more particularly described in that certain deed from Klausner Lumber Two LLC to Halifax County, dated June 11, 2014, and recorded in Book 2442, Page 282, Halifax Public Registry.

3.  A parcel of land containing 34.6356 acres and more particularly described in that certain deed from Klausner Lumber Two LLC to Halifax County, dated April 1, 2015, and recorded in Book 2466, Page 337, Halifax Public Registry.

4.  A parcel of land containing .603 acre and more particularly described in that certain deed from Klausner Lumber Two LLC to Virginia Electric and Power Company, dated August 10, 2018, and recorded in Book 2571, Page 127, Halifax Public Registry.

The remainder being conveyed is a portion of the real property conveyed to Klausner Lumber Two LLC  by deed of Halifax County dated January 6, 2014, and recorded in Book 2431, Page 127, Halifax Public Registry; reference to said plat and deed is made hereby for greater certainty of description.

**Schedule 2.2(e)**

**SPECIFICALLY EXCLUDED ASSETS**

1. **Kalmar Rolling stock:  Purchase option agreed to by Kalmar.**

   a.  Kalmar DCG160-12 (16t). VIN: S40400170
   b.  Kalmar DCG160-12 (16t). VIN: S40400171
   c.  Kalmar DCG160-12 (16t). VIN: S40400190
   d.  Kalmar DCG160-12 (16t). VIN: S40400191

2. **Kalmar Rolling stock which has been previously sold to Binder (to be removed prior to closing).**

   a.  Kalmar DCG160-12 (16t). VIN: S40400168
   b.  Kalmar DCG160-12 (16t). VIN: S40400169
   c.  Kalmar DCG160-12 (16t). VIN: S40400192
   d.  Kalmar DCG160-12 (16t). VIN: S40400193

3. **Rolling stock owned by Binder and located at KL2 (to be removed prior to closing).**

   a.  CAT 988H. Serial: 988HBXY05626

4. **Rolling stock sold pursuant to the** *Order Approving Motion of Debtor and Debtor-in-Possession to Sell and Abandon Certain Miscellaneous Assets* **[D.I. 242] (the "Miscellaneous Asset Sale Order") entered by the Bankruptcy Court on September 16, 2020.**

   a.  CAT 988K. Serial: 988KPTWX00689

5. **Rolling stock to be sold pursuant to Miscellaneous Asset Sale Order.**

   a.  Liebherr A924L. Serial: WLHZ1050EZK037041 (will be available for purchase by Buyer if not sold prior to auction).
   b.  Volvo L180E. Serial: L180EV6678 (will be available for purchase by Buyer if not sold prior to auction).

6. **Automobiles owned by other parties.**

   a.  2008 Nissan Xterra – Silver. VIN: 5N1AN08U68C502417 (KTU)
   b.  2013 VW Routan. VIN: 2C4RVAAG5DR725521 (KTU)

7. **Kop-Coat Equipment: Consignment agreement terminated prepetition.[2]**

---

[2] Debtor believes that this equipment is available for continued consignment from Kop-Coat provided buyer continues to utilize Kop-Coat spray.

    **a.**  The Kop-Coat, Inc. equipment with the following technical description:  Three Linear Spray Boxes; Three LSB Mist Elim Ducting; Three LSB Tip Monitoring; Two 500 CFM Mist Eliminator; Three Chemical Pressure Sensors; One Chemical Room with Pump Station and Metering Backboard, One Defoamer Tank Assembly and Metering Pump; One Multi Box Manifold; One PH Probe with Transmitter; One Additional Chemical Bulk Tank with Calibration Cylinder; and One additional metering pump and piping.

**Schedule 2.2(k)**

**EXCLUDED SOFTWARE**

See attached.

