IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>Klausner Lumber Two LLC,<br><br>Debtor.[1] | Chapter 11<br><br>Case No. 20-11518-KBO |

**DECLARATION OF J.T. ATKINS IN SUPPORT OF MOTION OF THE DEBTOR SEEKING AN ORDER APPROVING BIDDING PROCEDURES FOR A SALE OF SUBSTANTIALLY OF THE ASSETS OF THE DEBTOR**

I, J.T. ATKINS, being duly sworn, declare under penalty of perjury:

1. I am the Managing Partner of Cypress Holdings LLC, an affiliate of Cypress Associates LLC (collectively, "Cypress"), which has been retained (subject to this Court's approval[2]) as the investment banker to assist Klausner Lumber Two LLC ("KL2" or the "Debtor") in its Chapter 11 case.

2. I am over the age of 18 and authorized to submit this Declaration. If called to testify, I could and would competently testify to the facts and opinions as set forth in this Declaration.

3. On June 10, 2020 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

4. I submit this declaration in support of the *Debtor's Motion for Entry of (A) an Order (I) Scheduling a Hearing on the Approval of the Sale of All or Substantially All of the Debtor's Assets Free and Clear of all Encumbrances, and the Assumption and Assignment of*

---

[1] The last four digits of the Debtor's federal EIN are 4897. The Debtor's mailing address is P.O. Box C, Redding Ridge, CT 06876.

[2] The Debtor has concurrently filed an application to retain Cypress.

*Certain Executory Contracts and Unexpired Leases, (II) Approving Certain Bidding Procedures and Assumption and Assignment Procedures, and the Form and Manner of Notice Thereof, (III) Designating Stalking Horse Purchaser and Approving Certain Bid Protections, and (IV) Granting Related Relief; and (B) An Order (I) Approving Asset Purchase Agreement, (II) Authorizing the Sale of All or Substantially All of the Debtor's Assets Free and Clear of All Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* filed concurrently herewith (the "Sale Motion").

5. This declaration is intended to provide factual support for the Debtor's strategy to monetize their assets through the transactions contemplated by the Sale Motion (the "Sale").

**Background and Credentials**

6. Cypress is an investment banking firm specializing in providing mergers and acquisitions ("M&A") advice, capital raising, restructuring advisory services, and litigation consulting services, including expert reports and testimony. In support of its investment banking activities, Cypress engages in a significant amount of valuation analysis. My *curriculum vitae* is attached as Exhibit A and contains a selection of representative transactions on which I have worked.

7. I am a graduate of the University of Virginia with highest honors and Harvard Law School *cum laude*. I have been an investment banker for more than 35 years, specializing in M&A, restructurings and bankruptcies, and leveraged finance transactions. I have worked for companies in many industries, including oil and gas, power and energy, general manufacturing, business services, transportation, telecommunications, media/entertainment, manufacturing, automotive, consumer products, retailing, pulp and paper, health care, food and beverage,

chemicals, financial institutions, textiles, retailing, real estate, educational services, infrastructure services, and technology.

8. Following several years working as an M&A transactional attorney for Skadden Arps Slate Meagher & Flom, I began my investment banking career in 1985 at PaineWebber Inc. ("PaineWebber") as an Associate in the M&A group. In 1990, I was promoted to the position of managing director. At PaineWebber, I worked on many middle market and large capitalization transactions. Much of my work involved arranging debt and equity financing on behalf of PaineWebber's clients. I was also named co-head of PaineWebber's Restructuring group in 1989.

9. In 1991, I joined Houlihan Lokey Howard & Zukin ("Houlihan Lokey") as a Managing Director in the M&A department. At Houlihan Lokey, I ran the New York office's M&A group, as well as participated in Houlihan Lokey's restructuring practice.

10. In 1995, I joined Oppenheimer & Co. ("Oppenheimer") as a Managing Director in the Corporate Finance department. At Oppenheimer, I worked primarily on M&A, financings, restructuring and bankruptcy and advisory assignments.

11. I became a Managing Director at CIBC World Markets ("CIBC") in the Corporate and Leveraged Finance group, which I joined as a result of CIBC's acquisition of Oppenheimer in 1997. At CIBC, I was co-head of the Restructuring and Bankruptcy advisory group as well as participated in the firm's fairness opinion practice. I was the senior team leader on many publicly announced transactions.