## Software

| Bereich | Basis-Software (System) | Beschreibung |
|---|---|---|
| Vertrieb SH+RestH | SAP-SD | Bestandsmonitor (Bestandsauswertung unter Berücksichtigung von Reservierungen, Kommissionierungen, Sperrungen, Verkaufbarkeit, Verwendbarkeit, Kundenauftragsproduktion, Verkaufsproduktgruppen) |
| Vertrieb SH+RestH | SAP-BW | Auswertungen |
| RH-Beschaffung | SAP-MM | sämtliche Beschaffungs- und Abrechnungsprozesse inkl. Stockkauf und Industrieholz und ELDAT |
| RH-Beschaffung | SAP-BW | Auswertungen |
| RH-Beschaffung | INTEND | Mobile Anwendung zur Erfassung von RH-Bestellungen und Poiter im Wald und zur Abfuhrplanung |
| RH-Vermessung | SAP-MM | Fuhrenimport (Preisberechnung für Einzelstamm, Datenaufbereitung und Übertragung für Bestandsbuchung und Verrechnung) |
| RH-Vermessung | MICROTEC | Anpassung Anlagensoftware |
| RH-Vermessung | SAP-SchnittSt | ÜbernahmeNr, Vertragsdaten, Preismatrix |
| PPS | SAP-PP | Polarmonitor (Polterreservierungen, Plan-Fertigungsauftrag, Bestand und Zulaufprognose), Sägemonitor (Planung und Steuerung von Sägeaufträgen auf Basis TiCom-Produktionsaufträgen), Abstapelmonitor (Planung und Steuerung von Abstapelaufträgen), TK-Monitor (Planung und Steuerung von Trocknungsaufträgen mit graphischer Plantafel und Statistik), SH-Materialstamm, Grundkonzept für gesamte PPS |
| PPS | SAP-PI | Schichtprotokoll neu, Systemeinstellungen, Anwendungen an Paketierung (Paketgenerierung), an Bündelung (Bestandsbuchung), Klopfbach (Verbrauchsbuchung), Paketzeteldruck |
| PPS | TiCom | Schnittbildoptimierung, Produktionsauftrag für Säge, Vorkalkulation |
| PPS | TiCom-SchnittSt | RH-Bestände, SH-Materialien, Produktionsauftrag, RH-Preise |
| Sägen | SAP-PI | Rundholzabbuchung |
| Sägen | LINK | Anpassung Anlagensoftware für Anbindung an SAP |
| Sägen | SAP-SchnittSt | Leistungs- und Störidaten |
| Sägesortierung | MOBISYS for R3 | Anpassungen zu MatStamm neu |
| Sägesortierung | SPRECHER | Anpassungen zu MatStamm neu |
| Sägesortierung | SAP-SchnittSt | noch nicht realisiert |
| Sägesortierung | Excel Add-In | Schichtprotokoll |
| Trocknung | RAYEN INTEC | Anpassung Anlagensoftware |
| Trocknung | SAP-SchnittSt | Schnittstelle Anlagensoftware – ERP |
| Abstapeln/Hobeln | RAYEN INTEC | Anpassung Anlagensoftware |
| Abstapeln/Hobeln | SAP-SchnittSt | Schnittstellen Anlagensoftware – PI; Leistungs- und Störidaten |

Erstellt: W. Hörmann – 10.02.2017

1 von 3

Software.xlsx

00280732

# Software

| Bereich | Basic-Software (System) | Beschreibung |
|---|---|---|
| Abstapeln/Hobeln | Excel Add-In | Schichtprotokoll |
| Auftragsabwicklung | SAP-SD | Auftragsmonitor (Überwachung offener Aufträge, Auswertung zu allen Aufträgen mit Status, Planungsgrundlage für AV) |
| Versand | SAP-SD/WM | Aufnahmemonitor (SH-Kommissionierung in unterschiedlichen Prozessen), Chargenmanipulation (kundenspezifische Änderungen der Paketauswiesung), Transportmonitor (Transportdispoplanung) |
| Versand | SAP-MSB | Online-Scanneranwendungen SH-Kommissionierung und Verladung, Restholz-Versand |
| Versand | ATLAS | Zollabwicklung |
| Versand | TRANSPOREON | Transportvergabe |
| Versand | SAP-BW | Auswertungen |

00280732

00280732

00280732

00280732

**Schedule 2.9**

## EQUIPMENT SUBJECT TO PURCHASE OPTIONS

| Manufacturer | Model Number | Serial Numbers | Price |
|---|---|---|---|
| Kalmar | DCG160-12 | • S40400171<br>• S40400170 | • $57,368<br>• $57,368 |
| Kalmar | DCG160-12 | • S40400190<br>• S40400191 | • $77,330<br>• $77,330 |
| Volvo | L180 | • L180EV6678 | • $25,000 |
| Liebherr | A924L | • WLHZ1050EZK037041 | • $25,000 |

00280732

**Schedule 4.5**

**ASSETS REMOVED FROM PREMISES**[3]

1. **Assets removed from premises that were sold pursuant to the Miscellaneous Asset Sale Order.**

    a. Copper Scrap Wire
    b. 68 Shipping Containers
    c. CAT 988K. Serial: 988KPTWX00689

2. **This Caterpillar is owned by Binder and will be removed prior to closing.**

    a. CAT 988H. Serial: 988HBXY05626

3. **The following Kalmars were sold to Binder and will be removed prior to closing.**

    a. Kalmar DCG160-12 (16t). VIN: S40400168
    b. Kalmar DCG160-12 (16t). VIN: S40400169
    c. Kalmar DCG160-12 (16t). VIN: S40400192
    d. Kalmar DCG160-12 (16t). VIN: S40400193

---

[3] This list may vary slightly.  Debtor will update accordingly.