12. In 2001, I formed Cypress, and I have been the senior banker representing clients since that time. At Cypress, I have led many M&A, restructuring, and financing transactions. I have also served as an expert witness in more than 70 complex commercial litigations, including

more than 20 cases in Delaware Chancery, Bankruptcy, Federal District, and Superior Courts. I have also acted as an expert witness in numerous other state and Federal courts around the country. I have been qualified as an expert in valuation, damages, solvency analysis, evaluating leveraged acquisitions, capital structures, the development and analysis of projections, the reasonableness of fees paid to participants in certain merger and acquisition transactions, merger and acquisition and restructuring customs and practices, securities valuation (including illiquid securities), feasibility of restructuring plans, the evaluation of management's ability to operate distressed companies, distressed sales, and the fairness of sale processes in bankruptcies.

13. I have provided financial and valuation analysis in more than 1,000 situations during my career. I have participated in the sales and purchases of public and private companies, auctions, and negotiated transactions and sales in which the subject company was subject to judicial oversight. I also have provided valuation analysis of hundreds of companies and securities issued by companies.

## Marketing and Sale Process

14. Cypress began marketing KL2 in April 2020 prior to the filing of the bankruptcy petition. During this initial marketing process, Cypress organized a large virtual data room ("VDR") that now contains operational, legal, financial and descriptive information.

15. Since the start of the marketing process, Cypress has reached out to approximately 75 prospective strategic buyers and 192 prospective financial buyers, several of whom contacted Cypress after seeing the filing of the petition. So far, approximately 44 prospective buyers have requested or signed NDAs so that they can secure access to the VDR.

16. To date, the marketing process has generated interest from a more than six prospective buyers that Cypress believes have both a strong interest in KL2 and the financial

wherewithal to close on a transaction and thus maximize the value of the Debtor's assets. Cypress continues to work with these parties, responding to information requests and keeping them apprised of the developments in the sales process.

17. I believe that the Bidding Procedures provide the Debtor with significant flexibility that will enable the Debtor to conduct a value-maximizing sale through the sale process contemplated therein. The Bidding Procedures are specifically designed to allow the Debtor to pursue a Sale that should result in a sale in an amount that is well above the "Strike Price" (as defined in the County Settlement). This is most likely to generate the greatest level of interest in the Debtor's assets and achieve the highest or otherwise best value for the Debtor's assets.

18. In addition, the Bidding Procedures contemplate the designation of Mayr-Melnhof Holz Holding AG as the stalking horse purchaser (the "Stalking Horse Purchaser") and provide such Stalking Horse Purchaser with Bid Protections in the form of Break-Up Fee and Expense Reimbursement, in an aggregate amount not to exceed three percent (3%) of the purchase price proposed by the Stalking Horse Purchaser.

19. The Debtor believes it is critical to have a Stalking Horse Purchaser in order to generate interest in the Sale to maximize value for the estate. As such, I believe the proposed Bid Protections are appropriate in light of the size and complexity of the transaction at issue, reasonable under the circumstances of this case, and designed to maximize the value of the sale for the benefit of the estate and creditors. I also believe that approving a Stalking Horse Purchaser is in the best interest of the estate because, among other reasons, it would establish a floor for further bidding that may increase the consideration offered and thereby encourage a more competitive bidding process.

20.     A critical component of the Debtor's sale and marketing process is the proposed sale schedule.  I believe the proposed schedule builds upon the momentum created by the marketing process that is already underway and facilitates an open, orderly and efficient process for the solicitation and evaluation of bids.  Specifically, the timeline provides sufficient time for the Debtor, with the assistance of Cypress and its professionals, to appropriately market and solicit competing bids for the Debtor's assets.

21.     I and my team at Cypress will continue to market the KL2 assets.  In doing so, I will be reporting to KL2's management, which includes the Chief Restructuring Officer and the independent director of KL2.  I intend to follow all of the customary steps for marketing an asset of this type in these circumstances, including contacting additional buyers, endeavoring to have more buyers execute confidentiality agreements, continuing to add information to the data room, understanding more about the intricacies of this asset and its operations, arranging for additional site visits, and negotiating the terms of an asset purchase agreement, subject to higher or better offers at an auction.

22.     In my opinion, conducting the sale process for KL2 according to the Bidding Procedures proposed in the Motion will maximize its value for all creditors.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 9th day of November 2020, at Bronxville, New York.

                                                                /s/ J.T. Atkins_____
                                                                J.T. Atkins