00280732

**Schedule 4.6**

**EXISTING INSURANCE POLICIES**

1.  KL2 carries an Independent Directorship Liability policy with a $1M limit and a $0 self-insured retention.  The carrier is Ironshore, a division of Liberty Mutual and the annual premium is $29,794. The policy is written on an annual basis from June 22, 2020 to June 22, 2021 and contains a prior acts exclusion of June 10, 2020 (petition date.)  The definition of "Insured Person" has been amended to exclusively provide coverage for named independent directors.  The premium for run-off with wind-down coverage has been pre-determined via endorsement as six years for 310% of the annual premium.  Any unused portion of the annual premium will be credited against the 310% run-off factor.

2.  KL2 carries an Inland Marine Insurance policy with a $5M limit that covers direct physical loss or damage to miscellaneous equipment.  OneBeacon is the carrier and the annual premium is $30,864 excluding terrorism coverage and $31,790 including terrorism coverage.  The standard deductible is $10,000 though the deductible is $25,000 for items valued greater than $500,000.  This policy also has a $50,000 limit covering newly acquired miscellaneous equipment, a $25,000 limit covering pollutant clean-up, a $25,000 limit covering debris removal, and a $10,000 limit for inventory or appraisals required to determine the extent of any loss or damage to miscellaneous equipment.

3.  KL2 carries a general liability coverage policy with a $1M limit per occurrence and $2M limit on the aggregate. Evanston Insurance Company is the carrier and the annual premium is $1,041.22. The policy is written on an annual basis from September 25, 2020 to September 25, 2021. There is no deductible for liability, and products completed operations are excluded. This policy has a $1M limit covering personal/advertising liabilities, $1M limit covering each occurrence $100,000 limit covering premises rented to you, and a $5,000 limit for medical expenses for any one person.

4.  Halifax County carries property insurance for risks of direct physical loss with a $25M limit with a $100,000 deductible for the property located at 260 Piper Lane, Enfield, North Carolina 27823. NCACC Liability and Property Pool is the coverage provider, and the policy is written on an annual basis from July 1, 2020 to July 1, 2021. Flood and earthquake loss is excluded.

**Schedule 4.7**

**LIST OF SELLER CONTRACTS**

| # | Contract Counterparty | Description of Contract | Contract Start Date | Cure Amount[4] |
|---|---|---|---|---|
| 1. | Pac-Van, Inc. | 40' Ground Level Office space. | 11/16/2015 | $5,296.61[5] |
| 2. | Halifax County | Railroad facilities lease. | 12/17/2015 | |
| 3. | Halifax Electric Membership Corporation | Klausner Lumber Halifax Power Contract | 12/31/2013 | $154,438.96 |
| | | Special Warranty Deed to HEMC | 1/6/2014 | |
| 4. | CSX Transportation, Inc. and County of Halifax, North Carolina | Private Sidetrack Agreement | | |

---

[4] Except as otherwise indicated, cure amount represents Debtor's accounts payables balance as of 6/09/20. Actual cure amount may vary.
[5] Cure amount is as of 9/9/2020.

00280732

| 5. | Halifax County, North Carolina | Pump Station Operation and Maintenance Agreement | | |
|---|---|---|---|---|

**Schedule 4.8(A)**

**COMPANY USED INTELLECTUAL PROPERTY**

| KL2 Software Schedule | |
|---|---|
| Product Name | Version |
| Axios Camera Software | |
| Acronis Backup | |
| Siemens SIMATIC WinCC Runtime Advanced (2048 Power Tags V14 SP1 | |
| 7-Zip | 19 |
| Abbe Design | |
| Adobe Reader | 19.010.20098 |
| Anybus Software AB7000 | |
| Autodesk AutoCAD LT | 2015_SP1 |
| Autodesk Design Review | 14.0.0.177 |
| Autodesk TrueView | 23.0.46.0 |
| Avaya one-X Communicator | 6.2.12.22 |
| Axis Camera Station | |
| Banner Mini Array | |
| CD Burner XP | 4.5.8.7042 |
| Chrome | 4.5.8.7042 |
| Citrix Receiver | 4.9.6 |
| Citrix Workspace | 19.5.0.26 |
| EASY Navigator (Lenze) | |
| ELCAD | 7.14.0.307 |
| EPLAN Electronic P8 | 2.7 |
| FileZilla Client | 3.40.0 |
| Firefox | |
| Fluke Smart View | |
| Fluke Vibration Meter | |
| FortiClient | 5.4.1.0840 |

| | |
|---|---|
| Fuel Master Client | |
| GANN Feuchtmessung | |
| Google Earth | |
| Hardcopy | 2019.01.14 |
| Heidi SQL | |
| Info-Data Holzmanager (Timber Manager) | 2.21 |
| K und M | 43 |
| Kaspersky Enterprise Security | |
| Kdevelop | |
| Keepass | 2.41 |
| Keyence Safety Device Configurator | |
| LAPS | |
| Laser Link Tax Preparation | |
| Microsoft MapPoint - North America | 19.0.21.1000 |
| Microsoft MapPoint - Western Europe | 19.0.18.1000 |
| Microsoft Office Professional Plus | 15.0.45.69.1506 |
| Microsoft Power Map Preview for Excel 2013 | |
| Microsoft Project Standard | 2013 |
| Microsoft Teams | |
| Microsoft Visio Professional | 15.0.45.69.1506 |
| Milwaukee Thermal Imager Report Softw. | |
| Mobisys Client MSB | 4.10.10 |
| Mobisys Client MSD | WIN3233440 |
| Mobisys Screendesigner | |
| MS SQL Server SSMS | 17.9 |
| MS Visual Studio Community | |
| MS Visual Studio Professional | 2008 |
| MySQL GUI Tools | |
| NAPS2 PDF | 5.8.2 |
| NetApp Management Console | |
| NetApp OnCommand System Manager | 3.1.2.6399 |

| | |
|---|---|
| NetSupport Manager Client | 12.70.3 |
| Notepad ++ | 7.7.1 |
| Nuance PDF Converter Enterprise | |
| Oracle Java Runtime | 8 Upd. 181 |
| Paint.Net | 4.1.5 |
| Panel Pilot ACE Designer Studio | |
| PDF Creator | 1.7.1 |
| Phoenix Clip Project | 8.8.8642 |
| ProfiBus Diag Suite | |
| Prosis | |
| Putty | |
| Remote Assistance | |
| Rockwell RSLogix von Allen-Bradley | |
| Royal TS | 4.3.61328 |
| SAP GUI | 7.60 P2H1 |
| product<br>SCCM Console | |
| SCOM Console | |
| SEW Movitools | |
| Siemens Drive Monitor | |
| Siemens STARTER | |
| Siemens Step 7 V5.5 | |
| Siemens TIA Portal | |
| Siemens WinCC Flexible | |
| Skype For Business Plugin | |
| SmartBoard Software | |
| SOLIDWORKS 2018 Standard Netzwerk | |
| SOLIDWORKS eDrawings Viewer | |
| SOLIDWORKS Netzwerk-Lizenzmanager | |
| Strieplan | |
| System Center Endpoint Protection | 4.10.209.0 |
| TFP Tax Form | |

| | |
|---|---|
| Timbertec TiCOM | 10.01.72.14 |
| TROTEC IC_Report DuoVision | |
| UltraVnc | |
| ViewChoice 2.5 | |
| Visio Viewer | 2016? |
| VLC Player | 3.0.6 |
| vSphere Client | |
| WinPcap | |
| WinSCP | |
| Wireshark | |
| XenApp Center | |
| Xshell | 4 |
| Yaskawa Driver Works EZ Kiln VDF | |

**Schedule 4.8(B)**

**NOTICE REGARDING CONTINUED USE OF INTELLECTUAL PROPERTY**

Letter from Mercer International dated August 20, 2020.

**Schedule 4.9**

**TAXES**

None. [**To be confirmed and/or updated based on latest title report**]

**Schedule 6.13(a)**

**CONTRACT & CURE SCHEDULE (CONTRACTS TO BE ASSIGNED TO BUYER)**

To be delivered by Buyer.